IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| XXX | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. _1:14cv86_____ |
| | § | JURY |
| XXX | § | |
| | § | **FILED UNDER SEAL** |
| Defendants. | § | |

# ORIGINAL COMPLAINT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Robert Reddell | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | JURY |
| DYNCORP INTERNATIONAL, LLC; | § | |
| DYNCORP INTERNATIONAL; | § | |
| DAMCO U.S.A., INC. ; and | § | |
| DAMCO INTERNATIONAL B.V. | § | |
| | § | |
| Defendants. | § | **<u>FILED UNDER SEAL</u>** |

**<u>RELATOR ROBERT REDDELL'S ORIGINAL COMPLAINT</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION AND OVERVIEW ...........................................................................1
    A.  Summary ..........................................................................................................1
    B.  LOGCAP IV and Task Order No. 4.............................................................2
    C.  Damco's Bid and Invoices for Improper Accessorial Costs ........................3

II.    PARTIES ........................................................................................................................5
    A.  Plaintiffs ........................................................................................................5
        1.  Plaintiff/Relator Robert Reddell ........................................................5
        2.  The United States of America .............................................................5
    B.  Defendants .....................................................................................................5
        1.  The DynCorp Entities ........................................................................5
            a.  DynCorp International LLC .....................................................5
            b.  DynCorp International, Inc. .....................................................5
            c.  The DynCorp Entities' Relationship........................................6
        2.  The Damco Entities............................................................................7
            a.  Damco, U.S.A., Inc. ...............................................................7
            b.  Damco International B.V. ........................................................7

III.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY .............................................8

IV.    JURISDICTION AND VENUE ..........................................................................................9

V.    STATUTORY BACKGROUND..........................................................................................10
    A.  Federal Acquisition Regulation ("FAR") ...................................................10
    B.  Part 15: Contracting by Negotiation ..........................................................10
    C.  Part 42 Consent to Subcontracts .................................................................10

VI.    RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD ...................................................12
    A.  Introduction to Relator Robert Reddell.......................................................12
    B.  Relator's Discovery of Defendants' Fraudulent Schemes ..........................12
    C.  DynCorp's Retaliation Against Relator ......................................................16

VII.    DEFENDANTS' FRAUDULENT SCHEMES......................................................................17
    A.  Logistics Civil Augmentation Program ("LOGCAP IV")..........................17
        1.  Background to DynCorp's Subcontracting Activity Under Task Order No. 4......18
        2.  DynCorp's Subcontract With Damco ...............................................20
    B.  Fraud-in-the-Inducement ............................................................................23
    C.  DynCorp's Misrepresentations to Government of Actual Costs ................23
        1.  Accessorial Air Freight Costs ..........................................................23
            a.  Oversize Charges ...................................................................24
            b.  Dim Weight............................................................................26
        2.  Micro-Shipping Issue........................................................................27
    D.  DynCorp and Damco Conspired to Induce the Government's Acceptance of the Fraudulent Contract ............................................................................................28
    E.  DynCorp and Damco's Use of an Illegal Kickback....................................30

VIII.   ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT ......................30
        A.  Applicable Law – The False Claims Act ........................................................30
        B.  Defendants' Violation of the FCA ..............................................................33
            1.  Defendants' Fraudulent Representations and Certifications Violate the FCA
                31 U.S.C. § 3729(a)(1)(A) ...............................................................33
            2.  Defendants' Fraudulent Representations and Certifications Violate the FCA
                31 U.S.C. § 3729(a)(1)(B) ...............................................................34
            3.  Defendants' Conspiracy Violates the FCA 31 U.S.C. § 3729(a)(1)(C)................35
            4.  Defendants Failed to Disclose Their Obligation to Repay the Government in
                Violation of the Reverse False Claims Provision. ..................................36
            5.  DynCorp Retaliated Against Reddell in Violation of the False Claims Act..........37
            6.  DynCorp and Damco Engaged in the Use of an Illegal Kickback in Violation of
                the Anti-Kickback Act ..................................................................37

IX.     DAMAGES ..........................................................................................41

X.      CAUSES OF ACTION.................................................................................42
        A.  Count I: False Claims - 31 U.S.C. § 3729(a)(1)(A) .......................................42
        B.  Count II: False Records or Statements - 31 U.S.C. § 3729(a)(1)(B) .......................43
        C.  Count III: Conspiracy to Defraud the Government - 31 U.S.C. § 3729(a)(1)(C)........44
        D.  Count IV: Reverse False Claims – 31 U.S.C. §3729(a)(1)(G)  ..............................45
        E.  Count V: Retaliation – 31 U.S.C. § 3730(h).............................................46

XI.     RELIEF ...........................................................................................46

XII.    PRAYER............................................................................................47

XIII.   JURY DEMAND ......................................................................................48

The United States of America, by and through *qui tam* Relator Robert Reddell, brings this action under 31 U.S.C. § 3729-3732 ("False Claims Act") on behalf of the United States of America and on his own behalf to recover all damages, penalties, and other remedies established by the False Claims Act and would show the following:

## I.    INTRODUCTION AND OVERVIEW

A.    **Summary**

1.    In late 2011, DynCorp International LLC,[1] prime contractor with the United States Army for the provision of supplies to American troops stationed overseas, including in Afghanistan, jettisoned its freight forwarding contractor, EWC.  It did so even though EWC had consistently met its contractual requirements – in fact had handled much more freight than originally anticipated - and had billed DynCorp accurately and properly.  In its place, DynCorp chose Damco USA, Inc.[2] from among several bidders, in order to gain rent-free access to Damco's quality consolidation center in Dubai.  While Damco's bid appeared lower than most competitors', its actual charges from the start systematically included accessorial costs that it had bid as included in its base per kilo rate, not to be separately billed.  Further, Damco systematically billed "oversize" charges for freight that was not oversized, double-billed for "oversize" and "dim weight" charges on the same freight, and repeatedly billed for surcharges on multiple invoices for freight on the same plane, though the surcharges only applied once per plane.  DynCorp paid these charges, though they were fraudulent, doubled the per kilo rate, and rendered Damco's performance considerably more expensive either than EWC or Damco's fellow bidders.

---

[1] As set forth more fully below, DynCorp International LLC is one of the related entities collectively referred to herein as "DynCorp."
[2] As set forth more fully below, Damco USA, Inc. is one of the related entities collectively referred to herein as "Damco."

2.    Worse, DynCorp lied to the Government about Damco's real charges and their impropriety as well as its own receipt of illegal remuneration in exchange for hiring Damco. DynCorp represented Damco to the Government as the best value subcontractor even after Reddell fully audited Damco's bills and reported to DynCorp Damco's fraudulent mischaracterization of freight, made up costs, improper accessorial charges, and exorbitant bottom line. The Government has thus unwittingly paid fraudulent bills for Damco's work since 2011 and continues to do so today.

**B.    LOGCAP IV and Task Order No. 4**

3.    The Logistics Civil Augmentation Program ("LOGCAP") is the United States Department of Army's ("U.S. Army") program to provide the basic supports for life to the troops living in overseas bases. The fourth iteration of the program – LOGCAP IV – issued in 2009 and provides such support to the United States military personnel stationed in Afghanistan, Kuwait, and Iraq. Because of the cost overruns and general unaccountability of millions of dollars under the LOGCAP III program, the U.S. Army moved from utilizing one contractor to contracting with three companies: Defendant DynCorp, Fluor, and KBR. In order to maintain continual competition and prevent similar fiscal abuses that occurred under LOGCAP III, the three companies under LOGCAP IV are required to compete for each available task order issued by the U.S. Army. Defendant DynCorp was awarded work under Task Order No. 1 pertaining to the Program Management Office, Task Order No. 2 pertaining to Kuwait, Task Order No. 3 pertaining to the Udairi Air Field, Kuwait, and Task Order No. 4 pertaining to the Afghanistan-South Area of Responsibility. Task Order No. 4 is at issue in this current case.

4.    Task Order No. 4 relates to the provisions of goods and services to the United States bases in the area referred to as Afghanistan-South Area of Responsibility. In order to

provide such goods and services, Defendant DynCorp issued a Request for Proposals ("RFP") for subcontractors to provide DynCorp Global Freight Forwarding Services and Intra-Theater Ground Transport worldwide.  For the base year and Option Year 1 of Task Order 4, DynCorp initially subcontracted with Expedited World Cargo ("EWC") for the freight forwarding services for outside the continental United States ("OCONUS"), from Dubai, United Arab Emirates, into Afghanistan, and with DHL for the freight forwarding services for inside the continental United States ("CONUS"), from the United States to Afghanistan.  Then, without rhyme or reason, Defendant DynCorp issued a new RFP prior to the termination of Option Year 1.  DynCorp selected Defendant Damco as its subcontractor using Damco's lower cost projections as justification for switching from EWC.

**C.    Damco's Bid and Invoices for Improper Accessorial Costs**

5.    At $2.15 per kilo for freight to and from Dubai, Damco's bid appeared substantially lower than the $3.89 per kilo that EWC had charged on average.  It was lower than competitors' bids as well.  The bid represented, probably like others, that Damco would not bill for additional charges for most varieties of accessorial costs.  Accessorial costs include extra charges for oversized boxes, fuel surcharges, delivery costs on the weekends, and other surcharges.  The other companies, however, calculated and included their actual accessorial expenses in bidding on the contract.  Damco submitted a bid that was below cost.

6.    Damco's lower cost projections factored into the Government's required acceptance of the subcontract between DynCorp and Damco.  Yet, once Damco began to perform under the subcontract, it began systematically invoicing for the significant accessorial costs that it had promised were part of its per kilo charge.  While DynCorp had no controls in place to ensure that Damco's billing conformed to its contract, Relator Robert Reddell, a cost

analyst for DynCorp at the time, exposed that Damco was billing approximately double the amount it projected for its services in its winning bid.  The improper accessorial costs amounted to over $30 million dollars as of about September of 2013, about half of the $62 million paid out under the subcontract.  At approximately that time, Reddell was constructively forced to leave DynCorp due to hostility he faced after he reported irregularities in Damco's invoices, which DynCorp submitted to the United States for reimbursement.  DynCorp passed these inflated freight transportation costs onto the Government for reimbursement and received an additional percentage of the total for profits, overhead, general and administrative costs, and other indirect costs.   The Government paid these inflated and indirect costs.   These inflated freight transportation costs resulted in multi-millions of dollars of wrongful reimbursement from the United States Government.  More specifically, as of the submission of this Original Complaint, it is estimated that the United States Government has reimbursed Damco $80 million, out of which at least $30 million is comprised of improper accessorial costs.

7.     Rather than demanding a return of overcharges, however, when DynCorp learned of Reddell's audit findings, DynCorp protected Damco, requesting the return of a mere $3.1 million.  That $3.1 million amounted to perhaps half of the charges for oversized freight that was not in fact oversized.  Damco was allowed to keep all payments for freight deemed truly oversized, even though such costs were not permissible to bill under the subcontract.  Other improper accessorial costs were not corrected.  DynCorp continued to do business with Damco on essentially the same terms.   Damco continued to overcharge the Government but recategorized some of the costs to make them less obviously excessive, though still improper under the subcontract.  Reddell was punished for his embarrassing cost analysis with missed promotions and ostracism until he felt compelled to leave DynCorp for another position.

4

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Plaintiff/Relator Robert Reddell

8.    Plaintiff/Relator Robert Reddell ("Reddell" or "Relator") is a citizen of the United States and a resident of the State of Texas.

#### 2.    The United States of America

9.    The governmental plaintiff in this lawsuit is the United States of America ("United States" or "Government").

### B.    Defendants

#### 1.    The DynCorp Entities

##### a.    DynCorp International LLC

10.    Defendant DynCorp International LLC provides logistical support of military operations worldwide and, specifically for this case, for those operations in Afghanistan under Prime Contract No. W52P1J-07-D-007, *available at* http://www.sec.gov/Archives/edgar/data/1333142/000119312511111832/dex1018.htm.

11.    Defendant DynCorp International LLC is a Delaware corporation located at 13500 Heritage Parkway, Fort Worth, Texas 76177, with its principal office located at 3190 Fairview Park, Suite 900, Falls Church, Virginia 22042.  Defendant DynCorp International LLC may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

##### b.    DynCorp International, Inc.

12.    Defendant DynCorp International, Inc. is the corporate parent of Defendant DynCorp International LLC.  Defendant DynCorp International, Inc. is a Delaware Corporation

with its principal office located at 3190 Fairview Park Drive, Suite 900, Falls Church, Virginia 22042.  Defendant DynCorp International, Inc. may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

c.       <b><u>The DynCorp Entities' Relationship</u></b>

13.    Defendant DynCorp International LLC traces its origins from two companies formed in 1946: Land-Air, Inc. and California Eastern Airways.  In 1951, the Air Force Logistics Command awarded Land-Air, Inc. the first contract for Contract Field Teams, which provide mission support and depot-level repair to U.S. military aircraft and weapons systems worldwide. California Eastern Airways, Inc., later California Eastern Aviation, Inc., acquired Land-Air, Inc. in 1951.   In 1962, California Eastern Aviation, Inc. changed its name to Dynalectron Corporation, which, in 1987, changed its name to DynCorp.  In 1998, DynCorp established DynCorp Technical Services, Inc. ("DTS") and transferred its existing aerospace and international division business to DTS.  In 2000, DynCorp formed DynCorp International LLC and transferred all of its international business to DynCorp International LLC.  DTS continued to perform DynCorp's domestic contracts.  In 2003, Computer Sciences Corporation ("CSC") acquired DynCorp and its subsidiaries, including DTS and DynCorp International LLC. DynCorp remained the parent of its existing subsidiaries, and CSC became their ultimate parent. In 2004, DynCorp and CSC sold DynCorp International LLC to an entity that was renamed DynCorp International, Inc., which is the corporate parent of DynCorp International LLC.  Then, in 2010, DynCorp International, Inc. and private investment firm Cerberus Capital Management, L.P. merged, and DynCorp International, Inc. became a wholly-owned subsidiary of entities created by affiliates of Cerberus Capital Management, L.P.

6

14.    Defendants DynCorp International LLC and DynCorp International, Inc. are collectively referred to herein as "DynCorp."

**2.    The Damco Entities**

**a.    Damco USA, Inc.**

15.    Defendant Damco USA, Inc. does business under several assumed names, including Maersk Logistics.  Damco USA, Inc. specializes in worldwide freight forwarding services.  Defendant Damco USA, Inc. is a Delaware corporation with its United States headquarters located at Giralda Farms, Madison Avenue, P.O. Box 880, Madison, New Jersey 07940.  Defendant Damco USA, Inc. may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

16.    Under the contract with Defendant DynCorp, Defendant Damco USA, Inc. provides the air freight transportation for outside the continental United States ("OCONUS") and, specifically for this case, air freight transportation into Afghanistan. (Ex. 2, DynCorp Master Agreement with Damco USA.)  Defendant Damco USA, Inc. is part of the larger company Defendant Damco International B.V.

**b.    Damco International B.V.**

17.    Defendant Damco International B.V. is headquartered at Turfmarkt 107 2511 DP, The Hague, The Netherlands.

18.    Defendant Damco International B.V. provides third party logistics worldwide through ocean freight, airfreight, and supply chain management services.  Defendant Damco International B.V. is part of Defendant A.P. Moller - Maersk Group's logistics activities and is managed by the legal entity Defendant Damco International A/S.

19.    Defendants Damco USA, Inc. and Damco International B.V. are collectively referred to herein as "Damco."

20.    Defendants Damco International B.V. and Damco USA, Inc. are managed by Damco International A/S, formerly known as Maersk Logistics International A/S.  Damco International A/S operates as a subsidiary of A.P. Moller-Maersk Group, which is the parent company of Damco International A/S and Defendants Damco USA, Inc. and Damco International B.V.

21.    Of note is the rather recent agreement by A.P. Moller-Maersk Group's wholly-owned United States subsidiary Maersk Line Limited to pay the United States Government $31.9 million to resolve allegations that Maersk Line Limited submitted false claims to the United States related to contracts to transport cargo to support United States troops in Afghanistan and Iraq. "Maersk Line to Pay Us $31.9 Million to Resolve False Claims Allegations for Inflated Shipping Costs to Military in Afghanistan and Iraq", *available at* http://www.justice.gov/opa/pr/2012/January/12-civ-002.html.  The U.S. Government alleged that Maersk Line Limited knowingly overcharged the United States Department of Defense to transport thousands of shipping containers from ports to inland destinations in Iraq and Afghanistan. *Id.*

22.    Defendants DynCorp International LLC, DynCorp International, Inc., Damco USA, Inc., and Damco International B.V. are collectively referred to herein as "Defendants."

### III.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

23.    Any and all acts alleged herein to have been committed by any or all of the Defendants were committed by said Defendants' officers, directors, employees, representatives, or agents who at all times acted on behalf of their respective Defendant(s) and within the course and scope of their employment.

8

24.    The Defendants identified in paragraphs ten (10), eleven (11), twelve (12), thirteen (13), and fourteen (14) are related entities sharing common employees, offices, and business names such that they are joint and severally liable under legal theories of respondeat superior.  Further, the past, present, and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

25.    Additionally, the Defendants identified in paragraphs fifteen (15), sixteen (16), seventeen (17), eighteen (18), and nineteen (19) are related entities sharing common employees, offices, and business names such that they are joint and severally liable under legal theories of respondeat superior.  Further, the past, present, and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, some or all of them can and should be considered as a single entity at law and equity.

## IV.    JURISDICTION AND VENUE

26.    Jurisdiction and venue are proper in this Court pursuant to False Claims Act (31 U.S.C. § 3732(a)) because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by Defendants who transact business within the Eastern District of Texas.

27.    Defendants are subject to the general and specific personal jurisdiction of this Court.  Defendants engage in a variety of business activities in the State of Texas and within the Eastern District of Texas, which they accomplish through their corporate centers, business units, subsidiaries, officers, directors, employees, and/or agents.

## V.    STATUTORY BACKGROUND

### A.    Federal Acquisition Regulation ("FAR")

28.    The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniformed manner.  The FAR is codified in Title 48 of the United States Code of Federal Regulations.

### B.    Part 15 - Contracting by Negotiation

29.    Part 15 of the FAR describes the policies and procedures for awarding and entering into a negotiated contract.  A contract awarded using a process other than a sealed bid process is a negotiated contract.  48 C.F.R. § 15.000.  The objective of selecting a source for an item under a negotiated contract is to select the proposal that represents the best value.  48 C.F.R. § 15.302.  "Best value" means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement.  48 C.F.R. § 2.101(b)(2).

30.    An award is based on many evaluation factors.  Although the evaluation factors are largely discretionary dependent upon the particular contract at issue, certain factors must be taken into consideration, including the price or cost to the Government, the quality of the service provided, and the past performance.  48 C.F.R. § 15.304(b).

### C.    Part 42 – Consent to Subcontracts

31.    Subcontracts entered into as part of a negotiated contract executed in accordance with Part 15 of FAR must be approved by an administrative contracting officer ("ACO").  48 C.F.R. § 44.202-1.  When the prime contractor has an approved purchasing system, consent is

10

necessary only for subcontracts specifically identified by prime contractor in the subcontracts clause of the underlying contract.  48 C.F.R. § 44.201-1(a).  When the prime contractor does not have an approved purchasing system, as is the case with DynCorp with respect to this matter, consent to subcontract is required for several specific types of subcontracts including cost-reimbursement subcontracts and for unpriced actions under fixed-price contracts that exceed the simplified acquisition threshold for, among other listed contracts, fixed price subcontracts for the Department of Defense that exceed the greater of the simplified acquisition threshold or five percent of the total estimated cost of the contract.  48 C.F.R. § 42.201-1(b).

32.    The ACO reviews the prime contractor's notification of the subcontract and supporting data to ensure that the proposed subcontract is "appropriate for the risks involved and consistent with current policy and sound business judgment." 48 C.F.R. § 44.202-1(b).  When reviewing the request and the supporting data, the ACO takes into consideration the factors listed under 48 C.F.R. § 42.202-2, which include but are not limited to: whether an adequate price competition was obtained or its absence properly justified, whether the prime contractor had a sound basis for selecting and determining responsibility of the particular subcontractor, and whether the prime contractor performed adequate cost or price analysis or price comparison and obtained "accurate, complete and current cost or pricing data, including any required certifications."  48 C.F.R. § 42.202-2(a).  The ACO's consent to the subcontract does not equate to a determination of the acceptability of the subcontract's terms or price, or the allowability of costs, unless the consent or approval specifies otherwise.  48 C.F.R. § 42.203.

## VI.    RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD

### A.    Introduction to Relator Robert Reddell

33.    Relator Robert Reddell was employed by DynCorp beginning in August of 2009, working primarily at DynCorp's United States headquarters in Fort Worth, Texas.  Reddell was employed as a Principal Estimator – Cost Analyst.  In this position, Reddell provided support for DynCorp's proposals to the Government.  Reddell analyzed the company's incurred costs related to the company's Government contracts.  Reddell ensured that the company did not request more funds than necessary under such contracts and that the money the company spent was in compliance with the Government rules and regulations governing such contracts.  Reddell was constructively forced to leave the company in October of 2013, for reporting irregularities in invoices created and billed by Damco and presented through DynCorp to the United States Government for reimbursement.

### B.    Relator's Discovery of Defendants' Fraudulent Schemes

34.    Reddell has been a cost analyst for more than ten years.  Prior to joining DynCorp, Reddell was employed by Kellogg Brown & Root ("KBR") in a similar position working on an earlier LOGCAP contract.  Reddell has vast experience with contract bids, invoicing, and billing.  After DynCorp entered the subcontract with Damco, Reddell reviewed Damco's invoices to ensure that the billing was complaint and to track the company's incurred costs.  Reddell immediately noticed that Damco included more costs per invoice than what Damco had originally included in its Request for Proposal.  As explained more fully below, Damco did not include most accessorial costs when it submitted its price per kilo transportation costs in its bid proposal for the subcontract.  (Ex. 1, Damco Bidsheet 8, "Accessorials" tab.) Damco apparently did not factor in their cost, either.  Damco's proposed per kilo transportation

12

cost was comparable to competitors' costs with the accessorial costs stripped out. Yet, having won the contract, Damco immediately began charging for a full range of accessorial costs, such as "oversize" charges, "palletization" charges, fuel surcharges, and other handling charges. The accessorial charges, as described below, amounted to 130% of the total invoices. (Ex. 3, Damco Freight Invoice Audit PowerPoint Presentation I at 8.)

35.    After realizing that Damco was essentially charging twice for significant accessorial costs, realizing that costs amounted to approximately double its original bid for the freight forwarding charges, and understanding that DynCorp was passing these inflated rates onto the Government for reimbursement, Reddell notified his supervisor, Joel Steveson, Senior Director of Project Controls. Reddell did not receive any response from his supervisor, however. The overbilling practice continued for more than a year. In addition, Reddell notified DynCorp's senior management of a directive from the United States Government to closely monitor freight providers for excessive accessorial costs. (Ex. 4, Damco Freight Invoice Audit PowerPoint Presentation II at 6.)[3] This directive, in part, advised:

> **Be Advised:** It has come to the attention of the Military Surface Deployment and Distribution Command (SDDC) that some TSPs [Transportation Service Providers] have excessively high rates for accessorial services.
>
> Shippers should consider accessorial service rates as a "best value" factor prior to awarding TSPs freight. When selecting a TSP it is highly encouraged to review the entire tender to include accessorial rates. This will help to ensure the Department of Defense (DOD) is getting the "Best Value".

*Id.* The members of DynCorp's senior management did not consider this directive, however. Reddell continued to notify DynCorp's senior management, including T.V. Abercrombie, Vice President of Project Controls, that DynCorp should set aside Damco's costs, disclose the

---

[3] Someone other than Reddell added the red text in Exhibit 4.

overbilling issues to the Government, and work on correcting the problem.  DynCorp remained unresponsive to Reddell's concerns, however.

36.    In January 2012, DynCorp hired Jim Grazioplene as Program Manager for DynCorp's LOGCAP IV contract.  Grazioplene immediately suspected Damco's billing and invoices.  Grazioplene entrusted Reddell, with whom he had earlier worked at KBR, with performing an audit of the billing to get to the bottom of the problem and asked Reddell to report straight to him.  Reddell performed an audit – named the "Damco Freight Invoice Audit" – that outlined the problematic invoicing issues that resulted in excessive costs to the Government. (Ex. 3, Damco Freight Invoice Audit PowerPoint Presentation I; Ex. 4, Damco Freight Audit Invoice PowerPoint Presentation II; Ex. 5, Damco Invoice/MSA Audit Memorandum; Ex. 6, Master Air Waybill ("MAWB") 327-00184026 Analysis Excel Spreadsheet; Ex. 7, MAWB 686-00142026 Analysis Excel Spreadsheet; Ex. 8, MAWB 686-00142026 Analysis PowerPoint Presentation.) Reddell's audit succinctly outlined the systematic charging of separate fees for accessorial costs that the bid listed as included in the per kilo charge.  Reddell determined that Damco's actual per kilo cost on air freight was $6.60, compared with the figure of $2.15 in Damco's bid and EWC's average charges of $3.89.  That $6.60 figure included accessorial costs for which Damco was separately charging DynCorp improperly, which amounted to 130.07% of invoice amounts. (Ex. 3, Damco Freight Audit Invoice PowerPoint Presentation I at 8.)

37.    Reddell briefed Grazioplene on his findings and began to work with DynCorp senior management, including Grazioplene, Abercrombie, and Mike Daugherty, Senior Director of Change Management, on how best to resolve the issues identified in Reddell's audit. (Ex. 10, Email Correspondence "RE TO 0004 Freight Factor REAs SITREP".)   DynCorp senior management acknowledged that Damco was adding the previously unbid accessorial costs into

its invoices and that DynCorp was then passing such costs onto the Government for reimbursement.

38.    Reddell's reports regarding the improprieties in Damco's charges were swept under the rug by others at DynCorp.  DynCorp's former Vice President of Sourcing, Krista Robinson, signed the Damco subcontract on behalf of DynCorp.   After Reddell raised the problems with Damco's billings, Robinson defended Damco's performance and assuaged the concerns held by Grazioplene and others, insisting that no real problems existed and attempting to discredit Reddell's work.  When Robinson's employment with DynCorp abruptly ended, Rick Chevalier, Senior Category Manager Global Freight and Logistics for DynCorp, managed the Damco subcontract.  He continued Robinson's campaign to dismiss Reddell's reports regarding the problems with Damco's charges and likewise worked to ease the concerns of Grazioplene and others.   Robinson and Chevalier were largely successful in convincing Grazioplene and others that Damco's billing issues were narrower than Reddell reported.

39.    Thus, despite Reddell's findings, DynCorp and Damco negotiated a settlement that ignored the fundamental problem with the improper extra-subcontract charges. (Ex. 11, Email Correspondence "RE $3.1M HBL level detail" and Attachment.)  The settlement focused instead on just one of the improper accessorial costs, the "oversize" charges, which not only were not allowable separate charges within the contract, but which were very obviously grossly inflated in any case.  *Id.*; (Ex. 12, Damco Oversize Analysis.)  The companies settled on a one-time payment of $3.1 million dollars from Damco to DynCorp for these oversize charges.  That amount represented only about half of the oversized charges and excluded the other improper accessorial charges.

40.    Reddell learned that DynCorp afterwards went to great lengths to extend the contract and obtain approval to convert it to a sole source contract not subject to competitive bidding.   Additionally, DynCorp attempted to amend the subcontract in December 2012 to include such costs.

41.    In 2013, following the settlement for the oversize charges, Damco's charges for oversized packages disappeared and the same typical amounts, often doubling an invoice, uniformly appeared on new invoices as costs for "palletization".  (Ex. 7, MAWB 686-00142026 Analysis Excel Spreadsheet, "Summary" Tab; Ex. 8, MAWB 686-00142026 Analysis PowerPoint Presentation.)  This palletization charge is used to place the goods and products on the pallets that are then loaded for transport.  As reflected in Damco's bid, this palletization charge should only arise in the context of ocean freight, and not air transport.  (Ex. 1, Damco Bidsheet 8, "Accessorials" tab; Ex. 9, Damco Bidsheet 9, "Global Packing & Crating Rates" tab, cells B34, B35, B36, B37, B38, B39, B40, B41 – costs for "palletizing" under cell A4 titled "OCEAN PACKING AND CRATING COSTS", cell G4 titled "AIR FREIGHT PACKING AND CRATING", under which there is no mention of "palletizing"; Ex. 13, Email Correspondence "RE DAMCO Palletization Charges".)  Reddell's audit and findings on this shift to improper palletization charges were not received favorably by DynCorp's senior management, as described below.

**C.    DynCorp's Retaliation Against Relator**

42.    Once Reddell produced the Damco Freight Invoice Audit and worked more closely with Grazioplene on the issues he raised, Reddell began to experience a hostile work environment and adverse employment actions.  Prior to Reddell's work on the Damco Freight Invoice Audit, Abercrombie had asked Reddell to apply for a manager's position.  Once Reddell

16

finished the audit and briefed Grazioplene on his findings, Abercrombie withdrew his offer. DynCorp hired someone from outside the company for that position.

43.    Due to his report to the senior management members of the fraudulent billing issues, Reddell continued to experience harassment at DynCorp.   Abercrombie instructed Reddell never to speak to Grazioplene unless Abercrombie was present.   In addition, Reddell was excluded from higher level meetings regarding resolution of the billing and invoicing issues in which he should have participated as Principal Estimator/Cost Analyst.    It became increasingly clear that his termination from DynCorp was only a matter of time.  Reddell found a position located in Dubai with his former employer KBR and left DynCorp in October of 2013.

## VII.    DEFENDANTS' FRAUDULENT ACTIVITIES

### A.    Logistics Civil Augmentation Program ("LOGCAP IV")

44.    Established in 1985, the Logistics Civil Augmentation Program – LOGCAP – is a United States Department of Army program that utilizes global corporate resources to support its worldwide contingency operations by integrating contracted private sector capabilities to fulfill the operational commanders' requirements.   The operational commanders identify their requirements and request LOGCAP to meet the mission's needs.

45.    LOGCAP's objectives are twofold: (1) to provide combat support and service support augmentation to both combatant and component commanders, primarily during contingency and other operations; and (2) to facilitate the management and physical responsibility to support deployments, site preparation, set preparation, modules operations and maintenance, redeployment, and transportation requirements for the force provider.  Examples of support include food service, laundry and bath, sanitation, billeting, fuel services, and power

generation and distribution.   LOGCAP is currently being used to support operations in Afghanistan, Kuwait, Iraq, Bahrain, and Djibouti.

46.     The U.S. Army's sole provider under LOGCAP III was Halliburton-KBR. Halliburton-KBR, however, could not fully account for millions of dollars under the contract or justify all the charges to the Pentagon's satisfaction.   Due to these gross losses and lack of contractual oversight, the U.S. Army decided to award LOGCAP IV to three different companies.   To further maintain better overall cost controls and to maintain a competitive spirit among the three companies, the U.S. Army decided to issue a series of Task Orders to complete the needed services under LOGCAP IV.   DynCorp was one of the three companies selected to participate in LOGCAP IV.

### 1.      Background to DynCorp's Subcontracting Activity Under Task Order No. 4

47.     In June 2007, DynCorp entered Prime Contract W52P1J-07-D-0007, *available at* http://www.sec.gov/Archives/edgar/data/1333142/000119312511111832/dex1018.htm, with the United States Government, which enabled DynCorp to bid on all available Task Orders that arose under LOGCAP IV.   Defendant DynCorp was awarded work under Task Orders No. 1 pertaining to the Program Management Office, Task Order No. 2 pertaining to Kuwait, Task Order No. 3 pertaining to the Udairi Air Field, Kuwait, and Task Order No. 4 pertaining to the Afghanistan-South Area of Responsibility.   The services provided under Task Order 4 are at issue in this present case.

48.     Under Task Order 4, DynCorp provides all the supplies needed to maintain and run the United States military bases in Southern Afghanistan such as dishes, sheets, basketball hoops, laundry detergent, and electronic equipment.   In general, DynCorp procures the majority of the supplies in the United States, while DynCorp procures most of the electrical supplies and

basic materials such as wood and consumables from Europe.  For the supplies originating from the United States ("CONUS"), DynCorp consolidates all purchased goods at its Fort Worth headquarters and ships the goods via air transport to Afghanistan.  For all the goods purchased in Europe and other areas outside the continental United States ("OCONUS"), the goods are consolidated in Dubai and then transported to Afghanistan via air transport.

49.    Initially, DynCorp teamed with the subcontractors CH2M Hill and Agility Defense & Government Services[4] to provide all the freight forwarding services under the Task Orders.  In November of 2009, Agility Defense & Government Services, Inc. was suspended by the Government from participating in Government contracts due to the indictment of its ultimate parent company, Agility DGS Logistics Services Co. K.S.C.C., for alleged misconduct under a series of prime contracts in Kuwait and Iraq beginning in June of 2003.  Because of this suspension, DynCorp terminated its subcontract with Agility Defense & Government Services. In January of 2010, DynCorp issued a Request for Proposals seeking a new subcontractor.

50.    Expedited World Cargo ("EWC") was selected to perform the freight forwarding services for DynCorp's OCONUS theatres of operations based on "best value" approach taking into consideration technical and price considerations.  EWC was awarded a Fixed Unit Price Subcontract with economic price adjustment, which included fluctuations based on fuel surcharges.  The value of the EWC subcontract was $25,000,000 for the base year.  DynCorp anticipated that EWC would be the subcontractor for the entirety of the subcontracts with terms of a base year and four option years.

51.    Over the course of the base year and into the first option year, EWC provided DynCorp with the contracted freight forwarding services.  During the twenty months that EWC

---

[4] PWC Logistics bought Taos Industries Inc. in 2005.  Subsequent to the purchase the company's name was changed to Agility & Defense Government Services, Inc.

performed under the subcontract, its invoices amounted to $3.89 per kilo, as compared with EWC's quoted rate of $3.56 per kilo.[5]  This was not due to fraudulent invoicing, but due to the Government in the initial Request for Proposals ("RFPs") for the Prime Contract only including a budget of four million dollars for the freight forwarding services.  EWC's invoices reflected the prices proposed in its RFP for the subcontract.  The disparity was the actual costs it took to complete the work under Task Order 4.  Because EWC and DynCorp were able to provide support documentation that justified these apparent cost overruns, the United States Government recently approved (or "definitized") all outstanding invoices submitted during the twenty months that EWC was DynCorp's subcontractor.

52.    DynCorp's contractual relationship with EWC lasted until October 2011, when DynCorp issued another RFP for the same subcontract.  This time, DynCorp selected Damco as its sole subcontractor.

## 2.    DynCorp's Subcontract with Damco

53.    In early 2011, DynCorp decided to consolidate the administration of its Government subcontracts under one division titled "Center for Excellence."  Through this centralized division, DynCorp hoped to save on duplicate administrative costs and be able to purchase supplies in bulk for all its subcontracts beyond LOGCAP IV.  All of DynCorp's subcontract program managers worked in the Center for Excellence.  DynCorp also decided at this time to rebid its LOGCAP IV subcontract for freight forward services.

54.    In its quest to save on administrative costs, DynCorp sought to subcontract with Damco because it had a valuable resource in Dubai: a rent-free consolidation center building. (Ex. 2, DynCorp Master Agreement with Damco.)  DynCorp ships all the OCONUS procured goods and products it purchased under Task Order No. 4 to the Dubai airport.  These goods and

---

[5] By way of further comparison, Damco USA charged up to approximately $6 per kilo.

products are consolidated in one area and then loaded onto airplanes for the final destination, Kandahar, Afghanistan, or Camp Leatherneck Afghanistan.  Without a consolidation center building, DynCorp spent time and money gathering all the goods and products from different locations throughout the airport to one area in order to pallet and transport them.  With the rent-free consolidation center, DynCorp was able to schedule all goods and products to be shipped and stored in this building until the time arrives to transport them to their final destination. Importantly, this benefitted not only its military business, but all of DynCorp's business routed through Dubai.

55.     In exchange for the use of the rent-free consolidation center, DynCorp knowingly allowed Damco to submit a bid proposal that should have been recognized as unrealistically low, given the low cost per kilo transportation costs that supposedly included most accessorial fees. (Ex. 1, Damco Bidsheet 8, "Accessorials" tab.)  Accordingly, working with Damco appeared to create economic synergies within DynCorp's new Centers of Excellence structure.

56.     LOGCAP IV requires contractors to present subcontracts for approval before they can be finalized.  DynCorp knowingly submitted Damco's bid as the winning bid to the United States Government for approval in November of 2011.  (Ex. 14, Advance Notification & ACO Consent Request Form and Attachments.)  DynCorp fraudulently represented to the Government that Damco's bid represented the best possible pricing, that the subcontract was competitively awarded to Damco, and that DynCorp complied with the applicable cost accounting standards for awarding the subcontract to Damco.  *Id.* at 2-3.

57.     Reddell's early 2012 audits led to Damco's $3.1 million partial refund to DynCorp, as described above.  Yet, Damco continued charging for accessorial charges not within its subcontract and merely shifted oversize charges to palletization charges.

58.     DynCorp then clearly swept Reddell's concerns under the rug in August 2012, when DynCorp proposed to the Government that Damco continue as its OCONUS freight forward provider as a sole source for Option Year 2 without competitive bidding.  (Ex. 15, Justification of Award.)  In its Justification of Award dated July 10, 2012, DynCorp certified that Damco's offer was responsive and acceptable and that the contract price was fair and reasonable. *Id.* at 4.  Further, DynCorp averred that Damco's proposal "remains the best possible pricing and the company the best qualified supplier to provide additional freight services for DynCorp in Afghanistan."  *Id.* at 2.  DynCorp based its conclusion on the same costs that appeared in Damco's original bid, even though DynCorp was fully aware that Damco was billing DynCorp for significant accessorial costs outside of that bid, and that, if those were calculated in the bid, Damco's costs would be revealed as not just uncompetitive, but excessive.  Specifically, DynCorp listed Damco's original bids for freight in and out of Dubai for a year as $999,000 and $9,228,000, figures that, according to the contract, should have included the majority of accessorial costs.  *Id.* At 3.  The Justification further represented that there would be "no increase in pricing for the next year," and, again on the same page, "The pricing for the next period of performance 8/1/2012 to 7/31/2013 remains unchanged."  *Id.*  In reality, that pricing was a lie from inception, as DynCorp could hardly deny after paying Damco at least twice as much, and at least twice as much as EWC had charged, over the previous year. *Id.* DynCorp knowingly made false representations regarding the pricing of the services under the subcontract, thus fraudulently inducing the Government into accepting the subcontract, which resulted in the Government's wrongful reimbursement of millions of dollars.

**B.    Fraud–in-the-Inducement**

59.    The United States Supreme Court's ruling in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), has been recognized as establishing the "fraud-in-the-inducement" theory as actionable under the False Claims Act.[6]  Courts have found defendants liable under the False Claims Act for each claim submitted to the Government under a contract when that contract was obtained originally through false statements or fraudulent conduct.[7]  The Ninth Circuit in *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1048 (9th Cir. 2012), as a matter of first impression, held that "false estimates, defined to include fraudulent underbidding in which the bid is not what the defendant actually intends to charge, can be a source of liability under the FCA claim, assuming that the other elements of an FCA claim are met."  The contractor's fraudulent act of intentionally underbidding a contract taints the formation of a Government contract.  And, as the Supreme Court held in *Hess*, "[I]ts taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the government."[8]  The request for payment is a demand on the Government that makes the fraudulent low bid actionable under the False Claims Act.

**C.    DynCorp's Misrepresentations to Government of Actual Costs**

**1.    Accessorial Air Freight Costs**

60.    Every accessorial charge included on any Damco invoice outside of the few accessorial charges included in Damco's bid is a fraudulent charge.  In its directive, the Government specifically advised that some companies "have excessively high rates for

---

[6] *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1048 (9th Cir. 2012).
[7] *See, e.g., United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d, 458, 467-68 (5th Cir. 2009) (alleged false statements in grant proposals sufficient to trigger FCA liability, even if claims for payment were not alleged to be false or fraudulent.); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) (Fraud-in-the-inducement cases find FCA liability for each claims submitted when contract was originally obtained through false statements or fraudulent conduct.).
[8] *Hess*, 317 U.S. at 543 (1943).

accessorial services," and "highly encouraged . . . review [of] the entire tender to include accessorial rates . . . to ensure the Department of Defense (DOD) is getting the 'Best Value.'" (Ex. 4, Damco Freight Invoice Audit PowerPoint Presentation II at 6.)   All other companies bidding on the subcontract for Task Order No.4 included the anticipated use of accessorial costs in their price per kilo calculations.   That is the reason that all the subcontractors responding to DynCorp's initial RFP had significantly higher cost calculations.   Damco knowingly did not. With the exception of the few accessorial charges included in Damco's bid, every extra line item charge, such as Saturday delivery, airport transfers, shrink wrap, and/or fuel surcharge is a charge Damco pledged not to submit.   Each is therefore a fraudulent charge.   But many of the accessorial costs billed to DynCorp are fraudulent on an additional ground: Damco never actually incurred them; it made them up.

### a.    Oversize Charges

61.    As noted above, Damco agreed not to separately charge for most accessorial costs, instead including them in its price per kilo air freight transportation costs.   Damco did, however, include such costs in the invoices it charged DynCorp for such contracted services. Some of the costs, such as "oversize" charges, singlehandedly doubled invoice totals.

62.    Initially, Damco used the line item category of "oversize" charges to nearly double the invoice cost.   In the usual course of business, one or two packages may be considered "oversize," and additional charges are incurred for working with large packaging.   In contrast with usual course of business, however, Damco routinely categorized the entire pallet of goods and products as "oversize," resulting in the inflated rates Damco charged. (Ex. 12, Damco Oversize Analysis.)

63.    Following Reddell's 2012 freight invoice audit of Damco, in early 2013, Damco switched the category it used to inflate its freight costs from "oversize" to "palletization". Damco maintained the initial $2.15 charge per kilo as the base rate.  But, Damco added a "palletization" fee that mirrored the per kilo charge.  This extra fee thus doubled the total of the invoice Damco submitted to DynCorp under the parties' subcontract.  As reflected in Damco's bid, "palletization" fees may only be charged for oceangoing freight transportation.  (Ex. 1, Damco Bidsheet 8, "Accessorials" tab; Ex. 7, MAWB 686-00142026 Analysis Excel Spreadsheet, "Summary" Tab; Ex. 8, MAWB 686-00142026 Analysis PowerPoint Presentation; Ex. 9, Damco Bidsheet 9; Ex. 13, Email Correspondence "RE DAMCO Palletization Charges".) In Damco's surface transportation bid, this charge for "palletization" is not intended to be used for air freight transportation.  (Ex. 1, Damco Bidsheet 8, "Accessorials" tab; Ex. 7, MAWB 686-00142026 Analysis Excel Spreadsheet; Ex. 9, Damco Bidsheet 9; Ex. 13, Email Correspondence "RE DAMCO Palletization Charges".)  Specifically, in Damco's Bidsheet 9, in the tab titled "Global Packing & Crating Rates", cells B34, B35, B36, B37, B38, B39, B40, and B41 list costs for "palletizing" under cell A4 titled "OCEAN PACKING AND CRATING COSTS", and under cell G4, which is titled "AIR FREIGHT PACKING AND CRATING", there is no mention of "palletizing".  (Ex. 9, Damco Bidsheet 9.)  Damco therefore should not have been including this cost in the invoices.  Yet, Damco did, and the costs approximately doubled the amount of its invoices.  DynCorp passed these inflated and illegitimate costs to the Government, and the Government reimbursed DynCorp for the costs.

64.    DynCorp did not submit these inflated invoices or any other document that justified the increase in the freight forward charges.  These charges simply appeared as a line item identified as freight forward charges.  The Government has not audited DynCorp and has

not identified the rampant fraud perpetrated by DynCorp and Damco.  While EWC had the documents to support its cost overruns, no such documents exist here.  The justification for these overcharges therefore does not exist.  DynCorp has not yet requested the Government to definitize the Damco costs, as it did with EWC, perhaps because DynCorp's senior management knows it cannot justify these overcharges and will be held responsible to the Government for such charges.

### b.    Dim Weight

65.    The term "dim weight" is an abbreviation of the term "dimension weight".  "Dim weight" is used to describe objects or packages that are not standard and/or are asymmetrical in size.  A basketball hoop with stand is a prime example of an object that would fall within the "dim weight" category.  Due to the odd volume the object occupies in a pallet of goods for freight transport, the cost to transport the object is much higher than that of an object classified as "oversize".

66.    Damco routinely converted oversized objects to a "dim weight" chargeable weight, which is charged at a higher rate than the actual weight. (Ex. 4, Damco Freight Invoice Audit PowerPoint Presentation II at 5.)  This allowed Damco to charge more for the items it was transporting.  *Id.*  Further, Damco often would charge for the "dim weight" chargeable weight and add and "oversize" charges for the same object on the same invoice, which further contributed to the fraudulent charges that DynCorp passed onto the United States Government.  *Id.*

67.    An example illustrates how Damco would bill such charges.  If an object had an actual weight of 100 kilograms and Damco classified the object as "dim weight", the object may, for purposes of this example, have a chargeable weight of 150 kilograms.  Damco would

multiply the 150 kilograms by its $2.15 per kilo rate, to equal $322.50.  Damco would also add "oversize" charges at $2 per kilogram to equal an additional $300 "oversize" charge, for a total charge of $622.50 for the object.  Damco's practice is contrary to the standard industry practice, which involves charging an unusually shaped or oversized item as either "dim weight" or "oversize", but not both.  Damco's practice also resulted in additional fraudulent charges, which DynCorp passed onto the United States Government for reimbursement.

2.    **Micro-Shipping Issue**

68.    In addition to including all the accessorial costs onto its invoices, Damco also engaged in a practice known as "micro-shipping."  In the usual and normal course of air freight transport, a company will issue an invoice for all the pallets for an individual flight.  By utilizing one invoice, the company only includes a one-time charge for items such as "export customs clearance" and "documentation" preparation – usually the last two items listed on the accessorial fees on an invoice.  The usual and customary charge is $100 for the exports customs clearance and $200 for the documentation preparation.  Again, these two items are a one-time flat fee for the entire airplane load of goods and products.

69.    In contrast, Damco routinely creates an invoice for each pallet of goods and products that is loaded onto the airplane.  Reddell's investigation included review and analysis of all the invoices for each pallet of goods shipped on one plane load, corresponding with a Master Air Waybill ("MAWB").  Reddell's analysis revealed that Damco includes on every invoice charges for "export customs clearance" and "documentation" preparation.  *Id.*  By creating an individual invoice for every pallet loaded instead of one invoice for the entire load, Damco significantly increases the cost of each flight by charging multiple times fees that are ordinarily a one-time fee.  Due to Damco's graduated shipping rate, micro-shipping allowed Damco to bill

27

for numerous small shipments at a higher rate individually than what would have been charged collectively had the entire plane load been weighed and billed accordingly. For example, in the 21 invoices included in Reddell's analysis of Master Air Waybill ("MAWB") 327-00184026, every one included an $100 "export customs clearance" charge and a $200 "documentation" charge, which totaled $2,100 in "export customs clearance" charges and $4,200 in "documentation" charges on a single plane load. By way of comparison, in the usual and normal course of air freight transport, other companies would have charged a one-time fee of $100 for the "export customs clearance" charge and a one-time fee of $200 for the "documentation" charge for a single plane load. Damco's practice therefore resulted in significant additional fraudulent charges which DynCorp passed onto the United States Government for reimbursement.

## D.    DynCorp and Damco Conspired to Induce the Government's Acceptance of the Fraudulent Contract.

70.    Defendants conspired to enter into a mutually beneficial subcontract that resulted in higher earnings for both companies. As explained above, DynCorp's initial incentive to subcontract with Damco was the rent-free use of the consolidation center at the airport in Dubai. This resulted in significant savings to DynCorp for the transportation of goods and products purchased under Task Order No. 4 to Kandahar, Afghanistan. In exchange for the free use of Damco's consolidation center, DynCorp passed through inflated invoice charges for reimbursement from the United States Government. The United States Government approved the proposed subcontract between the two companies largely based on the low price per kilo fees included in Damco's initial bid and then its continuation into Option Year 2. DynCorp and Damco knew that these charges were fraudulent when the subcontract and price proposals were

28

submitted for approval.  DynCorp thus repeatedly certified that Damco's bid presented the best price proposal with fair and reasonable costs.

71.    Additionally, DynCorp did not object to the inflated invoice costs submitted by Damco as DynCorp's profit margins also increased due to the inflated costs.  DynCorp's prime contract was a "cost-plus-award-fee" contract, which allowed for a base fee, or fixed profit, and an award fee, or graded profit.  DynCorp's prime contract with the United States Government provided for payment of direct costs, such as labor, material, subcontracts, and equipment, and indirect costs, such as profit, the program support office ("PSO"), overhead ("OH"), and general and administrative costs ("G&A").  The profit consisted of a base fee profit and a graded fee profit of up to five percent.  With respect to the graded fee, the prime contract allowed DynCorp to recover all or part of an award fee pool, into which five percent of the amounts invoiced by Damco were placed.  The prime contract provided for an award to DynCorp of part or all of this award fee pool depending on how the Government graded DynCorp's performance under the prime contract.  The following example illustrates how direct costs and indirect costs are billed:

| | | |
|---|---|---|
| Direct Cost: | | $1,000.00 |
| PSO | 3.50% | $    35.00 |
| OH | 2.75% | $    27.50 |
| G&A | 1.60% | $    16.00 |
| Base Fee (Fixed Profit) | 2.00% | $    20.00 |
| Award Fee (Graded Profit) | 5.00% | $    50.00 |
| TOTAL: | | $1,148.50 |

Accordingly, the greater the amounts Damco invoiced to DynCorp, the greater the amounts DynCorp could charge the Government for indirect costs.

72.    Further, DynCorp paid upper management members bonuses based on profit (the base fee and the award fee) under Task Order No. 4.  The higher the direct costs, including the Damco subcontract, were, the higher DynCorp's profit was, and, as a result, the higher the

bonuses of DynCorp's upper management were.  Based on this bonus structure, these individuals were incentivized to keep invoices high.  Although DynCorp management knew that Damco was grossly overcharging the United States Government for freight forward services, these individuals did not want to lose any percentage of their bonuses.  DynCorp's upper management therefore maintained a blind eye to the overcharges, which resulted in the Government wrongly reimbursing the Defendants millions of dollars.

**E.**     **DynCorp and Damco's Use of an Illegal Kickback**

73.     DynCorp and Damco engaged in the illegal use of a kickback.  Damco gave DynCorp rent-free use of the consolidation center at the airport in Dubai in exchange for DynCorp subcontracting with Damco.  This arrangement constitutes an illegal kickback, which resulted in significant savings to DynCorp for the transportation of goods and products purchased under Task Order No. 4 to Kandahar, Afghanistan.  DynCorp passed through inflated invoice charges for reimbursement from the United States Government in exchange for the rent-free use of Damco's consolidation center.  This kickback scheme resulted in the Government wrongly reimbursing Defendants millions of dollars.

**VIII.**     **ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT**

**A.**     **Applicable Law - The False Claims Act**

74.     This is an action to recover damages and civil penalties on behalf of the United States and Relator Reddell arising from the false or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

75.     For conduct occurring after May 20, 2009, the FCA provides that any person who:

    (A)     knowingly presents, or causes to be presented, a false or fraudulent claim
            for payment or approval;

      (B)      knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim [except that this language applies to all claims pending on or after June 7, 2008];

      (C)      conspires to defraud the Government by committing a violation of [the FCA];
          . . .

      (G)      knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
          . . .

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000

for each such claim, plus three times the amount of damages sustained by the Government

because of the false or fraudulent claim. 31 U.S.C. § 3729(a)(1).

      76.      For conduct occurring after May 20, 2009, the FCA defines "claim" as:

(A)      mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

      (i)      is presented to an officer, employee, or agent of the United States; or

      (ii)      is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

          (I)      provides or has provided any portion of the money or property requested or demanded; or

          (II)      will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. § 3729(b)(2).

77.     The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

78.     Based on these provisions, Relator Reddell, on behalf of the United States Government, seeks through this action to recover damages and civil penalties arising from Defendants' causation of the submission of false claims to the federal Government.  In this case, such claims for payment were submitted to the federal Government as a result of the Government contracts awarded to the Defendants.

79.     Contrary to the Government's directive, the Defendants falsely provided the costs for the freight forwarding subcontract to the ACO for approval, knowing that the proposed freight costs were fraudulent as the price per kilo bid did not include the accessorial costs.  These accessorial costs were included in Damco's subsequent invoices essentially doubling the costs under the approved subcontract.  DynCorp then passed these fraudulently created invoices through to the Government for reimbursement.  DynCorp and Damco further engaged in the use of an illegal kickback, which occurred when Damco gave DynCorp rent-free use of the consolidation center in Dubai in exchange for the subcontract.  In exchange for the rent-free use of Damco's consolidation center, DynCorp passed through inflated invoice charges for reimbursement from the United States Government.  DynCorp then fraudulently certified in the Justification Award for Option Year 2 under Task Order No. 4 that Damco's costs had not changed from the previous year and the company's proposal still remained the best possible price for the freight forward services.

80.    Because of these false and fraudulent certifications, explicit or implied, and the false and fraudulent representations, Relator Reddell believes that the United States has suffered significant damages.

81.    There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relator Reddell is an original source as therein defined.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.  This Original Complaint details Relator Reddell's discovery and investigation of Defendants' fraudulent schemes.  As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relator Reddell has voluntarily provided information, oral and/or written, and sent disclosure statements describing all material evidence, and information, related to his Original Complaint, both before and contemporaneously with filing his Original Complaint, to the Attorney General of the United States and the United States Attorney for the Eastern District of Texas, Beaumont Division.

**B.    Defendants' Violation of the FCA**

**1.    Defendants' Fraudulent Representations and Certifications Violate the FCA 31 U.S.C. § 3729(a)(1)(A).**

82.    From 2011 to the present, the Defendants have knowingly presented and/or caused to be presented false and/or fraudulent claims for reimbursement (i.e. for payment or approval) to the United States by falsely and/or fraudulently representing and certifying, expressly and/or impliedly, to the United States that the invoices submitted correctly reflected the costs and prices of the freight forward services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.  The invoices submitted for reimbursement for such services under the subcontract were false and fraudulent as the included costs and prices were approximately double those originally accepted and approved.

33

83.    All invoices submitted by DynCorp as passed through from Damco from 2011 to the present under LOGCAP IV's Task Order No. 4 are tainted by these fraudulent prices and by DynCorp's acceptance of a kickback from Damco in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq.*, and therefore, the damages are the full amount of those reimbursed invoices during this time period.

84.    Given the structure of the Government contracting system, the false statements, false representations, false records, and/ or material omissions made by the Defendants had the potential to influence the payment decisions of the federal Government.    Because of the fraudulent representations, Defendants earned millions of dollars to which they are not legitimately entitled.    The ultimate submission to the federal Government of claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme.    As a result, the United States has suffered substantial damages.

**2.    Defendants' Fraudulent Representations and Certifications Violate the FCA 31 U.S.C. § 3729(a)(1)(B).**

85.    Defendants knowingly made, used, or caused to made or used, false records or statements with the specific intent to cause false and/or fraudulent claims to be paid or approved by the United States.    These false statements or records consist of false certifications or representations, expressed or implied, of compliance with all laws, made or caused to be made by Defendants in requesting payments from the federal Government for performing the contract at issue in this case.    The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that their statements were true, accurate, and correct.    The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the prices proposed in the subcontract bid were the true and correct costs to be billed to the Government for the freight forwarding services into Kandahar, Afghanistan.    The Defendants knew that these prices were false and/or fraudulent because the

costs did not include the accessorial costs.  Once performance began under the subcontract, the Defendants included these accessorial costs, approximately doubling the cost to the Government for these contracted services.  Defendants also knowingly engaged in the kickback scheme whereby Damco gave DynCorp rent-free use of Damco's consolidation center in Dubai in order to secure the subcontract in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq*.  Defendants knowingly passed these inflated costs to the Government for reimbursement.

86.    Given the structure of the Government contracting system at issue, given the Defendants' false statements and representations, and given the false records and/or statements that the Defendants made, used, or caused to be made or used, Defendants' conduct had the potential to influence the payment decisions of the federal Government.

87.    The ultimate submission to the federal Government of claims for payment, directly or indirectly, was a foreseeable factor in the Government's losses and a consequence of the Defendants' actions.  As a result, the United States Government has suffered substantial damages.

### 3.    Defendants' Conspiracy Violates the FCA 31 U.S.C. § 3729(a)(1)(C).

88.    By virtue of planning, and then implementing their schemes, Defendants' actions violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

89.    Defendants have knowingly conspired to falsely and/or fraudulently certify, implicitly or explicitly, their statements were true accurate and correct.  The Defendants knew that the cost per kilo submitted by Damco in its bid for the subcontract did not include the accessorial costs.  The parties knew that in exchange for the low prices that would be approved by the Government, Damco would allow DynCorp to use Damco's consolidation center building

located at the airport in Dubai free of charge.  The rent-free use of this building allowed DynCorp to realize substantial savings in completing the Task Order No. 4 under LOGCAP IV. The Defendants knew that Damco would then charge for the accessorial costs omitted from its bid, essentially doubling the cost to the United States Government for these services.

90.    Defendants have conspired in knowingly presenting false and/or fraudulent claims for payment or approval to the United States Government and have knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims. The United States has suffered substantial damages as a result of the perpetration of Defendants' conspiracies.

**4.      Defendants Failed to Disclose Their Obligation to Repay the Government in Violation of the Reverse False Claims Provision.**

91.    Defendants falsely and/or fraudulently submitted claims for reimbursement (i.e. for payment or approval) to the United States and falsely and/or fraudulently represented that the invoices submitted correctly reflected the costs and prices of the freight forward services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.  The invoices submitted for reimbursement for such services under the subcontract were false and fraudulent as the included costs and prices were not authorized by the subcontract and approximately doubled those originally accepted and approved.  As a result, the Government has been falsely and/or fraudulently overcharged for freight forward services.  As part of their scheme, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay money to the Government.  These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendants to the Government in requesting payment from the Government for freight forward services.

36

92.    By virtue of the Defendants' failure to disclose their obligation to repay the Government, the United States has suffered substantial monetary damages.

**5.    DynCorp Retaliated Against Reddell in Violation of the False Claims Act.**

93.    DynCorp created a hostile work environment for Reddell, continually harassed him, threatened him, and overlooked him for promotion in response to his efforts to investigate the fraudulent invoicing and billing practices as alleged in this Original Complaint.

94.    Once Reddell had completed his internal audit of the invoicing and billing practices of Damco, at the direction of Jim Grazioplene, Reddell began to experience a hostile work environment.    Prior to Reddell's work on the Damco Freight Invoice Audit, T.V. Abercrombie had asked Reddell to apply for a manager's position.    Once Reddell finished the audit and briefed Grazioplene on his findings, Abercrombie withdrew his offer, and DynCorp hired someone outside the company for that position.    Additionally, Abercrombie instructed Reddell never to speak to Grazioplene unless Abercrombie was present.    Reddell was also improperly excluded from higher level meetings to which Reddell should have been invited, given his position with DynCorp.    DynCorp's conduct toward Reddell resulted in his constructive discharge, as it became clear Reddell's termination from his position at DynCorp was only a matter of time.    Reddell therefore had no choice but to leave his position in October of 2013, rather than endure the continual hostile work environment.

**6.    DynCorp and Damco Engaged in the Use of an Illegal Kickback in Violation of the Anti-Kickback Act.**

95.    DynCorp and Damco engaged in the illegal use of a kickback in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq.*  The Anti-Kickback Act provides:

A person may not—

37

(1)    provide, attempt to provide, or offer to provide a kickback;

(2)    solicit, accept, or attempt to accept a kickback; or

(3)    include the amount of a kickback prohibited by paragraph (1) or (2) in the contract price--

    (A)    a subcontractor charges a prime contractor or a higher tier subcontractor; or

    (B)    a prime contractor charges the Federal Government.

41 U.S.C. § 8702.

96.    The Anti-Kickback Act defines "kickback" as follows:

The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract.

41 U.S.C. § 8701(2).

97.    The Anti-Kickback Act further provides:

(a)    **Requirements included in contracts.**--Each contracting agency shall include in each prime contract awarded by the agency a requirement that the prime contractor shall--

    (1)    have in place and follow reasonable procedures designed to prevent and detect violations of section 8702 of this title in its own operations and direct business relationships; and
    . . . .

(c)    **Reporting requirement.**--

    (1)    **In general.**--A prime contractor or subcontractor that has reasonable grounds to believe that a violation of section 8702 of this title may have occurred shall promptly report the possible violation in writing to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Attorney General.
    . . . .

41 U.S.C. § 8703.

98.  The Anti-Kickback Act also provides:

(a)  Requirements included in contracts.--Each contracting agency shall include in each prime contract awarded by the agency a requirement that the prime contractor shall--

(1)  have in place and follow reasonable procedures designed to prevent and detect violations of section 8702 of this title in its own operations and direct business relationships; and
. . . .

(c)  Reporting requirement.--

(1)  In general.--A prime contractor or subcontractor that has reasonable grounds to believe that a violation of section 8702 of this title may have occurred shall promptly report the possible violation in writing to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Attorney General.
. . . .

41 U.S.C. § 8703.

99.  The Anti-Kickback Act also provides:

The Anti–Kickback Act of 1986 (41 U.S.C. 51–58) was passed to deter subcontractors from making payments and contractors from accepting payments for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or a subcontract relating to a prime contract. The Act—

(a)  Prohibits any person from--

(1)  Providing, attempting to provide, or offering to provide any kickback;

(2)  Soliciting, accepting, or attempting to accept any kickbacks; or

(3)  Including, directly or indirectly, the amount of any kickback in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

(b)    Imposes criminal penalties on any person who knowingly and willfully engages in the prohibited conduct addressed in paragraph (a) of this subsection.

(c)    Provides for the recovery of civil penalties by the United States from any person who knowingly engages in such prohibited conduct and from any person whose employee, subcontractor, or subcontractor employee provides, accepts, or charges a kickback.
. . . .

(g)    Requires a prime contractor or subcontractor to report in writing to the inspector general of the contracting agency, the head of the contracting agency if the agency does not have an inspector general, or the Department of Justice any possible violation of the Act when the prime contractor or subcontractor has reasonable grounds to believe such violation may have occurred.
. . . .

(i)    Requires each contracting agency to include in each prime contract exceeding $150,000 for other than commercial items (see part 12), a requirement that the prime contractor shall--

(1)    Have in place and follow reasonable procedures designed to prevent and detect violations of the Act in its own operations and direct business relationships (e.g., company ethics rules prohibiting kickbacks by employees, agents, or subcontractors; education programs for new employees and subcontractors, explaining policies about kickbacks, related company procedures and the consequences of detection; procurement procedures to minimize the opportunity for kickbacks; audit procedures designed to detect kickbacks; periodic surveys of subcontractors to elicit information about kickbacks; procedures to report kickbacks to law enforcement officials; annual declarations by employees of gifts or gratuities received from subcontractors; annual employee declarations that they have violated no company ethics rules; personnel practices that document unethical or illegal behavior and make such information available to prospective employers) . . . .

48 C.F.R. 3.502-2.

100.    Additionally, the Anti-Kickback Act provides:

(a)    Amount.--The Federal Government in a civil action may recover from a person--

    (1)    that knowingly engages in conduct prohibited by section 8702 of this title a civil penalty equal to--

        (A)    twice the amount of each kickback involved in the violation; and

        (B)    not more than $10,000 for each occurrence of prohibited conduct; and

    (2)    whose employee, subcontractor, or subcontractor employee violates section 8702 of this title by providing, accepting, or charging a kickback a civil penalty equal to the amount of that kickback.

41 U.S.C. § 8706(a).

101.    The Anti-Kickback Act further provides criminal penalties in the form of fines, imprisonment for not more than ten (10) years, or both.  41 U.S.C. § 8707.

102.    Damco gave DynCorp rent-free use of the consolidation center at the airport in Dubai in exchange for DynCorp subcontracting with Damco.  This arrangement constitutes an illegal kickback, which resulted in significant savings to DynCorp for the transportation of goods and products purchased under Task Order No. 4 to Kandahar, Afghanistan.  DynCorp passed through inflated invoice charges for reimbursement from the United States Government in exchange for the rent-free use of Damco's consolidation center.  This kickback scheme resulted in the Government wrongly reimbursing Defendants millions of dollars.

## IX.    DAMAGES

103.    The Defendants defrauded the federal Government in an amount to be determined.  As of the submission of this Original Complaint it is estimated that the United States Government has reimbursed the Defendants at least $80 million, out of which at least $30 million is comprised of improper accessorial costs.  Because the Defendants fraudulently induced the Government into entering the contract for these services, the Government is entitled to the full reimbursement of the $80 million.

## X.  CAUSES OF ACTION

### A.  Count I: False Claims - 31 U.S.C. § 3729(a)(1)(A)

104.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

105.    From 2011 to the present, the Defendants have knowingly presented and/or caused to be presented false and/or fraudulent claims for reimbursement (i.e. for payment or approval) to the United States by falsely and/or fraudulently representing and certifying, expressly and/or impliedly, to the United States that the invoices submitted correctly reflected the costs and prices of the freight forward services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.  Defendants did so in connection with their use of an illegal kickback scheme, whereby Damco gave DynCorp rent-free use of Damco's consolidation center in Dubai in order to secure the subcontract in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq*.

106.    The invoices submitted for reimbursement for such services under the subcontract were false and fraudulent as the included costs and prices were approximately double those originally accepted and approved.  Further, the invoices arose out of an illegal kickback and DynCorp's prime contract with the Government makes clear that compliance with the Anti-Kickback Act was a condition of payment.  These invoices amounted to or contained false certifications of compliance with the Anti-Kickback Act.

107.    As a result of Defendants' scheme to submit inflated and otherwise improper invoices to the Government for reimbursement for freight forwarding services, all of the claims that Defendants presented are false and/or fraudulent.  Defendants knowingly presented or

caused to be presented such false and/or fraudulent claims for payment or approval in violation of current 31 U.S.C. § 3729(a)(1)(A).

108.    The United States paid the false and/or fraudulent claims.

109.    By virtue of the false and/or fraudulent claims that Defendants knowingly presented or caused to be presented, the United States has suffered substantial monetary damages.

**B.    Count II: False Records or Statements - 31 U.S.C. § 3729(a)(1)(B)**

110.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Original Complaint.

111.    As a result of Defendants' scheme to submit inflated and otherwise improper invoices to the Government for reimbursement for freight forwarding services, Defendants knowingly made or used or caused to be made or used false records or statements and omitted material facts that were material to false and/or fraudulent claims, in violation of current 31 U.S.C. §3729(a)(1)(B).  These false statements or records consist of false or fraudulent invoices and other statements provided to the Government as well as false certifications or representations made or caused to be made by Defendants to the Government.  Each invoice and/or claim for reimbursement submitted in connection with the contracts at issue in this case represents a false and/or fraudulent claim for payment.  Defendants did so in connection with their use of an illegal kickback scheme, whereby Damco gave DynCorp rent-free use of Damco's consolidation center in Dubai in order to secure the subcontract in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq.*

112.    By virtue of the false records or statements that Defendants made or used, the United States has suffered substantial monetary damages.

43

C.     **Count III: Conspiracy to Defraud the Government - 31 U.S.C. § 3729(a)(1)(C)**

113.     Relator realleges and hereby incorporates by reference each and every allegation contained in all the paragraphs of this Original Complaint.

114.     Defendants have knowingly conspired to falsely and/or fraudulently certify, implicitly or explicitly, in Damco's bid, DynCorp's subcontract with Damco, the Justification(s) of Award and related documentation, and invoices for freight forwarding services that their statements were true accurate and correct and that the Defendants were in full compliance with the federal laws governing such contracts in violation of current 31 U.S.C. § 3729(a)(1)(C).

115.     The Defendants knowingly conspired to falsely and/or fraudulently certify, explicitly or implicitly, that their statements were true, accurate, and correct.

116.     The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the prices proposed in the subcontract bid were the true and correct costs to be billed to the Government for the freight forwarding services into Kandahar, Afghanistan. The Defendants knew that these prices were false and/or fraudulent because the costs did not include the accessorial costs.  Once performance began under the subcontract, the Defendants included these accessorial costs, approximately doubling the cost to the Government for these contracted services.

117.     The Defendants have also knowingly conspired to falsely and/or fraudulently engage in the kickback scheme whereby Damco gave DynCorp rent-free use of Damco's consolidation center in Dubai in order to secure the subcontract in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq.*

118.     Defendants knowingly passed these inflated costs to the Government for reimbursement.

119.    Defendants have conspired in knowingly presenting false and/or fraudulent claims for payment or approval to the United States government and have knowingly made, used, or caused to be made or used false records or statements material to false and/or fraudulent claims in violation of current 31 U.S.C. § 3729(a)(1)(C).

120.    By virtue of the false and/or fraudulent claims submitted, paid, or approved as a result of the conspiracies to defraud the Government, the United States has suffered substantial monetary damages.

**D.    Count IV: Reverse False Claims – 31 U.S.C. §3729(a)(1)(G)**

121.    Relator realleges and hereby incorporates by reference each and every allegation contained in all the paragraphs of this Original Complaint.

122.    Defendants schemed to falsely and/or fraudulently submit claims for reimbursement (i.e. for payment or approval) to the United States and falsely and/or fraudulently represent that the invoices submitted correctly reflected the costs and prices of the freight forward services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.  As reflected in Reddell's cost analysis, the invoices submitted for reimbursement were false and/or fraudulent as the included costs and prices were not authorized by the subcontract and approximately doubled those originally accepted and approved.  As a result, the Government has been falsely and/or fraudulently overcharged for freight forward services.  Defendants did so in connection with their use of an illegal kickback scheme, whereby Damco gave DynCorp rent-free use of Damco's consolidation center in Dubai in order to secure the subcontract in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq.*  Throughout this scheme, Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease and

obligation to pay money to the Government.  These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendants to the Government in requesting payment from the Government for freight forward services.

123.    By virtue of the Defendants' failure to disclose their obligation to repay the Government in violation of current 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial monetary damages.

**E.    Count V: Retaliation – 31 U.S.C. § 3730(h)**

124.    Relator realleges and hereby incorporates by reference each and every allegation contained in all the paragraphs of this Original Complaint.

125.    In violation of the False Claims Act 31 U.S.C. § 3730(h), DynCorp took negative employment actions and discriminated against Relator Reddell in response to his investigating and reporting Defendants' fraudulent schemes the fraudulent invoicing and billing practices alleged in this Original Complaint.  DynCorp did so when Reddell's investigation and reports threatened Defendants' use of an illegal kickback scheme, whereby Damco gave DynCorp rent-free use of Damco's consolidation center in Dubai in order to secure the subcontract in violation of the Anti-Kickback Act, 41 U.S.C. §§ 8701-8707; 48 C.F.R. 3.502.2, *et seq*.

126.    As a result of DynCorp's conduct in response to Reddell's investigation and reports, Reddell has suffered negative employment consequences including harassment, threats, being overlooked for a promotion, and a hostile work environment which resulted in Reddell's constructive discharge.  As a result, Reddell has suffered economic damages.

## XI.    RELIEF

127.    On behalf of the United States Government, the *qui tam* Relator seeks to receive monetary damages equal to three times that suffered by the United States Government.    In

addition, the *qui tam* Relator seeks to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

128.    The *qui tam* Relator seeks to receive on his own behalf, all damages, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees, that he is entitled to receive for DynCorp's retaliatory conduct against him. Special damages also include, but are not limited to, compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to reputation, and other pecuniary and nonpecuniary losses.

129.    The *qui tam* Relator seeks to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

130.    The *qui tam* Relator seeks to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

131.    The *qui tam* Relator seeks pre-judgment interest at the highest rate allowed by law.

## XII.    PRAYER

132.    WHEREFORE, Relator prays that this Court enter judgment on behalf of the Relator and against Defendants for the following:

> a.    Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;
>
> b.    Civil penalties against Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;
>
> c.    The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);
>
> d.    Relator's individual damages, including two times the amount of back pay, interest on the back pay, and compensation for any special damages

47

sustained as a result of the discrimination including, but not limited to, compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to reputation and other pecuniary and nonpecuniary losses, litigation costs and reasonable attorney's fees;

e.      Punitive damages to Relator for the retaliatory conduct by DynCorp.

f.      All costs and expenses of this litigation, including attorney's fees and costs of court;

g.      Pre-judgment interest at the highest rate allowed by law; and

h.      All other relief on behalf of Relator or the United States Government to which they may be entitled and that the Court deems just and proper.

## XIII.   JURY DEMAND

133.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Respectfully submitted,

/s/ Sarah M. Frazier
Joel M. Androphy
State Bar No. 01254700
Sarah M. Frazier
State Bar No. 24027320
Rachel L. Grier
State Bar No. 24055592
Berg & Androphy
3740 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785
Email: jandrophy@bafirm.com
Email: sfrazier@bafirm.com
Email: rgrier@bafirm.com

**ATTORNEYS-IN-CHARGE FOR RELATOR ROBERT REDDELL**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the above and foregoing document, along with Plaintiff's Motion to Seal, was forwarded via the United States Mail, certified, return receipt requested, by facsimile, by electronic mail, or by messenger to the United States Attorney's Office in the Eastern District of Texas and the Department of Justice on February 5, 2014.

/s/ Sarah M. Frazier<u>       </u>
Sarah M. Frazier

**EXHIBITS TO**
**RELATOR ROBERT REDDELL'S ORIGINAL COMPLAINT**

| EXHIBIT | DESCRIPTION | BATES NO. |
|---|---|---|
| 1 | Damco Bidsheet 8 | BARR-000035.1-000035.13 |
| 2 | DynCorp Master Agreement with Damco | BARR-000003-000034 |
| 3 | Damco Freight Invoice Audit PowerPoint Presentation I | BARR-000036.1-000036.9 |
| 4 | Damco Freight Invoice Audit PowerPoint Presentation II | BARR-000037.1-000037.6 |
| 5 | Damco Invoice/MSA Audit Memorandum | BARR-00038-000039 |
| 6 | MAWB 327-00184026 Analysis Excel Spreadsheet | BARR-000040 |
| 7 | MAWB 686-00142026 Analysis Excel Spreadsheet | BARR-000063.1-000063.8 |
| 8 | MAWB 686-00142026 Analysis PowerPoint Presentation | BARR-000064.1-000064.5 |
| 9 | Damco Bidsheet 9 | BARR-018570.1-018570.7 |
| 10 | Email Correspondence: "RE TO 0004 Freight Factor REAs SITREP" | BARR-018571-018572 |
| 11 | Email Correspondence: "RE 3.1 M HBL level detail" and Attachment: "Damco Oversize final list 4-10-13" | BARR-018573-018580.178 |
| 12 | Damco Oversize Analysis | BARR-018581.1-018581.108 |
| 13 | Email Correspondence: "RE DAMCO Palletization Charges" | BARR-018582-018583 |
| 14 | Advance Notification & ACO Consent Request Form and Attachments: <br> (1) Material Requisition & Signature Authority Documentation <br> (2) Statement of Work <br> (3) Pricing Summary <br> (4) Process Summary <br> (5) Attachment A Technical Evaluation <br> (6) Attachment B Comparative Pricing <br> (7) CACO Letter <br> (8) EPLS & Visual Compliance <br> (9)    Draft PO LG40032512 | BARR-018674-018716 |
| 15 | Justification of Award Dated July 10, 2012 | BARR-018717-018720 |