IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* Robert Reddell and Robert Hendrix | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 1:14CV86 |
| | § | JURY |
| DYNCORP INTERNATIONAL, LLC and | § | |
| DAMCO U.S.A., INC. | § | |
| | § | |
| | § | |
| Defendants. | § | |

### RELATORS ROBERT REDDELL AND ROBERT HENDRIX'S FOURTH AMENDED COMPLAINT

## TABLE OF CONTENTS

I.    INTRODUCTION AND OVERVIEW ...........................................................................1

    A.    Summary ...................................................................................................1

    B.    LOGCAP IV and Task Order No. 4.........................................................2

    C.    Damco's Bid and Invoices for Improper Accessorial Costs ...................3

II.    PARTIES ...........................................................................................................5

    A.    Plaintiffs .................................................................................................5

        1.    Plaintiffs/Relators Robert Reddell and Robert Hendrix ...............5

        2.    The United States of America ........................................................5

    B.    Defendants ..............................................................................................5

        1.    The DynCorp Entities ...................................................................5

            a.    DynCorp International LLC ...............................................5

            b.    The DynCorp Entities' Relationship .................................6

        2.    Damco USA, Inc. ..........................................................................7

III.    VICARIOUS LIABILITY ......................................................................................8

IV.    JURISDICTION AND VENUE ................................................................................8

V.    STATUTORY BACKGROUND................................................................................9

    A.    Federal Acquisition Regulation ("FAR") ...............................................9

    B.    Part 15 - Contracting by Negotiation .....................................................9

    C.    Section 52.244-2 – Consent to Subcontracts ..........................................9

    D.    Part 52—Allowability of Costs..............................................................11

    E.    Section 52.232-25 – Prompt Payment……………………………………11

VI.    RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD ...........................................13

A.    Introduction to Relators Robert Reddell and Robert Hendrix ...............................13

B.    Relator Reddell's Discovery and Reporting of Defendants' Fraudulent Schemes ................................................................................................................14

C.    DynCorp's Retaliation Against Relator Reddell and Reddell's Exclusion From Higher Level Meetings...................................................................................21

VII.   DEFENDANTS' FRAUDULENT ACTIVITIES...........................................................23

A.    Logistics Civil Augmentation Program ("LOGCAP IV")....................................23

       1.    Background to DynCorp's Subcontracting Activity Under Task Order No. 4 ........................................................................................24

       2.    DynCorp's Subcontract with Damco ..................................................27

B.    DynCorp's Misrepresentations to Government of Actual Costs ...........................31

       1.    Accessorial Air Freight Costs ..................................................31

             a.    Oversize Charges .................................................32

             b.    Palletization charges ...........................................35

             c.    Dim Weight...........................................................38

       2.    Micro-Shipping Issue ............................................................39

       3.    Fuel Surcharges....................................................................41

       4.    Lump Sum Invoicing ............................................................44

       5.    Weight Inflation..........................................................................45

C.    Fraud–in-the-Inducement.......................................................................46

D.    DynCorp and Damco Conspired to Induce the Government's Acceptance of the Fraudulent Conduct......................................................................47

E.    Certifications and False Statements ..........................................................50

F.    Obligation to Repay Money to the Government......................................53

VIII.  ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT .......................54

A.      Applicable Law – The False Claims Act ...................................................54

B.      Defendants' Violation of the FCA ...........................................................58

1.      Defendants' Fraudulent Representations and Certifications Violate the FCA 31 U.S.C. § 3729(a)(1)(A) ..........................................................58

2.      Defendants' Fraudulent Representations and Certifications Violate the FCA 31 U.S.C. § 3729(a)(1)(B).........................................................59

3.      Defendants' Conspiracy Violates the FCA 31 U.S.C. § 3729(a)(1)(C) .............................................................................60

4.      Defendants Failed to Disclose Their Obligation to Repay the Government in Violation of the Reverse False Claims Provision ............61

IX.   DAMAGES ...................................................................................................62

X.    CAUSES OF ACTION.....................................................................................62

A.      Count I: False Claims - 31 U.S.C. § 3729(a)(1)(A)..................................62

B.      Count II: False Records or Statements - 31 U.S.C. § 3729(a)(1)(B) ....................65

C.      Count III: Conspiracy to Defraud the Government - 31 U.S.C. § 3729(a)(1)(C) .......................................................................65

D.      Count IV: Reverse False Claims – 31 U.S.C. § 3729(a)(1)(G) .......................................................................67

XI.   RELIEF .......................................................................................................68

XII.  PRAYER ......................................................................................................69

XIII. JURY DEMAND ............................................................................................69

CERTIFICATE OF SERVICE ...................................................................................71

EXHIBITS TO RELATORS ROBERT REDDELL AND ROBERT HENDRIX'S ORIGINAL, FIRST, SECOND & THIRD AMENDED COMPLAINTS incorporated by reference in this FOURTH AMENDED COMPLAINT ..............................72

The United States of America, by and through *qui tam* Relators Robert Reddell and Robert Hendrix, brings this action under 31 U.S.C. § 3729-3732 ("False Claims Act") on behalf of the United States of America and on their own behalf to recover all damages, penalties, and other remedies established by the False Claims Act and would show the following:

## I.    INTRODUCTION AND OVERVIEW

**A.    Summary**

1.      In late 2011, DynCorp International LLC ("DynCorp"), prime contractor with the United States Army for the provision of supplies to American troops stationed overseas, including in Afghanistan, jettisoned its freight forwarding contractor, EWC.  It did so even though EWC had consistently met its contractual requirements – in fact had handled much more freight than originally anticipated - and had billed DynCorp accurately and properly.  In its place, DynCorp chose Damco USA, Inc.[1] from among several bidders, including one who at first was awarded the contract, in order to gain discounted access to Damco's quality consolidation center in Dubai.  While Damco's bid appeared lower than most competitors', its actual charges from the start of the contract performance systematically included accessorial costs that it had bid as included in its base per kilo rate, not to be separately billed.  Further, Damco systematically billed "oversize" charges for freight that was not oversized, double-billed for "oversize" and "dim weight" charges on the same freight, excessive palletization fees regardless of whether goods were palletized, exorbitant fuel surcharges regardless of actual fuel price, and repeatedly billed for surcharges on multiple invoices for freight on the same plane, though the surcharges only applied once per plane. In addition, Damco used impermissible "lump sum" designations on its invoices and invoiced DynCorp and, in turn, the Government for more freight than it actually shipped. Damco pretended

---

[1] As set forth more fully below, Damco USA, Inc. is one of the related entities collectively referred to herein as "Damco."

it was passing on incurred costs billed by its sole aircraft provider, DFS, when in fact DFS had not incurred or billed such costs to DynCorp and had no knowledge of DynCorp's accessorial markups in which it was receiving no part. DynCorp paid these charges, though they were fraudulent, doubled the per kilo rate, and rendered Damco's performance considerably more expensive either than EWC or Damco's fellow bidders. DynCorp allowed Damco to continually find new charges to invoice to perpetuate the same fraudulent profits, understanding that in objecting it risked exposing its own devil's bargain with Damco to all. DynCorp allowed Damco to underbid its base per kilo contract price but then reap a hefty profit from accessorial costs it had promised not to charge.

2.      Worse, DynCorp lied outright and by omission in several Justification of Awards and other disclosures to the Government about Damco's real charges and their impropriety as well as its own receipt of illegal remuneration in exchange for hiring Damco. DynCorp represented Damco to the Government as the best value subcontractor even after Reddell audited Damco's bills and reported to DynCorp Damco's fraudulent mischaracterization of freight, made up costs, improper accessorial charges, and exorbitant bottom line. The Government thus unwittingly paid fraudulent bills for Damco's work from at least 2011 to 2013.

**B.      LOGCAP IV and Task Order No. 4**

3.      The Logistics Civil Augmentation Program ("LOGCAP") is the United States Department of Army's ("U.S. Army") program to provide the basic supports for life to the troops living in overseas bases. The fourth iteration of the program – LOGCAP IV – was issued in 2009 and provides such support to the United States military personnel stationed in Afghanistan, Kuwait, and Iraq. Because of the cost overruns and general unaccountability of millions of dollars under the LOGCAP III program, the U.S. Army moved from utilizing one contractor to contracting

with three companies: Defendant DynCorp, Fluor, and KBR.  In order to maintain continual competition and prevent similar fiscal abuses that occurred under LOGCAP III, the three companies under LOGCAP IV are required to compete for each available task order issued by the U.S. Army.  Defendant DynCorp was awarded work under Task Order No. 1 pertaining to the Program Management Office, Task Order No. 2 pertaining to Kuwait, Task Order No. 3 pertaining to the Udairi Air Field, Kuwait, and Task Order No. 4 pertaining to the Afghanistan-South Area of Responsibility.  Task Order No. 4 is at issue in this current case.

4.    Task Order No. 4 relates to the provisions of goods and services to the United States bases in the area referred to as Afghanistan-South Area of Responsibility.  In order to provide such goods and services, Defendant DynCorp issued a Request for Proposals ("RFP") for subcontractors to provide DynCorp Global Freight Forwarding Services and Intra-Theater Ground Transport worldwide.  For the base year and Option Year 1 of Task Order 4, DynCorp initially subcontracted with Expedited World Cargo ("EWC") for the freight forwarding services for outside the continental United States ("OCONUS"), from Dubai, United Arab Emirates, into Afghanistan, and with DHL for the freight forwarding services for inside the continental United States ("CONUS"), from the United States to Afghanistan.  Then, without rhyme or reason, Defendant DynCorp issued a new RFP prior to the termination of Option Year 1.  DynCorp selected Defendant Damco as its subcontractor using Damco's lower cost projections as justification for switching from EWC.

**C.    Damco's Bid and Invoices for Improper Accessorial Costs**

5.    At $2.15 per kilo for freight to and from Dubai, Damco's bid appeared substantially lower than the $3.89 per kilo that EWC had charged on average.  It was lower than competitors' bids as well.  The bid represented, probably like others, that Damco would not bill for additional charges for most varieties of accessorial costs.  Accessorial costs include extra charges for

3

oversized boxes, fuel surcharges, delivery costs on the weekends, and other surcharges.  The other companies, however, calculated and included their actual accessorial expenses in bidding on the contract.  Damco submitted a bid that was below cost.

6.      Damco's lower cost projections factored into the Government's required acceptance of the subcontract between DynCorp and Damco.  Yet, once Damco began to perform under the subcontract, it began systematically invoicing for the significant accessorial costs that it had promised were part of its per kilo charge.  While DynCorp had no controls in place to ensure that Damco's billing conformed to its contract, Relator Robert Reddell, a cost analyst for DynCorp at the time, exposed that Damco was billing approximately double the amount it projected for its services in its winning bid.  The improper accessorial costs amounted to over $30 million dollars as of about September of 2013, about half of the $62 million paid out under the subcontract.  At approximately that time, Reddell was constructively forced to leave DynCorp due to hostility he faced after he reported irregularities in Damco's invoices, which DynCorp submitted to the United States for reimbursement.  DynCorp passed these inflated freight transportation costs onto the Government for reimbursement and received an additional percentage of the total for profits, overhead, general and administrative costs, and other indirect costs.  The Government paid these inflated and indirect costs.  These inflated freight transportation costs resulted in multi-millions of dollars of wrongful reimbursement from the United States Government.  More specifically, as of the submission of Relators' Original Complaint, it is estimated that the United States Government had reimbursed DynCorp at least $64 million, out of which at least $34.5 million is comprised of improper accessorial costs alone.

7.      Rather than demanding a return of overcharges, however, when DynCorp learned of Reddell's audit findings, DynCorp protected Damco, requesting the return of a mere $3.1

million. That $3.1 million amounted to perhaps half of the charges for oversized freight that was not in fact oversized. Damco was allowed to keep all payments for freight deemed truly oversized, even though such costs were not permissible to bill under the subcontract. Other improper accessorial costs were not corrected. DynCorp continued to do business with Damco on essentially the same terms. Damco continued to overcharge the Government but recategorized some of the costs to make them less obviously excessive, though still improper under the subcontract. Reddell was punished for his embarrassing cost analysis with missed promotions and ostracism until he felt compelled to leave DynCorp for another position.

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Plaintiffs/Relators Robert Reddell and Robert Hendrix

8.    Plaintiff/Relator Robert Reddell ("Reddell" or "Relator") is a citizen of the United States and a resident of the State of Texas.

9.    Plaintiff/Relator Robert Hendrix ("Hendrix" or "Relator") is a citizen of the United States and a resident of the State of Texas.

#### 2.    The United States of America

10.    The governmental real party in interest in this lawsuit is the United States of America ("United States" or "Government").

### B.    Defendants

#### 1.    The DynCorp Entities

##### a.    DynCorp International LLC

11.    Defendant DynCorp International LLC provides logistical support of military operations worldwide and, specifically for this case, for those operations in Afghanistan under

Prime      Contract      No.      W52P1J-07-D-007,      *available      at*
http://www.sec.gov/Archives/edgar/data/1333142/000119312511111832/dex1018.htm.

12.    Defendant DynCorp International LLC is a Delaware corporation located at 13500 Heritage Parkway, Fort Worth, Texas 76177, with its principal office located at 3190 Fairview Park, Suite 900, Falls Church, Virginia 22042.  Defendant DynCorp International LLC may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

### b.    The DynCorp Entities' Relationship

13.    DynCorp International, Inc. is the corporate parent of Defendant DynCorp International, LLC.  Defendant DynCorp International LLC traces its origins from two companies formed in 1946: Land-Air, Inc. and California Eastern Airways.  In 1951, the Air Force Logistics Command awarded Land-Air, Inc. the first contract for Contract Field Teams, which provide mission support and depot-level repair to U.S. military aircraft and weapons systems worldwide. California Eastern Airways, Inc., later California Eastern Aviation, Inc., acquired Land-Air, Inc. in 1951.  In 1962, California Eastern Aviation, Inc. changed its name to Dynalectron Corporation, which, in 1987, changed its name to DynCorp.  In 1998, DynCorp established DynCorp Technical Services, Inc. ("DTS") and transferred its existing aerospace and international division business to DTS.  In 2000, DynCorp formed DynCorp International LLC and transferred all of its international business to DynCorp International LLC.  DTS continued to perform DynCorp's domestic contracts.  In 2003, Computer Sciences Corporation ("CSC") acquired DynCorp and its subsidiaries, including DTS and DynCorp International LLC.  DynCorp remained the parent of its existing subsidiaries, and CSC became their ultimate parent.  In 2004, DynCorp and CSC sold DynCorp International LLC to an entity that was renamed DynCorp International, Inc., which is

the corporate parent of DynCorp International LLC.  Then, in 2010, DynCorp International, Inc. and private investment firm Cerberus Capital Management, L.P. merged, and DynCorp International, Inc. became a wholly-owned subsidiary of entities created by affiliates of Cerberus Capital Management, L.P.

### 2.    **Damco USA, Inc.**

14.    Defendant Damco USA, Inc. does business under several assumed names, including Maersk Logistics.  Damco USA, Inc. specializes in worldwide freight forwarding services.  Defendant Damco USA, Inc. is a Delaware corporation with its United States headquarters located at Giralda Farms, Madison Avenue, P.O. Box 880, Madison, New Jersey 07940.  Defendant Damco USA, Inc. may be served through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

15.    Under the contract with Defendant DynCorp, Defendant Damco USA, Inc. provided the air freight transportation for outside the continental United States ("OCONUS") and, specifically for this case, air freight transportation into Afghanistan. (Ex. 2, DynCorp Master Agreement with Damco USA.)

16.    Defendant Damco USA, Inc. is managed by Damco International A/S, formerly known as Maersk Logistics International A/S.  Damco International A/S operates as a subsidiary of A.P. Moller-Maersk Group, which is the parent company of Damco International A/S and Defendant Damco USA, Inc.

17.    Of note is the rather recent agreement by A.P. Moller-Maersk Group's wholly-owned United States subsidiary Maersk Line Limited to pay the United States Government $31.9 million to resolve allegations that Maersk Line Limited submitted false claims to the United States related to contracts to transport cargo to support United States troops in Afghanistan and Iraq.

"Maersk Line to Pay Us $31.9 Million to Resolve False Claims Allegations for Inflated Shipping Costs to Military in Afghanistan and Iraq", *available at* http://www.justice.gov/opa/pr/2012/January/12-civ-002.html.  The U.S. Government alleged that Maersk Line Limited knowingly overcharged the United States Department of Defense to transport thousands of shipping containers from ports to inland destinations in Iraq and Afghanistan. *Id.*

18.    Defendants DynCorp International LLC and Damco USA, Inc. are collectively referred to herein as "Defendants."

## III.    VICARIOUS LIABILITY

19.    Any and all acts alleged herein to have been committed by any or all of the Defendants were committed by said Defendants' officers, directors, employees, representatives, or agents who at all times acted on behalf of their respective Defendant(s) and within the course and scope of their employment.

## IV.    JURISDICTION AND VENUE

20.    Jurisdiction and venue are proper in this Court pursuant to False Claims Act (31 U.S.C. § 3732(a)) because Relators' claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729 in the United States by Defendants who transact business within the Eastern District of Texas.

21.    Defendants are subject to the general and specific personal jurisdiction of this Court.  Defendants engage in a variety of business activities in the State of Texas and within the Eastern District of Texas, which they accomplish through their corporate centers, business units, subsidiaries, officers, directors, employees, and/or agents.

## V.    STATUTORY BACKGROUND

### A.    Federal Acquisition Regulation ("FAR")

22.    The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by the Department of Defense, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for government contracts.  The FAR is codified in Title 48 of the United States Code of Federal Regulations.

### B.    Part 15 - Contracting by Negotiation

23.    Part 15 of the FAR describes the policies and procedures for awarding and entering into a negotiated contract.  A contract awarded using a process other than a sealed bid process is a negotiated contract.  48 C.F.R. § 15.000.  The objective of selecting a source for an item under a negotiated contract is to select the proposal that represents the best value.  48 C.F.R. § 15.302. "Best value" means the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement.  48 C.F.R. § 2.101(b)(2).

24.    An award is based on many evaluation factors.  Although the evaluation factors are largely discretionary dependent upon the particular contract at issue, certain factors must be taken into consideration, including the price or cost to the Government, the quality of the service provided, and the past performance.  48 C.F.R. § 15.304(b).

### C.    Section 52.244-2 – Consent to Subcontracts

25.    LOGCAP IV incorporates by reference FAR provision 48 C.F.R. § 52.244-2, which requires the prior consent of the administrative contracting officer ("ACO") before a subcontract such as Damco's is entered:

9

**52.244-2 Subcontracts**

(e)(1) The Contractor shall notify the Contracting Officer reasonably in advance of placing any subcontract or modification thereof for which consent is required under paragraph (b), (c), or (d) of this clause, including the following information:

(i) A description of the supplies or services to be subcontracted.

(ii) Identification of the type of subcontract to be used.

(iii) Identification of the proposed subcontractor.

(iv) The proposed subcontract price.

(v) The subcontractor's current, complete, and accurate certified cost or pricing data and Certificate of Current Cost or Pricing Data, if required by other contract provisions.

(vi) The subcontractor's Disclosure Statement or Certificate relating to Cost Accounting Standards when such data are required by other provisions of this contract.

(vii) A negotiation memorandum reflecting -

(A) The principal elements of the subcontract price negotiations;

(B) The most significant considerations controlling establishment of initial or revised prices;

(C) The reason certified cost or pricing data were or were not required;

(D) The extent, if any, to which the Contractor did not rely on the subcontractor's certified cost or pricing data in determining the price objective and in negotiating the final price;

(E) The extent to which it was recognized in the negotiation that the subcontractor's certified cost or pricing data were not accurate, complete, or current; the action taken by the Contractor and the subcontractor; and the effect of any such defective data on the total price negotiated;

(F) The reasons for any significant difference between the Contractor's price objective and the price negotiated; and

(G) A complete explanation of the incentive fee or profit plan when incentives are used. The explanation shall identify each critical performance element, management decisions used to quantify each incentive element, reasons for the incentives, and a summary of all trade-off possibilities considered.

26. The ACO's consent is also required on modifications to the subcontract. 48 C.F.R. § 52.244-2.

27. No exemption exists in this provision to allow parties to a subcontract to provide for agreed price modifications without advanced notice to the government and government consent.

**D**.    **Part 52—Allowability of Costs**

28.    Federal procurement contracts may incorporate by reference the standardized contract provisions found in Part 52 of the FAR. Part 52 governs the costs and standards that apply to a contractor's invoice to the United States for charges associated with its performance and its subcontractors' performance. 48 C.F.R. § 52.216-7, in particular, which LOGCAP IV incorporates by reference, requires the contractor to submit invoices to the Government subject to allowability of costs in accordance with Subpart 31.2. 48 C.F.R. § 52.216-7(a)(1). Under Subpart 31.201-2, a cost is allowable, in relevant part, only if it is (1) reasonable and (2) complies with the terms of the contract. 48 C.F.R. § 31.201-2(a). This includes costs incurred for payment or reimbursement to subcontractors. 48 C.F.R. § 31.204(b). Subpart 31.2 also provides that a contractor is responsible for maintaining records that demonstrate the costs claimed have been incurred, are allocable to the contract, and comply with this applicable cost provisions, including this subpart.

29.    Part 52 also provides that allowable costs are limited to (1) the contractor's actual costs for items or services purchased for the contract; (2) costs for supplies and services under a subcontract, provided that the those costs are "in accordance with the terms and conditions of a subcontract or invoice;" and (3) financing payments made to subcontractors. 48 C.F.R. § 52.216-7(b)(1).

**E.**    **Section 52.232-25 – Prompt Payment**

30.    LOGCAP IV as originally executed in 2007 incorporated by reference FAR provision 48 C.F.R. § 52.232-25, specifying the terms and conditions under which the Government will make its invoice payments:

> **52.232–25 Prompt payment.**
>
> As prescribed in 32.908(c), insert the following clause:

PROMPT PAYMENT (OCT 2003)

Notwithstanding any other payment clause in this contract, the Government will make invoice payments under the terms and conditions specified in this clause. The Government considers payment as being made on the day a check is dated or the date of an electronic funds transfer (EFT). . . .

31.     The subpart contained at 48 C.F.R. § 52.232-25(d), in this same version of the regulation, mandates arrangement for return of any overpayment to the Government, upon the contractor's awareness of such overpayment:

**(d)** *Overpayments.* If the Contractor becomes aware of a duplicate contract financing or invoice payment or that the Government has otherwise overpaid on a contract financing or invoice payment, the Contractor shall immediately notify the Contracting Officer and request instructions for disposition of the overpayment.

The provision was promulgated in December 2001 and became effective on February 19, 2002, following the issuance of a 1999 General Accounting Office report, which found that contractors rarely returned overpayments on their own initiative. DOD Contract Management: Greater Attention Needed to Identify and Recover Overpayments (Letter Report, 07/19/1999, GAO/NSIAD-99-131), *available at* https://www.govinfo.gov/content/pkg/GAOREPORTS-NSIAD-99-131/html/GAOREPORTS-NSIAD-99-131.htm.

32.     In October 2008, the overpayment provision was modified to include more specific instructions for disposing of the overpayment.  It now states that upon becoming aware of an overpayment, the contractor shall:

(1) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the -
    (i) Circumstances    of    the    overpayment    (e.g.,    duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);
    (ii) Affected contract number and delivery order number if applicable;
    (iii) Affected line item or subline item, if applicable; and
    (iv) Contractor point of contact.
(2) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

12

33.    Since LOGCAP IV was originally executed in 2007, it has been modified over 580 times.  Following the amendment of 48 C.F.R. § 52.232-25(d) in 2008, and before DynCorp contracted with Damco to handle OCONUS logistics in 2011, the parties agreed to a modification that updated the incorporation of this regulation to its 2008 version, as is the custom of the United States when regulations are modified during the term of a LOGCAP contract.

## VI.    RELATOR'S DISCOVERY OF DEFENDANTS' FRAUD

### A.    Introduction to Relators Robert Reddell and Robert Hendrix

34.    Relator Robert Reddell was employed by DynCorp beginning in August of 2009, working primarily at DynCorp's United States headquarters in Fort Worth, Texas.  Reddell was employed as a Principal Estimator – Cost Analyst.  In this position, Reddell provided support for DynCorp's proposals to the Government.  Reddell analyzed the company's incurred costs related to the company's Government contracts.  Reddell ensured that the company did not request more funds than necessary under such contracts and that the money the company spent was in compliance with the Government rules and regulations governing such contracts.  Reddell was constructively forced to leave the company in October of 2013, for reporting irregularities in invoices created and billed by Damco and presented through DynCorp to the United States Government for reimbursement.

35.    Relator Robert Hendrix was employed by DynCorp beginning in September of 2007, also working at its Fort Worth headquarters. Hendrix was originally hired as a Senior Systems Analyst and promoted to several positions including Information Technology Manager. In May 2013, Hendrix was first demoted and then discharged for complaining of irregularities in DynCorp's billings to the United States unrelated to the fraudulent freight forwarding scheme described in Relators' Fourth Amended Complaint.

**B.** **Relator Reddell's Discovery and Reporting of Defendants' Fraudulent Schemes**

36.    Reddell has been a cost analyst for more than thirteen years. Prior to joining DynCorp, Reddell was employed by Kellogg Brown & Root ("KBR") in a similar position working on an earlier LOGCAP contract. Reddell has vast experience with contract bids, invoicing, and billing. After DynCorp entered the subcontract with Damco, Reddell reviewed Damco's invoices to ensure that the billing was complaint and to track the company's incurred costs. Reddell immediately noticed that Damco included more costs per invoice than what Damco had originally included in its Request for Proposal. As explained more fully below, Damco did not include most accessorial costs when it submitted its price per kilo transportation costs in its bid proposal for the subcontract. (Ex. 1, Damco Bidsheet 8, "Accessorials" tab.) Damco apparently did not factor in their cost, either. Damco's proposed per kilo transportation cost was comparable to competitors' costs with the accessorial costs stripped out. Yet, having won the contract, Damco immediately began charging for a full range of accessorial costs, charges that are listed in the contract price schedule for air freight as "$0.00," such as "oversize" charges, "palletization" charges, fuel surcharges, and other handling charges. *Id.* The accessorial charges, as described below, amounted to 130% of the total invoices. (Ex. 3, Damco Freight Invoice Audit PowerPoint Presentation I at 8.)

37.    After realizing that Damco was essentially charging twice for significant accessorial costs, realizing that costs amounted to approximately double its original bid for the freight forwarding charges, and understanding that DynCorp was passing these inflated rates onto the Government for reimbursement, Reddell notified his supervisor, Joel Steveson, Senior Director of Project Controls. Reddell did not receive any response from his supervisor, however. The overbilling practice continued for more than a year. In addition, Reddell notified DynCorp's senior

management of a directive from the United States Government to closely monitor freight providers for excessive accessorial costs.  (Ex. 4, Damco Freight Invoice Audit PowerPoint Presentation II at 6.)[2]  This directive, in part, advised:

> **Be Advised:** It has come to the attention of the Military Surface Deployment and Distribution Command (SDDC) that some TSPs [Transportation Service Providers] have excessively high rates for accessorial services.
>
> Shippers should consider accessorial service rates as a "best value" factor prior to awarding TSPs freight. When selecting a TSP it is highly encouraged to review the entire tender to include accessorial rates. This will help to ensure the Department of Defense (DOD) is getting the "Best Value".

*Id.*  The members of DynCorp's senior management did not consider this directive, however. Reddell continued to notify DynCorp's senior management, including T.V. Abercrombie, Vice President of Project Controls, that DynCorp should set aside Damco's costs, disclose the overbilling issues to the Government, and work on correcting the problem.  DynCorp remained unresponsive to Reddell's concerns, however.

38.    In January 2012, DynCorp hired Jim Grazioplene as Program Manager for DynCorp's LOGCAP IV contract.  Grazioplene immediately suspected Damco's billing and invoices.  Grazioplene entrusted Reddell, with whom he had earlier worked at KBR, with performing an audit of the billing to get to the bottom of the problem and asked Reddell to report straight to him.  Reddell began investigating.

39.    Reddell audited 98 freight invoices from UPS and Damco to ensure that freight costs were being vetted against government-approved rates. Reddell found that Damco freight invoices had not been consistently vetted against government-approved rates and that the lack of accurate freight cost validation caused (1) submittal of non-compliant invoices to the United States Government for reimbursement and (2) excessive costs to the United States Government. This

---

[2] Someone other than Reddell added the red text in Exhibit 4.

LOGCAP Freight Invoice Audit further found that Damco had a 0% accessorial rate compliance, compared with 36% for UPS. To be clear, it was apparent that DynCorp had exerted no oversight over Damco.

40.     The LOGCAP Freight Invoice Audit led to a second audit, which involved review of 500 invoices. Reddell completed the second audit report – named the "Damco Freight Invoice Audit" – which outlined some of the problematic invoicing issues that resulted in excessive costs to the Government. (Ex. 3, Damco Freight Invoice Audit PowerPoint Presentation I; Ex. 4, Damco Freight Audit Invoice PowerPoint Presentation II; Ex. 5, Damco Invoice/MSA Audit Memorandum; Ex. 6, Master Air Waybill ("MAWB") 327-00184026 Analysis Excel Spreadsheet; Ex. 7, MAWB 686-00142026 Analysis Excel Spreadsheet; Ex. 8, MAWB 686-00142026 Analysis PowerPoint Presentation.) Reddell's audit succinctly outlined the systematic charging of separate fees for accessorial costs that the bid listed as included in the per kilo charge and confirmed the problems found in the first audit.  Reddell determined that Damco's actual per kilo cost on air freight was $6.60, compared with the figure of $2.15 in Damco's bid and former freight forwarder EWC's average charges of $3.89.  That $6.60 figure included accessorial costs for which Damco was charging DynCorp improperly, which amounted to 130.07% of invoice amounts. (Ex. 3, Damco Freight Audit Invoice PowerPoint Presentation I at 8.)  Reddell cited a July 25, 2012 advisory from the Army warning of the need to monitor accessorial charges because of the opportunity for abuse:



BARR-000037.6

41.    In addition, in October 2012, Reddell learned from Terry Howard about a suspiciously large oversize charge.  Jetta Aiello, the DynCorp employee charged with checking Damco bills, assured Reddell that DynCorp was actually undercharged, according to her copy of the bidsheet.  Upon further inquiry, though, Reddell learned, on or about October 25, 2012, that Aiello had obtained her bidsheet, which listed significantly higher accessorials than contained in the contract, ***directly from Damco*** after finding she had been provided no documentation on pricing.  See Bidsheet sent to Jetta Aiello by DAMCO, at Exhibit 16. During a meeting to discuss audit findings, Reddell attempted to ask Aiello about the circumstances surrounding her receipt of the bait-and-switch bidsheet but T.V. Abercrombie, who had left retirement to join DynCorp in August 2012 as Vice President of Project Controls for LOGCAP, told him to stop with words to the effect of, "Robert, quit harassing the poor girl." The discussion was over.

42.    With further investigation, Reddell learned that initially no one at DynCorp's Fort Worth headquarters was reviewing Damco's invoices and they were instead receiving cursory approval in the field. When that changed, Aiello was the sole individual with such responsibility,

yet DynCorp did not provide her with the contract pricing, or any pricing at all. As for the origin of the bidsheet Aiello received from Damco, Ed Beniak told Reddell that Damco and DynCorp had adopted this new bidsheet but had not sought ACO approval for it, either in the July 2012 JOA or otherwise. Importantly, Reddell found that Damco never billed DynCorp, even at the outset of performance, under the contractual pricing. Damco billed from the outset according to the inflated pricing contained in Jetta Aiello's bidsheet—or sometimes billed at even higher prices. In addition to the non-contractual pricing in Aiello's bidsheet, on Mar 2, 2012, Adam Nicholas, who was considered Krista Robinson's right hand man, had created "Express Program Rates," including a "Blueball Express (BBE)" priority airfare rate, that Damco could charge DynCorp on LOGCAP only, also not ACO-approved.

43.     Talks between Damco and DynCorp regarding resolution of the billing/invoicing issues ensued as a result of Reddell's audit, but Reddell was not privy to them. In December of 2012, DynCorp and Damco entered into an Amendment to their agreement, which indicated that they wished to amend it "to include additional Terms and Conditions and Rate Schedules." On about December 6, 2012, Richard Chevalier forwarded Reddell a draft $4.2 million JOA to ask for ACO consent for all of the accessorial and express rates DynCorp was already paying (See December 6, 2012 JOA, Exhibit 17), but Reddell objected that the JOA failed to justify the rates by merely comparing one accessorial charge - HAZMAT - in the Damco versus UPS contracts (UPS was handling freight forwarding between the U.S. and Afghanistan).  The JOA as signed stated that pricing was based on market research, and that accessorial charges were comparable and reasonable.

Assessorial charges are compared to a current contract provider for same or related services. They are comparable in classification and reasonable in amount.

|  | UPS | DAMCO |  |  |  |
|---|---|---|---|---|---|
|  | Charge | Charge |  |  |  |
| HAZARDOUS MATERIALS | $155 MIN, .25 KG | 150% of rate | HAZARDOUS MATERIALS | $110 min or $0.60/kg | HAZARDOUS MATERIALS (BBE) |

In reality there was no market research, and hazmat charges are probably the only possibly market rate charge on the rate table, due to the nature of the charge. Oversize charges of $200%, in contrast, are not comparable to any company's price. Thus, the December 2012 JOA failed to remedy the misrepresentations of past disclosures to the governments and indeed, offered new deceptions.

44.    Reddell further reported during this period that oversize charges appeared on virtually every invoice, even though this accessorial was not authorized under the contract. In addition, Damco was billing by the pallet instead of the plane load, allowing for duplicate charges. Nevertheless, the JOA was submitted and approved.

45.    While the two companies met in January through March of 2013 to discuss the problem charges, Reddell's reports regarding the improprieties in Damco's charges were largely swept under the rug by others at DynCorp in the end. DynCorp's former Vice President of Sourcing, Krista Robinson, signed the Damco subcontract on behalf of DynCorp. After Reddell raised the problems with Damco's billings, Robinson defended Damco's performance and assuaged the concerns held by Grazioplene and others, insisting that no real problems existed and attempting to discredit Reddell's work. When Robinson's employment with DynCorp abruptly ended, Rick Chevalier, Senior Category Manager Global Freight and Logistics for DynCorp, managed the Damco subcontract. He continued Robinson's campaign to dismiss Reddell's reports regarding the problems with Damco's charges and likewise worked to ease the concerns of

Grazioplene and others. Robinson and Chevalier were largely successful in convincing Grazioplene and others to disregard the larger issues with Damco's billing.

46.     In January 2013, DynCorp and Damco held an in-person meeting regarding oversize charges. During the meeting, DynCorp agreed to accept a fuel surcharge increase in exchange for Damco discontinuing its oversize charge practices. Thus, despite Reddell's findings, DynCorp and Damco negotiated a settlement that ignored the fundamental problem with the improper extra-subcontract charges. (Ex. 11, Email Correspondence "RE $3.1M HBL level detail" and Attachment.)  The settlement focused instead on just one of the improper accessorial costs, the "oversize" charges, which not only were not allowable charges under the contract, but which were very obviously grossly inflated in any case. *Id.*; (Ex. 12, Damco Oversize Analysis.)  Further, Krista Robinson had informed others with DynCorp in February 2013 that LOGCAP did not permit oversize charges to be paid without documentation that the airline had actually charged Damco such amounts.  The companies settled on a one-time payment of $3.1 million dollars from Damco to DynCorp for these oversize charges.  That amount represented only about half of the oversized charges and excluded the other improper accessorial charges.

47.     Reddell was assigned during this period to calculate the freight factor for the Damco contract, requiring him to continue to probe and report Damco's various forms of suspicious billing.  He was asked to remove from such calculations the oversize charges for the audited period only.  Reddell was performing new audits on various charges for the freight factor calculation project as late as April 2013.

48.     In 2013, following the settlement for the oversize charges, Damco's charges for oversized packages disappeared and the same typical amounts, often doubling an invoice, uniformly appeared on new invoices as costs for "palletization."  (Ex. 7, MAWB 686-00142026

Analysis Excel Spreadsheet, "Summary" Tab; Ex. 8, MAWB 686-00142026 Analysis PowerPoint Presentation.) This palletization charge is used to place the goods and products on the pallets that are then loaded for transport. As reflected in Damco's bid, this palletization charge should only arise in the context of ocean freight, and not air transport. (Ex. 1, Damco Bidsheet 8, "Accessorials" tab; Ex. 9, Damco Bidsheet 9, "Global Packing & Crating Rates" tab, cells B34, B35, B36, B37, B38, B39, B40, B41 – costs for "palletizing" under cell A4 titled "OCEAN PACKING AND CRATING COSTS", cell G4 titled "AIR FREIGHT PACKING AND CRATING", under which there is no mention of "palletizing"; Ex. 13, Email Correspondence "RE DAMCO Palletization Charges".) Even in September 2013, Reddell was continuing to report the palletization problems. Reddell's audit and findings on this shift to improper palletization charges were not received favorably by DynCorp's senior management, as described below.

**C.  DynCorp's Retaliation Against Relator Reddell and Reddell's Exclusion From Higher Level Meetings**

49.     When Reddell presented his two audit findings to his managers, he was not merely suggesting improvements to compliance. Instead, as he explained, his audits exposed that DynCorp had agreed to massive price increases on accessorials that had been concealed from the Army's contracting officer. Further, he continued to object to any settlement or invoice approval that failed to insist on recovering payments in accordance with the contractual pricing that had been approved by the government. As former KBR employees accustomed to government investigations into invoicing fraud, Reddell and Grazioplene understood that Reddell was articulating a fraud: purposeful overcharges to the Government. And Reddell used the specific word "fraud" and "illegal" (in discussing the FAR violations he discovered) to describe both of his audit results in his oral communications with his superiors, including Grazioplene.

21

50.    Once Reddell produced the Damco Freight Invoice Audit and worked more closely with Grazioplene on the issues he raised, Reddell began to experience a hostile work environment and adverse employment actions.  When Reddell discovered that Jetta Aiello at DynCorp held the sole responsibility for cross-referencing each Damco invoice with the bidsheet and that she was doing this with an inflated bidsheet provided from Damco because she was unable to get one from DynCorp, he raised the issue in a meeting with DynCorp management. Reddell was told not to "pick on" Aiello and the issue was dropped. Prior to Reddell's work on the Damco Freight Invoice Audit, Abercrombie had asked Reddell to apply for a manager's position.  Once Reddell finished the audit and briefed Grazioplene on his findings, by October 2012, Abercrombie withdrew his offer.  DynCorp hired someone from outside the company for that position.

51.    Reddell continued to question Damco's billings and he continued to suffer the consequences in his workplace. For instance, in July 2013, he challenged the new higher palletization charges that Damco was adding to invoices, contradicting Rick Chevalier's assertion that palletization fees were authorized under the original contract. Ex. 13, Email Correspondence "RE DAMCO Palletization Charges." Abercrombie instructed Reddell never to speak to Grazioplene unless Abercrombie was present.  In addition, Reddell was excluded from higher level meetings regarding resolution of the billing and invoicing issues in which he should have participated as Principal Estimator/Cost Analyst.  It became increasingly clear that his termination from DynCorp was only a matter of time. Reddell began looking for another job. Reddell eventually found a position located in Dubai with his former employer KBR and left DynCorp in October of 2013.

## VII.    DEFENDANTS' FRAUDULENT ACTIVITIES

### A.    Logistics Civil Augmentation Program ("LOGCAP IV")

52.    Established in 1985, the Logistics Civil Augmentation Program – LOGCAP – is a United States Department of Army program that utilizes global corporate resources to support its worldwide contingency operations by integrating contracted private sector capabilities to fulfill the operational commanders' requirements.    The operational commanders identify their requirements and request LOGCAP to meet the mission's needs.

53.    LOGCAP's objectives are twofold: (1) to provide combat support and service support augmentation to both combatant and component commanders, primarily during contingency and other operations; and (2) to facilitate the management and physical responsibility to support deployments, site preparation, set preparation, modules operations and maintenance, redeployment, and transportation requirements for the force provider.    Examples of support include food service, laundry and bath, sanitation, billeting, fuel services, and power generation and distribution.    LOGCAP is currently being used to support operations in Afghanistan, Kuwait, Iraq, Bahrain, and Djibouti.

54.    The U.S. Army's sole provider under LOGCAP III was Halliburton-KBR. Halliburton-KBR, however, could not fully account for millions of dollars under the contract or justify all the charges to the Pentagon's satisfaction.    Due to these gross losses and lack of contractual oversight, the U.S. Army decided to award LOGCAP IV to three different companies. To further maintain better overall cost controls and to maintain a competitive spirit among the three companies, the U.S. Army decided to issue a series of Task Orders to complete the needed services under LOGCAP IV.    DynCorp was one of the three companies selected to participate in LOGCAP IV.

1.      **Background to DynCorp's Subcontracting Activity Under Task Order No. 4**

55.      In June 2007, DynCorp entered Prime Contract W52P1J-07-D-0007, *available at* http://www.sec.gov/Archives/edgar/data/1333142/000119312511111832/dex1018.htm, with the United States Government, which enabled DynCorp to bid on all available Task Orders that arose under LOGCAP IV. Defendant DynCorp was awarded work under Task Order No. 1 pertaining to the Program Management Office, Task Order No. 2 pertaining to Kuwait, Task Order No. 3 pertaining to the Udairi Air Field, Kuwait.  In July of 2009, DynCorp was awarded work under Task Order No. 4 pertaining to the Afghanistan-South Area of Responsibility.  The services provided under Task Order 4 are at issue in this present case.

56.      Under Task Order 4, DynCorp provides all the supplies needed to maintain and run the United States military bases in Southern Afghanistan such as dishes, sheets, basketball hoops, laundry detergent, and electronic equipment.  In general, DynCorp procures the majority of the supplies in the United States, while DynCorp procures most of the electrical supplies and basic materials such as wood and consumables from Europe.  For the supplies originating from the United States ("CONUS"), DynCorp consolidates all purchased goods at its Fort Worth headquarters and ships the goods via air transport to Afghanistan.  For all the goods purchased in Europe and other areas outside the continental United States ("OCONUS"), the goods are consolidated in Dubai and then transported to Afghanistan via air transport.

57.      LOGCAP IV specifically incorporates certain sections of FAR. (*See* Prime Contract, A-2(a) ("This contract incorporates one or more clauses and provisions by reference, with the same force and effect as if they were sort forth in full text. . . )). Specifically, Section I of LOGCAP IV includes FAR 52.216-7, entitled Allowable Cost and Payment, as a contract clause.

(Prime Contract at 38).This provision requires the contractor to submit invoices to the Government subject to the allowability of costs in accordance with Subpart 31.2. 48 C.F.R. § 52.216-7(a)(1).

58.    Thus, FAR subpart 31.2 governs what amounts are allowable under LOGCAP IV. Under Subpart 31.201-2, a cost is allowable, in relevant part, only if it is (1) reasonable and (2) complies with the terms of the contract. 48 C.F.R. § 31.201-2(a). This section also provides that a contractor is responsible for maintaining records that demonstrate the costs claimed have been incurred, are allocable to the contract, and comply with this applicable cost provisions, including this subpart. 48 C.F.R. § 31.201-2(d).

59.    FAR subpart 52.216-7 provides that allowable costs are limited to (1) the Contractor's actual costs for items or services purchased for the contract; (2) costs for supplies and services **under a subcontract, provided that those costs are "in accordance with the terms and conditions of a subcontract** or invoice;" and (3) financing payments made to subcontractors. 48 C.F.R. § 52.216-7(b)(1) (emphasis added). The MSA, in turn, provides that invoices shall be submitted electronically with backup documents "in accordance with Part II Exhibit 6 'Schedule of Prices.'" Ex. 2 at 8. The Schedule of Prices was the bidsheet that Damco initially submitted. Ex. 1. Thus, any invoice Damco submitted was required to be consistent with that bidsheet under the terms of the MSA and FAR § 52.216-7(b)(1).

60.    Reading these provisions together, LOGCAP IV requires DynCorp to invoice the Government for payments subject to the allowability of costs and according to other terms of LOGCAP IV. Allowable costs are those that are reasonable and comply with the terms of the contract. In addition, FAR 52.216-7 (b)(1) sets out that allowable costs must be (i) DynCorp's own costs of self-performance, (ii) costs related to a subcontract if DynCorp actually incurred them and

**"[i]n accordance with the terms and conditions of a subcontract,"** or (iii) progress payments subject to cost principles.

61. Initially, DynCorp teamed with the subcontractors CH2M Hill and Agility Defense & Government Services[3] to provide all the freight forwarding services under the Task Orders. In November of 2009, Agility Defense & Government Services, Inc. was suspended by the Government from participating in Government contracts due to the indictment of its ultimate parent company, Agility DGS Logistics Services Co. K.S.C.C., for alleged misconduct under a series of prime contracts in Kuwait and Iraq beginning in June of 2003. Because of this suspension, DynCorp terminated its subcontract with Agility Defense & Government Services. In January of 2010, DynCorp issued a Request for Proposals seeking a new subcontractor.

62. On March 31, 2010, Expedited World Cargo ("EWC") was selected to perform the freight forwarding services for DynCorp's OCONUS theatres of operations based on "best value" approach taking into consideration technical and price considerations. EWC was awarded a Fixed Unit Price Subcontract with economic price adjustment, which included fluctuations based on fuel surcharges. The value of the EWC subcontract was $25,000,000 for the base year. DynCorp anticipated that EWC would be the subcontractor for the entirety of the subcontracts with terms of a base year and four option years.

63. Over the course of the base year and into the first option year, EWC provided DynCorp with the contracted freight forwarding services. During the twenty months that EWC performed under the subcontract, its invoices amounted to $3.89 per kilo, as compared with EWC's quoted rate of $3.56 per kilo.[4] This was not due to fraudulent invoicing, but due to the fact that

---

[3] PWC Logistics bought Taos Industries Inc. in 2005. Subsequent to the purchase the company's name was changed to Agility & Defense Government Services, Inc.

[4] By way of further comparison, Damco USA charged up to approximately $6 per kilo.

the Government, in its initial Request for Proposals ("RFPs") for the Prime Contract, included a budget of only four million dollars for the freight forwarding services. EWC's invoices reflected the prices proposed in its RFP for the subcontract. The disparity was the actual costs it took to complete the work under Task Order 4. Because EWC and DynCorp were able to provide support documentation that justified these apparent cost overruns, the United States Government later approved (or "definitized") all outstanding invoices submitted during the twenty months that EWC was DynCorp's subcontractor.

64.    DynCorp's contractual relationship with EWC lasted until October 2011, when DynCorp issued another RFP for the same subcontract. This time, DynCorp ultimately selected Damco as its sole subcontractor for freight originating from abroad.

### 2.    DynCorp's Subcontract with Damco

65.    In early 2011, DynCorp decided to consolidate the administration of its Government subcontracts under one division titled "Center for Excellence." Through this centralized division, DynCorp hoped to save on duplicate administrative costs and be able to purchase supplies in bulk for all its subcontracts beyond LOGCAP IV. All of DynCorp's subcontract program managers worked in the Center for Excellence. Later in 2011, DynCorp further decided to rebid its LOGCAP IV subcontract for freight forwarding services.

66.    In its quest to save on administrative costs, DynCorp sought to subcontract with a partner with access to a valuable resource in Dubai: a low-cost consolidation center building, called a "quality control center" or "QCC." (Ex. 2, DynCorp Master Agreement with Damco.) DynCorp ships all the OCONUS procured goods and products it purchased under Task Order No. 4 to the Dubai airport. These goods and products are consolidated in one area and then loaded onto airplanes for the final destination, Kandahar, Afghanistan, or Camp Leatherneck Afghanistan.

Without a consolidation center building, DynCorp spent time and money gathering all the goods and products from different locations throughout the airport to one area in order to pallet and transport them. With a rent-free consolidation center, DynCorp was able to schedule all goods and products to be shipped and stored in this building until the time arrives to transport them to their final destination. Importantly, this was meant to benefit not only its military business, but all of DynCorp's business routed through Dubai. Accordingly, working with a partner that had a QCC appeared to create economic synergies within DynCorp's new Centers of Excellence structure.

67.     The United States at no time asked DynCorp to use a QCC or articulated a need for one. DynCorp's Request for Proposal for EWC's replacement, Exhibit 16, shows that DynCorp never asked bidders to bid on providing a QCC *per se*. Instead, the scope of work in the RFP required shipment to and beyond "DynCorp's newly initiated QCC in Dubai." Ex. 14 at BARR-018695.

68.     LOGCAP IV requires contractors to present subcontracts for approval before they can be finalized. DynCorp knowingly submitted Damco's bid as the winning bid to the United States Government for approval in November of 2011. (Ex. 14, Nov. 7, 2011 Advance Notification & ACO Consent Request Form and Attachments.) Among the materials DynCorp attached were the RFP and a pricing analysis. DynCorp's ***initial*** draft of the pricing analysis to be inserted in its ACO consent for the freight forwarding subcontract stated that ***Kuehne & Nagel, and not Damco, won the OCONUS contract.*** Draft Pricing Analysis, Exhibit 18. In the final ACO consent signed by the ACO officer, however, evident redlining has changed out the winners and Damco is now listed as the winning bidder, with Kuehne & Nagel listed as backup. Ex. 14 at BARR-018695.

69.     Kuehne & Nagel did indeed win the contract, but shortly afterwards a DynCorp manager visited the company's consolidation center in Dubai and declared it to be inadequate.

DynCorp rescinded the contract and approached each of the bidders to reach the last stage of bidding, including Damco. On the strength of Damco's representations about its QCC, DynCorp awarded the contract to Damco. Yet Damco's technical ratings had been judged low during the previous bidding process; Damco scored poorly on the qualitative 125-question survey examining technical basis, FAR and DFAR compliance, safety, trade compliance, risk assessments, and legal and financial standing. In its quest for the use of a QCC, DynCorp now represented Damco's technical score as higher, with changes across the board. Damco's technical score was now number 3, with a score of 82 compared to a previous score of 72.

70.    In demanding the use of the consolidation center, DynCorp knowingly accepted a Damco bid that should have been recognized as unrealistically low. Damco's OCONUS bid of $10,227,000 was at least $1 million lower than Kuehne & Nagel, the next lowest bid. In per kilo rate terms, Damco's bid was $2.15 per kilo. *See, e.g.,* Ex. 21 at 4. This was compared to EWC's actual per kilo billings of $3.89. And unlike other bidders, Damco reserved no right to charge accessorial costs on top of that base price – with a few rare exceptions. (Ex. 1, Damco Bidsheet 8, "Accessorials" tab.) Damco did so with the understanding that Damco *could charge accessorial costs despite the bid terms*. In the end, Damco's per kilo rate was approximately $6.60 per kilo.

71.    DynCorp's ACO consent fraudulently represented to the Government that Damco's bid represented the best possible pricing, that the subcontract was competitively awarded to Damco, and that DynCorp complied with the applicable cost accounting standards for awarding the subcontract to Damco. *Id.* at 2-3. And fundamentally, the ACO consent misrepresented the actual terms of the subcontract, because Damco intended at the outset that it would charge DynCorp, and thus the United States, for accessorial costs not allowed in the written contract, in exchange for use of Damco's Dubai QCC and simply to make maximum profit, and DynCorp

prepared to look the other way. Indeed, DynCorp's contract management team explicitly directed Damco to bid the per kilo cost for air freight low and add costs of operations to the accessorial charges so Damco would win the bid as the best price/service provider. Hugh Healey of Damco explicitly recognized this agreement, from the outset, in an email to Dean Arnold of DynCorp in July 2013. Of course, DynCorp and Damco agreed on this method of bidding while submitting an ACO consent with no accessorials.

72.     Before submitting the ACO consent request, Damco entered a Master Services Agreement (MSA) with DynCorp on October 25, 2011, with a one-year term, covering all of its freight forwarding needs as to goods originating from abroad, under both private and public contracts.  That MSA incorporated DynCorp's RFP and the terms of Damco's winning bid, including its accessorial bid sheet that listed zeros for all but a few charges. Section 9 of the MSA contemplated modifications to the contract, but only in writing, and only to the Schedule of Pricing as an equitable adjustment in response to a change in goods or services demanded by DynCorp. Ex. 2 at 9.

73.     In July 2012, DynCorp submitted a Justification of Award (JOA) for renewing the Damco subcontract for the next option year in the amount of $60.4 million as a sole source vendor without competitive bidding.  (Ex. 15, Justification of Award.)  In its Justification of Award dated July 10, 2012, DynCorp certified that Damco's offer was responsive and acceptable and that the contract price was fair and reasonable.  *Id.* at 4.  Further, DynCorp averred that Damco's proposal "remains the best possible pricing and the company the best qualified supplier to provide additional freight services for DynCorp in Afghanistan."  *Id.* at 2.  DynCorp based its conclusion on the same costs that appeared in Damco's original bid, even though DynCorp was fully aware that Damco was billing DynCorp for significant accessorial costs outside of that bid, and that, if those were

calculated in the bid, Damco's costs would be revealed as not just uncompetitive, but excessive. Specifically, DynCorp listed Damco's original bids for freight in and out of Dubai for a year as $999,000 and $9,228,000, figures that, according to the contract, should have included the majority of accessorial costs. *Id.* At 3. The Justification further represented that there would be "no increase in pricing for the next year," and, again on the same page, "The pricing for the next period of performance 8/1/2012 to 7/31/2013 remains unchanged." *Id.* In reality, that pricing was a lie from inception, as DynCorp could hardly claim that prices remained unchanged after paying Damco at least twice as much, and at least twice as much as EWC had charged, over the previous year. *Id.* DynCorp based its Justification on the same costs that appeared in Damco's original bid. Yet, DynCorp was fully aware that Damco was billing DynCorp for significant accessorial costs outside of that bid, and that if those were calculated in the bid, Damco's costs would be revealed as not just uncompetitive but excessive. DynCorp knowingly made false representations regarding the pricing of the services under the subcontract, thus fraudulently inducing the Government into accepting the subcontract, which resulted in the Government's wrongful reimbursement of millions of dollars.

74.    Reddell's early 2012 audits led to Damco's $3.1 million partial refund to DynCorp, as described above. Yet, Damco continued charging for accessorial charges not within its subcontract and merely shifted oversize charges to palletization charges.

## B.    DynCorp's Misrepresentations to Government of Actual Costs

### 1.    Accessorial Air Freight Costs

75.    Relators reallege and hereby incorporate by reference each and every allegation contained in the preceding paragraphs of the Fourth Amended Complaint.

76.    Every accessorial charge included on any Damco invoice outside of the few accessorial charges included in Damco's bid is a fraudulent charge.    In its directive, the Government specifically advised that some companies "have excessively high rates for accessorial services," and "highly encouraged . . . review [of] the entire tender to include accessorial rates . . . to ensure the Department of Defense (DOD) is getting the 'Best Value.'"  (Ex. 4, Damco Freight Invoice Audit PowerPoint Presentation II at 6.) DynCorp's RFP required subcontract bidders to fill out bidsheets, including for accessorial charges. All other companies bidding on the subcontract for Task Order No.4 included the anticipated use of accessorial costs in their price per kilo calculations.  That is the reason that all the subcontractors responding to DynCorp's initial RFP had significantly higher cost calculations. Like its competitors, Damco purported to include accessorial charges in its price per kilo bid proposal, but with the plan to charge them at high rates from inception of performance. Damco's cost per kilo, therefore, appeared lower than most of its competitors. With the exception of the few accessorial charges included in Damco's bid, every extra line item charge, such as Saturday delivery, airport transfers, shrink wrap, and/or fuel surcharge is a charge Damco pledged not to submit.  Each is therefore a fraudulent charge.  But many of the accessorial costs billed to DynCorp are fraudulent on an additional ground: Damco never actually incurred them; it made them up. The fact that these accessorial charges were not included in the MSA and the fact these charges were not incurred serve as independent bases for rendering these charges unallowable under FAR 55.216-7, as incorporated in LOGCAP IV. DynCorp was prohibited from submitting invoices for charges not included in the Damco MSA.

### a.  **Oversize Charges**

77.    As noted above, Damco agreed not to charge for most accessorial costs, instead including them in its price per kilo air freight transportation costs.  Oversize charges, like most of

Damco's accessorials, were listed on Damco's bid at zero cost. Damco did, however, include such costs in the invoices it charged DynCorp for such contracted services. (*See* Exhibit 22, Invoice). Some of the costs, including "oversize" charges, singlehandedly doubled invoice totals.

78.    Oversize billing is a cost associated with the shipment of cargo aboard an aircraft that exceeds the capacity of the aircraft fuselage to accommodate said cargo in a cost effective manner. In the usual course of business, one or two packages may be considered "oversize," and additional charges are incurred for working with large packaging. In contrast with usual course of business, however, Damco routinely categorized the entire pallet of goods and products as "oversize," resulting in the inflated rates Damco charged. (Ex. 12, Damco Oversize Analysis.)

79.    Billing in this manner was fraudulent, first, because the contract prohibited billing DynCorp, and thus the United States, for oversize charges. It was fraudulent, second, because the oversize charges had never been incurred; they were fictional. For an oversize charge to be legitimate, the freight forwarder (Damco) must have been billed an "oversize rate" by aircraft owner/operator, a company by the name of Diplomatic Freight Services (DFS). That cost is then passed through to the prime contractor (DynCorp) and on to the United States. If the owner/operator, DFS, of the aircraft did not actually charge for the supposedly oversize cargo, then no initial billing for said oversize should occur. Any subsequent billing for oversize charges not actually incurred is fraudulent in nature and constitutes a violation of federal law.

80.    Indeed, from 2011 through 2013, DFS did not charge Damco any special fee for shipping oversize items.

81.    Damco's practice was to declare a pallet oversize if its dimensions were over 1 meter by 1.2 meters in dimension, and if one pallet was oversized then the whole master airway bill was charged the oversize rate. DynCorp was worried that the United States would deem

Damco's $4 million in overcharges, exposed by Reddell's audit, not fair or reasonable, and it was that worry that drove the $3.1 million settlement.

82.    During the negotiations leading up to the $3.1 million settlement, DynCorp negotiators spoke among themselves about their acceptance of the fact that Damco was pursuing a strategy of winning DynCorp's business with a low quoted price, and their general contentment with the costs of $5.4/kilo they were seeing across their global business.  On the other hand, DynCorp refused to accept Damco's offer of $1.5 million dollars and wanted more money, but paid incrementally as part of a "structured reduction."

83.    Damco was inclined to agree to $3.1 million, on the condition that it would be allowed to continue as freight forwarder at least through 2013.  The parties agreed to the price with the understanding that DynCorp employee Gary Bailey would notify the Army about the settlement.  That never occurred.

84.    Damco had numerous strategies for recovering the $3.1 million payment.  First, Damco personnel such as Thomas Kristensen, an employee on loan from Maersk Logistics, expected its sole airfreight provider, DFS, to contribute.  This was a remarkable expectation, as DFS had only charged Damco a few times for oversize items in the whole of 2012, and then only for extremely large items, after first providing a separate quote to Damco.  Damco had been imposing the oversize charges without regard to whether items were in fact oversize, without relation to any actual cost to Damco, and without telling DFS.  DFS's lack of knowledge of Damco's imaginary charges posed a challenge that apparently did not deter Damco from its determination that DFS share the cost of settlement.  On April 2, 2013, two Damco executives, Thomas Kristensen and Jacco Weterings, discussed these points in an email exchange. After that, Kristensen attempted to gain DFS's contribution by offering DFS a "Retroactive VIP Scheme."

While he was not successful in getting a credit from DFS, Damco was nevertheless able to leverage the situation to secure better rates from DFS.

85.    Indeed, Kristensen and Damco were able to recoup their entire loss from DFS, by securing approximately 21% of Damco's gross billings from DFS in the form of credits and adjustments for rates, double billing, fees and assessorial charges.  Specifically, from December 2011 through December 2014 for work conducted under LOGCAP IV, DFS moved, or caused the movement of, 6,360,448.36 kilograms of cargo on behalf of Damco.  DFS billed Damco $17,672,448.76 for the period in question.  DFS issued $3,663,349.63 in credits (21%) back to Damco for the same period. *See, e.g.*, DFS Credit Memo for Dnata Handling Charges, attached as Exhibit 26. By having DFS invoice for fictional accessorials that Damco had no intention of paying for, Damco was able to conceal that it was not actually incurring any costs for accessorial fees it charged to DynCorp. *See* DFS Invoice with DNATA Handling Charges, attached as Exhibit 27.

86.    Second, Damco began imposing a new fuel surcharge calculated to make it whole, discussed in detail below.  In addition to these two steps, Damco determined moving forward to continue making the same profit it had been making through oversize charges, by shifting to palletization charges.

### b.  Palletization Charges

87.    Palletization is the placing of goods to be transported on pallets so that they can be moved in larger units, especially with a forklift, potentially saving time and labor. Palletization charges on air freight were not included as a separate accessorial cost in the MSA.

88.    Following Reddell's 2012 freight invoice audit of Damco and the $3.1 million settlement, in early 2013, Damco switched the category it used to inflate its freight costs from

"oversize" to "palletization." Damco maintained the initial $2.15 charge per kilo as the base rate, but added a "palletization" fee that mirrored the per kilo charge. This extra fee thus doubled the total of the invoice Damco submitted to DynCorp under the parties' subcontract. As reflected in Damco's bid, "palletization" fees may only be charged for oceangoing freight transportation. (Ex. 1, Damco Bidsheet 8, "Accessorials" tab; Ex. 7, MAWB 686-00142026 Analysis Excel Spreadsheet, "Summary" Tab; Ex. 8, MAWB 686-00142026 Analysis PowerPoint Presentation; Ex. 9, Damco Bidsheet 9; Ex. 13, Email Correspondence "RE DAMCO Palletization Charges.") In Damco's surface transportation bid, the bidsheet for air freight transportation does not even contain a blank to fill out for palletization charges. (Ex. 1, Damco Bidsheet 8, "Accessorials" tab; Ex. 7, MAWB 686-00142026 Analysis Excel Spreadsheet; Ex. 9, Damco Bidsheet 9; Ex. 13, Email Correspondence "RE DAMCO Palletization Charges".) Specifically, in Damco's Bidsheet 9, in the tab titled "Global Packing & Crating Rates", cells B34, B35, B36, B37, B38, B39, B40, and B41 list costs for "palletizing" under cell A4 titled "OCEAN PACKING AND CRATING COSTS", and under cell G4, which is titled "AIR FREIGHT PACKING AND CRATING", there is no mention of "palletizing". (Ex. 9, Damco Bidsheet 9.) Because palletization charges on air freight were not included on the bid sheet or authorized under the MSA, Damco should not have been charging this cost in its invoices at all. Yet, it did. (*See* Exhibit 23, Invoice).

89.    Further, the palletization charges that Damco billed to DynCorp were patently unreasonable and even detached from any actual incurred service or cost. First, the charges were inflated; Damco routinely charged for palletization of multiple lines of LOGCAP goods in a pallet and did so on a percentage basis that was not industry standard, even though the company understood that shipments may often have included only one line. Employees expressed considerable concern that this practice constituted fraud and violated the False Claims Act, but

it continued.  Second, Damco charged for palletization fees even where goods had arrived from DFS already palletized.  Third, the per-pallet charge of $600 was itself exorbitant.  DynCorp's John Hatch (Supply Chain Director) and David Ashcraft objected internally, but Gary Bailey was hesitant to protest the charge.  Jacco Weterings at Damco eventually admitted to a colleague that there were problems with the setup of rate structure and that the palletization charge actually covered full operation end-to-end costs with warehouses, storage electricity, etc. He asked that such information not be shared with DynCorp.

90.    By fall of 2013, DynCorp employees including Dean Arnold and Jim Grazioplene were objecting to palletization charges that amounted to more than seven times the value of the goods transported in some instances.  With palletization charges that increased from $330,000 in 2012 to $2.8 million over about 9 months in 2013, it was clear that Damco was making up for its inability to charge for oversize costs.  Damco did not deny it; it claimed instead that it was palletizing more often in order to avoid oversize charges.  Thomas Kristensen at Damco counseled avoiding the subject, but DynCorp demanded reduction of the charges or it would find a new freight forwarder.

91.    Damco decisionmakers began exploring what accessorial charge it could begin imposing to make up for all lost profit if the company agreed to reduce palletization fees to $75 per pallet.  They hit upon a fuel surcharge, as it is easily justifiable by pointing to market levels, and is an easy pass through to the United States Government for DynCorp. Damco's goal at this point was to squeeze as much money as possible out of the remainder of the contract term, calculating that the company could do nothing to win contract renewal at that point.  In a subsequent meeting, Thomas Kristensen was able to convince DynCorp's Dean Arnold that it was at DynCorp's request that Damco had kept its per kilo rate low but accessorials high.

37

92.     Damco's palletization charges approximately doubled the amount of its invoices over many months.  DynCorp passed these inflated and illegitimate costs to the Government, and the Government reimbursed DynCorp for the costs.  Even when Damco ceased billing for palletization charges, it offered no refund, and indeed, simply shifted the charges elsewhere.

93.     DynCorp did not submit to the Government these inflated palletization invoices or any other document that justified the increase in the freight forward charges.  These charges simply appeared as a line item identified as freight forward charges.  Before this suit commenced, the Government had not audited DynCorp or identified the rampant fraud perpetrated by DynCorp and Damco.  While EWC had the documents to support its cost overruns, no such documents exist here.  The justification for these overcharges therefore does not exist.  DynCorp has not yet requested the Government to definitize the Damco costs, as it did with EWC, perhaps because DynCorp's senior management knows it cannot justify these overcharges and will be held responsible to the Government for such charges.

### c.  Dim Weight

94.     The term "dim weight" is an abbreviation of the term "dimension weight."  "Dim weight" is used to describe objects or packages that are not standard and/or are asymmetrical in size.  A basketball hoop with stand is a prime example of an object that would fall within the "dim weight" category.  Due to the odd volume the object occupies in a pallet of goods for freight transport, the cost to transport the object is much higher than that of an object classified as "oversize".

95.     Damco routinely converted oversized objects to a "dim weight" chargeable weight, which is charged at a higher rate than the actual weight. (Ex. 4, Damco Freight Invoice Audit PowerPoint Presentation II at 5.)  This allowed Damco to charge more for the items it was

transporting.  *Id.*  Further, Damco often would charge for the "dim weight" chargeable weight and add "oversize" charges for the same object on the same invoice, which further contributed to the fraudulent charges that DynCorp passed onto the United States Government.  *Id.*

96.     Dim weight calculations are shown on the air waybill via a dim weight conversion for that pallet.  That dim weight was then used to populate the invoice as kilo weight. Subsequently, oversize charges were then applied to the already "marked up" actual weight to dim weight.

97.     An example illustrates how Damco would bill such charges.  If an object had an actual weight of 100 kilograms and Damco classified the object as "dim weight", the object may, for purposes of this example, have a chargeable weight of 150 kilograms.  Damco would multiply the 150 kilograms by its $2.15 per kilo rate, to equal $322.50.  Damco would also add "oversize" charges at $2 per kilogram to equal an additional $300 "oversize" charge, for a total charge of $622.50 for the object.  Damco's practice is contrary to the standard industry practice, which involves charging an unusually shaped or oversized item as either "dim weight" or "oversize", but not both.  Damco's practice also resulted in additional fraudulent charges, which DynCorp passed onto the United States Government for reimbursement.

## 2.     Micro-Shipping Issue

98.     In addition to including all the accessorial costs on its invoices, Damco also engaged in a practice known as "micro-shipping."  In the usual and normal course of air freight transport, a company will issue one invoice for all the pallets for an individual flight.  By utilizing one invoice, the company only includes a one-time charge for items such as "export customs clearance" and "documentation" preparation – usually the last two items listed on the accessorial fees on an invoice.  The usual and customary charge is $100 for the exports customs clearance and

$200 for the documentation preparation.  Again, these two items are a one-time flat fee for the entire airplane load of goods and products.

99.    In contrast, Damco routinely created an invoice for each pallet of goods and products that was loaded onto the airplane.  Damco created up to 50 invoices per load. Reddell's investigation included review and analysis of all the invoices for each pallet of goods shipped on one plane load, corresponding with a Master Air Waybill ("MAWB").  Reddell's analysis revealed that Damco includes on every invoice charges for "export customs clearance" and "documentation" preparation. *Id.* By creating an individual invoice for every pallet loaded instead of one invoice for the entire load, Damco significantly increases the cost of each flight by charging multiple times fees that are ordinarily a one-time fee. For example, in the 21 invoices included in Reddell's analysis of Master Air Waybill ("MAWB") 327-00184026, every one included an $100 "export customs clearance" charge and a $200 "documentation" charge, which totaled $2,100 in "export customs clearance" charges and $4,200 in "documentation" charges on a single plane load. The total cost was, therefore, $6,300 per airplane load. By way of comparison, in the usual and normal course of air freight transport, other companies would have charged a one-time fee of $100 for the "export customs clearance" charge and a one-time fee of $200 for the "documentation" charge for a single plane load.  Damco's practice therefore resulted in significant additional fraudulent charges that DynCorp passed onto the United States Government for reimbursement.

100.    Due to Damco's graduated shipping rate, micro-shipping also allowed Damco to bill for numerous small shipments at a higher rate individually than what would have been charged collectively had the entire plane load been weighed and billed accordingly.  Normally, a company charges a set per kilo rate, regardless of the weight. But Damco charged a graduated rate and broke down shipments into 1000 pounds or less to charge at a higher graduated rate per invoice.

### 3.    Fuel Surcharges

101.    Fuel surcharges are considered an accessorial cost covering the ever changing cost of aviation fuel.  When contracts are bid, bidders can choose to include fuel surcharges in the per kilo rate, or reserve the right to charge them separately according to a specified method.  Here, Damco did not so reserve the right to charge this fee in its bid; instead, Damco included fuel surcharges in the per-kilo cost in its contract bid.  Yet, Damco sent Aiello a bidsheet with a "FSC" charge of 40 cents per kilo. In the December 6, 2012, JOA, Damco's new accessorials bidsheet listed "FSC" for the first time, and priced it at 40 cents per kilogram. Thus, any fuel surcharge invoiced prior to the December 2012 JOA was not consistent with the terms of the MSA, and was therefore unallowable under FAR 55.216-7, as incorporated in LOGCAP IV. The fuel surcharges after the December 2012 JOA were also unreasonable, which made them unallowable under FAR 55.216-7, as incorporated in LOGCAP IV.

102.    Where fuel surcharges are allowed, a cost for air cargo is provided to the contactor (Damco) by the owner/operator, DFS, of the aircraft designated for said purpose.  When fuel costs increase, DFS is entitled to charge a fuel surcharge to Damco.  Damco, with proper approval, in turn, can pass the fuel surcharge onto DynCorp and ultimately the United States for payment. For the fuel surcharge to be legitimate there has to be a paper-trail of actual fuel cost increase; it cannot be applied arbitrarily at the whim of Damco.  Yet Damco did just that. DFS never invoiced Damco for a fuel surcharge. Damco increased the fuel surcharge from $.40 to $1.00 per kilo in an effort to recoup lost profits due to the $3.1 million settlement with DynCorp for excessive oversize billings.

103.    In the first months of 2013, when Damco and DynCorp were negotiating the $3.1 million settlement, Damco began conditioning settlement on DynCorp's consent to a raised fuel surcharge to replace the oversize charge. Fuel surcharges were considered easy to pass through

to the Army. DynCorp negotiators responded that they could envision justifying a fuel surcharge and possibly other freight rates as well BUT, they could not tie the two things together in a settlement deal – that would be too transparent. Damco pushed back, representing that its current fuel surcharge was only one third of market rate. The parties haggled about the how retroactive the increased fuel surcharge would be. During this period, Damco negotiators were aware that their demands amounted to blackmail, given DynCorp's inability to justify the parties' pricing and conduct from the contract's inception.

104. In July of 2013, Rick Chevalier agreed to a fuel surcharge increase to $1.00 per kilogram, retroactive to May 1, 2013. DynCorp calculated internally that the increase would give Damco at least $2 million positive impact over nine months of historical data.

105. At that time, DCAA was already scrutinizing Damco's fuel surcharges. On March 25, 2013, DCAA auditor emailed DynCorp about a number of questions arising during its audit, including questions to Brian Freas about why the fuel surcharge was so high. *See* August 8, 2013 email containing string of past auditor questions, Exhibit 19. DCAA's Raymond Attaway questioned excessive fuel surcharges in a March 22 2013 meeting, as acknowledged by DynCorp's Debora Parry via email.

106. In mid-July of 2013, Brian Freas asked for Reddell's input on a white paper attempting to justify the fuel surcharges, among other charges. It attempted to do so by comparing "base" Damco and UPS charges, including fuel surcharge but not other accessorials, in essence relying on Damco's still low base charges to downplay the exorbitant accessorials. Even so, UPS's rates were lower. Freas's white paper suggested that UPS had mistakenly underbid its contract as to palletization and certain charges, and that in the end UPS would charge just as much:

> Continued evaluation of all costs adding assessorial [sic] charges presented a variance or difference in the price model. DAMCO assessorials [sic] additions of

palletization charges, shrink-wrap fees, and documentation charges increased the costs by 28%. UPS assessorial charges were minimal.  Some assumptions can be made concerning the results of the all in costs. UPS not having the full understanding of the shipment and the physical condition of the cargo may not have added enough cost for palletization, shrink-wrap or other fees.  In this comparison, the cost differences between the two forwarders will only decrease as the UPS "estimates" would add cost should they move actual freight in the sample configurations. UPS did not provide a variable charge for their assessorial fees. They were fixed.

July 16, 2013 email from Brian Freas to Robert Reddell, Exhibit 20.  The problem with this comment is that UPS was bound to its contract; unlike Damco, it was not going to charge for accessorials prohibited in its contract. What the white paper actually shows is that other vendors offered a much cheaper alternative to Damco's real per kilo price of $6.60.  Yet DynCorp apparently submitted this white paper to the government, probably with a July 5, 2013 Justification of Award extending the contact into 2014 and stating that the fuel surcharge, in effect since May, was comparable to other airfreight providers listed in a chart.  *See* July 5, 2013 JOA at pages 4-5, Exhibit 21. The July 2013 JOA also continued to misrepresent DAMCO pricing, stating, "Since the inception of MSA# 2011-06-0031-DAMCO, DAMCO USA Inc., pricing has remained largely unchanged," and suggesting that Damco's per kilo pricing of $2.05 to $2.25 was the total price except for the fuel surcharge and is thus under the market price of $3.40-$3.65.

107.    Moreover, all statements to the United States, including in the July 2013 JOA, disclose at most deceptive half-truths about the new fuel surcharge, because they fail to disclose that the impetus for the surcharge, and its price, were determined solely by Damco's desire to regain the fraudulent proceeds it would otherwise lose upon agreeing to the $3.1 million settlement and the limit on its palletization charges. And that circumstance alone rendered the fuel surcharges *unreasonable* and materially so under FAR regulations. All of those other providers, however, including UPS, would have adhered to the industry standard: the charge is allowable under limited

circumstances only, and tied at all times to actual cost increases.  Only then is $1 per kilogram reasonable.

### 4.  <u>Lump Sum Invoicing</u>

108.    On certain small kilo invoices (including invoices that were wrongfully broken down into pallets instead of encompassing a whole plane, furthering Damco's microshipping scheme), Damco, and correspondingly DynCorp, defrauded the Government by billing unreasonable lump sum costs. On its invoices, Damco charged individual items as "lump sums," instead of including the per kilo rate for each charge. Damco used a "lump sum" designation to cloak the per kilo charge actually charged per item. Damco was thus knowingly hiding its excessive, non-contractual rates behind the term "lump sum." These charges were exorbitant and unreasonable in violation of FAR Subpart 31.201-2. DynCorp knew these charges were unreasonable, as it was industry standard to include the per kilo rate for each charge.

109.    For example, Damco billed DynCorp $2,318.87 on Invoice 55-10-000848-01 from June 15, 2012, while moving only 15 kilograms of freight. (*See* Exhibit 24, Invoice). DFS, conversely, invoiced Damco only $112.50 for the air freight for the same invoice. (*See* Exhibit 25, Invoice). The Damco invoice included $1,193.63 in "AirFreight Charges" listed as a lump sum. This invoice also included lump sum charges for (1) packaging, skid or pallets; (2) shrink wrap; (3) handling fees; (4) air fuel surcharge; (5) customs clearance; and (6) documentation fee origin. Setting aside the fact that these accessorials were either unallowable under the contract or not incurred, as evidenced by the corresponding DFS invoice, they were also false and/or fraudulent because they bear no relation to the weight of the freight being shipped. Damco's per kilo charge for this shipment is $79.57 with all of these charges included. Damco simply made up a charge for the air freight and accessorials and added the designation "lump sum" to each one. Damco used

this "lump sum" designation throughout 2012 and 2013. DynCorp knew or should have known that these charges were unreasonable but nevertheless passed them on to the Government.

### 5.  **Weight Inflation**

110.    During the year of 2012, Damco routinely inflated the weights on its freight invoices to DynCorp. These inflated invoices were eventually passed onto the Government for payment.

111.    An examination of DFS Invoices covering 2012, specifically form December 1, 2011 through December 6, 2012, reveals that DFS billed Damco for 4,190,742.4 kilograms for freight moved. Damco invoiced DynCorp for 4,371,128.67 kilograms for freight moved for that same time period. DynCorp passed said invoices onto the Government for payment.

112.    Damco thus billed DynCorp for at least 180,386.23 kilograms more than DFS billed Damco. Of particular note, the overage of 180,386 kilograms was derived from reviewing only 2787 Damco Invoices of a total 2012 universe of 5351 invoices. The missing Damco invoices will likely increase significantly the calculation of the overcharge for inflated weights.

113.    For example, for Airway Bill 327-0018-4166, DFS invoiced Damco for transporting 35,369 kilograms of freight. *See* DFS Invoice, attached as Exhibit 28. Damco's thirteen invoices for that same AWB, which were passed onto the Government for payment, were for 35,595.2 kilograms. Damco overbilled for 226.2 kilograms of freight on this set of invoices alone.

114.    Damco also improperly charged for assessorial costs on each weight-inflated invoice. Assessorial rates were almost always tied to the weight--per-kilo rate when billing. Because assessorial costs made up approximately half of the total cost of the contract, this overcharge is significant.

### C. Fraud–in-the-Inducement

115.    The United States Supreme Court's ruling in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), has been recognized as establishing the "fraud-in-the-inducement" theory as actionable under the False Claims Act.[5]   Courts have found defendants liable under the False Claims Act for each claim submitted to the Government under a contract when that contract was obtained originally through false statements or fraudulent conduct.[6]   The Ninth Circuit in *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1048 (9th Cir. 2012), as a matter of first impression, held that "false estimates, defined to include fraudulent underbidding in which the bid is not what the defendant actually intends to charge, can be a source of liability under the FCA claim, assuming that the other elements of an FCA claim are met."   The contractor's fraudulent act of intentionally underbidding a contract taints the formation of a Government contract.   And, as the Supreme Court held in *Hess*, "[I]ts taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the government."[7] The request for payment is a demand on the Government that makes the fraudulent low bid actionable under the False Claims Act.

116.    Damco and DynCorp fraudulently induced the United States, and specifically, the ACO, to consent to Damco's MSA. First, Damco lied in its bid for the freight forwarding contract by representing that it would not charge for accessorials, when it always intended to do so, and from the inception of performance.   DynCorp either knew that, or should have known it, but agreed to look the other way because it valued Damco's QCC. That deception caused DynCorp to present

---

[5] *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1048 (9th Cir. 2012).
[6] *See, e.g., United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d, 458, 467-68 (5th Cir. 2009) (alleged false statements in grant proposals sufficient to trigger FCA liability, even if claims for payment were not alleged to be false or fraudulent.); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) (Fraud-in-the-inducement cases find FCA liability for each claims submitted when contract was originally obtained through false statements or fraudulent conduct.).
[7] *Hess*, 317 U.S. at 543 (1943).

an equally deceptive Justification of Award document to the ACO to approve the MSA after the fact.

117.    After the contract began to be performed and Damco began charging contrary to the terms of its own subcontract, DynCorp had clear knowledge of the fraudulent charges, but nevertheless submitted a series of false Justifications of Award to the United States, including a July 2012 statement that claimed that pricing was unchanged, a December 6, 2012 statement misrepresenting the comparability of new pricing, and a July 2013 statement asserting that prices were largely unchanged since inception of the subcontract.

118.    The government relied on these representations in consenting to the MSA, consenting to its renewal, and consenting to modifications to the MSA, when otherwise it would have refused to do so and refused to pay Damco's exorbitant charges or rescinded the subcontract altogether.

**D.      DynCorp and Damco Conspired to Induce the Government's Acceptance of the Fraudulent Contract.**

119.    Relators hereby allege and incorporate all preceding allegations in the Fourth Amended Complaint.

120.    Defendants conspired to enter into a mutually beneficial subcontract that resulted in higher earnings for both companies. DynCorp and Damco agreed to have Damco bid low for the per kilo rate while using high accessorial rates to make up the difference. DynCorp and Damco structured a bid from Damco that it knew the Government would approve, without disclosing the true accessorial rates. As explained above, DynCorp's initial incentive to subcontract with Damco was the rent-free use of the consolidation center at the airport in Dubai. This agreement to use the QCC resulted in significant savings to DynCorp for the transportation of goods and products purchased under Task Order No. 4 to Kandahar, Afghanistan.  In exchange for the free use of

Damco's consolidation center, DynCorp passed through inflated invoice charges for reimbursement from the United States Government. The United States Government approved the proposed subcontract between the two companies largely based on the low price per kilo fees included in Damco's initial bid and then its continuation into Option Year 2. DynCorp and Damco knew that these charges were fraudulent when the subcontract and price proposals were submitted for approval. DynCorp thus repeatedly certified that Damco's bid presented the best price proposal with fair and reasonable costs.

121.    Additionally, DynCorp did not object to the inflated invoice costs submitted by Damco as DynCorp's profit margins also increased due to the inflated costs. DynCorp's prime contract was a "cost-plus-award-fee" contract, which allowed for a base fee, or fixed profit, and an award fee, or graded profit. DynCorp's prime contract with the United States Government provided for payment of direct costs, such as labor, material, subcontracts, and equipment, and indirect costs, such as profit, the program support office ("PSO"), overhead ("OH"), and general and administrative costs ("G&A"). The profit consisted of a base fee profit and a graded fee profit of up to five percent. With respect to the graded fee, the prime contract allowed DynCorp to recover all or part of an award fee pool, into which five percent of the amounts invoiced by Damco were placed. The prime contract provided for an award to DynCorp of part or all of this award fee pool depending on how the Government graded DynCorp's performance under the prime contract. The following example illustrates how direct costs and indirect costs are billed:

| Direct Cost: | | $1,000.00 |
|---|---|---|
| PSO | 3.50% | $    35.00 |
| OH | 2.75% | $    27.50 |
| G&A | 1.60% | $    16.00 |
| Base Fee (Fixed Profit) | 2.00% | $    20.00 |
| Award Fee (Graded Profit) | 5.00% | $    50.00 |
| TOTAL: | | $1,148.50 |

Accordingly, the greater the amounts Damco invoiced to DynCorp, the greater the amounts DynCorp could charge the Government for indirect costs.

122.    Further, DynCorp paid upper management members bonuses based on profit (the base fee and the award fee) under Task Order No. 4.  The higher the direct costs, including the Damco subcontract, were, the higher DynCorp's profit was, and, as a result, the higher the bonuses of DynCorp's upper management were.  Based on this bonus structure, these individuals were incentivized to keep invoices high.  Although DynCorp management knew that Damco was grossly overcharging the United States Government for freight forward services, these individuals did not want to lose any percentage of their bonuses.  DynCorp's upper management therefore maintained a blind eye to the overcharges, which resulted in the Government wrongly reimbursing the Defendants millions of dollars.

123.    Even if DynCorp did not conspire from the outset to overcharge the United States, DynCorp understood and approved at least by the time of Reddell's reports in 2012 and its negotiation of the $3.1 million "settlement" that Damco was not charging contractual rates and the new rates had not been approved by the government. DynCorp understood that Damco was piling fraudulent charge upon fraudulent charge with the vast majority of invoices from a combinations of misrepresenting its services and costs, overcharging under the contract, and inducing the Government to accept modified contractual rates that were actually grossly unreasonable. Instead of exposing these issues and seeking full refund, DynCorp compromised on charges and drafted

deceptive Justification of Awards and other documents that obscured the truth about Damco's charges.

**E.    Certifications and False Statements**

124.    DynCorp and Damco have issued or caused to be issued a number of different false certifications and statements.  All of the below FAR provisions are incorporated into LOGCAP IV and therefore obligated DynCorp as prime contractor.

125.    Each time DynCorp submitted an invoice to the Government it included the following express certification: "I certify that all payments requested for the appropriate purposes and in accordance with the agreements set forth in the contract." DynCorp submitted invoices via electronic means about every two weeks, and this certification appears on every electronic submission, not via some automatic population process, but because it was written in. For each such invoice that included Damco charges, the invoice indicated that the amount was under Damco's freight forwarding contract and listed a Damco invoice number. This express certification forms the basis for falsity based on express certification.  *See, e.g., U.S. ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 988 (S.D. Ohio 2014) ("Vouchers for payment which Lockheed submitted to the Government contained a certification that the costs were applicable, allocable, and reasonable, a standard consistent with FAR 31").

126.    Likewise, FAR 52.232-4 provides that for transportation-related contracts, the Government shall pay the contractor "upon the submission of properly certified invoices or vouches, the amount due for services rendered and accepted . . . . " 48 C.F.R. § 52.232-4. Under this provision, which was incorporated into LOGCAP IV, DynCorp was required to submit properly certified invoices for all of Damco's claims.

127.    Section 52.244-2, incorporated into LOGCAP IV, required DynCorp to notify the ACO reasonably in advance of placing any subcontract or modification for which consent is required for the proposed subcontract price. 48 C.F.R. § 52.244-2. Under this provision, Damco and DynCorp were compelled to submit the original JOA and the December 2012 JOA with modifications for approval. These JOAs contained false statements because they misrepresent the true pricing to be charged and misrepresent that pricing has not changed when pricing never described in the JOA was included. In its Justification of Award dated July 10, 2012, DynCorp certified that Damco's offer was responsive and acceptable and that the contract price was fair and reasonable.  Exhibit 15 at 4.  Further, DynCorp averred that Damco's proposal "remains the best possible pricing and the company the best qualified supplier to provide additional freight services for DynCorp in Afghanistan."  *Id.* at 2.  DynCorp based its conclusion on the same costs that appeared in Damco's original bid, even though DynCorp was fully aware that Damco was billing DynCorp for significant accessorial costs outside of that bid, and that, if those were calculated in the bid, Damco's costs would be revealed as not just uncompetitive, but excessive.  Specifically, DynCorp listed Damco's original bids for freight in and out of Dubai for a year as $999,000 and $9,228,000, figures that, according to the contract, should have included the majority of accessorial costs.  *Id.* At 3.  The Justification further represented that there would be "no increase in pricing for the next year," and, again on the same page, "The pricing for the next period of performance 8/1/2012 to 7/31/2013 remains unchanged."  *Id.* Similarly, in December 2012, DynCorp submitted another JOA. This JOA included the bidsheet for ACO approval, but gave misleading information about the new charges and failed to justify them.

128.    Under FAR 52.215-21, incorporated into LOGCAP IV, the contractor may submit a written request for an exception to costs that were in excess of the original contracting price by

submitting, inter alia, information on "prices at which the same item or similar items have previously been sold that is adequate for evaluating the reasonableness of the price of the modification ." 48 C.F.R. § 52-215-21. The December 2012 JOA as signed stated that pricing was based on market research, and that accessorial charges were comparable and reasonable.  In reality there was no market research, and hazmat charges were probably the only possibly market rate charge on the rate table, due to the nature of the charge. The December 2012 JOA, therefore, included misrepresentations and falsehoods because Damco and DynCorp did not provide sufficient information to evaluate the reasonableness of the modification.

129.    As part of LOGCAP IV, all contractors were required to complete online certifications for their online submission of claims for payment under Online Representations and Certifications Application ("ORCA"). 48 C.F.R. § 52-204-7000. This later became the System for Award Management ("SAM"). DynCorp made these certifications at the outset and with each voucher.

130.    Even during the Government's investigation, Damco continued to make false statements regarding its invoices. In a June 1, 2015 letter to an agent investigating the fraud alleged by Relators, Damco claimed it had conducted an audit of all invoices under the MSA and found that the charges on Damco's invoices were accurate and that Damco had in fact undercharged DynCorp half a million dollars. Damco asserted that the undercharges and overcharges were a result of a misunderstanding regarding oversized cargo charges that were later clarified. Even if this were true, Damco's letter completely ignored the fact that all accessorials were extra-contractual and not incurred.

131.     All of these certifications and false statements caused the Army to enter into the contract, approve the subcontract and modifications, to pay false claims, and to not rescind the contract or subcontract.

**F.     Obligation to Repay Money to the Government**

132.     As part of their fraudulent scheme, both Damco and DynCorp knowingly and improperly avoided an obligation to repay money to the Government.

133.     FAR Section 52.232-25(d), incorporated into LOGCAP IV at p. 39, provides that once the Contractor becomes aware that the Government has overpaid on a contract financing or invoice payment, he shall notify the Contracting Officer and seek instructions for remitting the overpayment. 48 C.F.R. § 52.232-25(d). Under this provision, DynCorp had the contractual obligation to notify the Government immediately once it became aware of the fraudulent charges submitted by Damco and DynCorp in order to arrange for disposition of the overpayment.

134.     The October 2008 version of FAR Section 52.232-25(d), which became effective as part of a contract modification, added specific instructions for repayment of the overpayment amount to the Government. Thus, both the 2003 and 2008 versions of 48 C.F.R. § 52.232-25(d) mandate repayment of any overpayments from the Government.

135.     Instead, DynCorp and Damco chose not to inform the Government of their settlement agreements and findings about improperly charged assessorial and other costs, even though those costs were passed on to the Government. Moreover, DynCorp chose to retain the $3.1 million settlement amount as well as millions of dollars on top of that knowing that it represented overpayments induced by fraudulent and improper invoices from Damco. Defendants also never sought instructions on how to remit the overpayment to the Government. Defendants did not immediately repay the overpayment of fraudulent charges to the Government as required.

## VIII.    ACTIONABLE CONDUCT BY DEFENDANTS UNDER THE FALSE CLAIMS ACT

### A.    Applicable Law - The False Claims Act

136.    This is an action to recover damages and civil penalties on behalf of the United States and Relators Reddell and Hendrix arising from the false and/or fraudulent statements, claims, and acts by Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

137.    For conduct occurring after May 20, 2009, the FCA provides that any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim [except that this language applies to all claims pending on or after June 7, 2008];

(C)    conspires to defraud the Government by committing a violation of [the FCA];
. . .

(G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
. . .

is liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claim.  31 U.S.C. § 3729(a)(1).

138.    For conduct occurring after May 20, 2009, the FCA defines "claim" as:

(A)    mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)    is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

    (I)    provides or has provided any portion of the money or property requested or demanded; or

    (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. § 3729(b)(2).

139.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in Federal District Court for themselves and for the United States Government and to share in any recovery as authorized by 31 U.S.C. § 3730.

140.    Based on these provisions, Relators Reddell and Hendrix, on behalf of the United States Government, seek through this action to recover damages and civil penalties arising from Defendants' causation of the submission of false claims to the federal Government.  In this case, such claims for payment were submitted to the federal Government as a result of the Government contracts awarded to the Defendants.

141.    DynCorp and Damco conspired from the outset to a bid-rigging scheme in which Damco would submit the lowest base costs and win DynCorp's freight forwarding subcontract, but with the plan that Damco would then make up the money from the low base cost by charging exorbitant accessorials not authorized in the bidsheet it submitted that was incorporated into the parties' contract – which permitted almost no accessorial costs.  From November 2011 to December 2012, the parties proceeded to use a rate sheet full of accessorials that was not the rate sheet in the contract and was not disclosed to the Government, and Damco submitted invoices to

DynCorp full of charges based on that rate sheet. Every two weeks, from January 2012, if not earlier, through at least December of 2012, DynCorp submitted certified invoices for costs incurred via payment of these Damco invoices. In July 2012 DynCorp represented that prices were unchanged, though the disclosed price had never actually been employed by Damco. In December 2012, DynCorp finally submitted the bidsheet to the ACO for approval, but gave misleading information about the new charges and failed to justify them. Even that bidsheet was then superseded by undisclosed settlements on oversize charges that were allowed as a category under the new bidsheet, but exorbitant and removed from actual costs, and by undisclosed and unreasonable palletization and fuel surcharges Damco imposed to replace the oversize profits. Throughout this time, DynCorp continued to pay the Damco invoices and demand the same costs from the United States via certified invoices.

142. Thus, in 2011 and 2012, contrary to the Government's directive, the Defendants falsely provided the costs for the freight forwarding subcontract to the ACO for approval, knowing that the proposed freight costs were fraudulent as the price per kilo bid did not include the accessorial costs. These accessorial costs, including oversize charges and dim weight charges that were not only prohibited but unreasonable, exorbitant, and unrelated to actual costs incurred, were included in Damco's subsequent invoices essentially doubling the costs under the approved subcontract. DynCorp then passed these fraudulently created invoices through to the Government for reimbursement. DynCorp and Damco further engaged in the use of an illegal kickback, which occurred when Damco gave DynCorp rent-free use of the consolidation center in Dubai in exchange for the subcontract. In exchange for the rent-free use of Damco's consolidation center, DynCorp passed through inflated invoice charges for reimbursement from the United States Government. DynCorp then fraudulently certified in the Justification Award for Option Year 2

under Task Order No. 4 that Damco's costs had not changed from the previous year and the company's proposal still remained the best possible price for the freight forward services.

143.    Then in December 2012 and afterwards, under pressure from Damco, DynCorp submitted to the Government regular invoices for freight forwarding that incorporated what it knew were unreasonable and exorbitant charges for palletization charges and fuel surcharges. Again, DynCorp lacked ACO consent for such charges. Damco's main airfreight provider was in the dark about these charges for unincurred costs, but DynCorp knew at least by the time the parties were negotiating the fuel surcharge, because Damco was frank about needing a price that would equal the loss from discontinuing palletization charges. The invoices in this period were false and fraudulent as a result.

144.    Because of these false and fraudulent certifications, explicit or implied, and the false and fraudulent representations, the United States has suffered significant damages.

145.    There are no bars to recovery under 31 U.S.C. § 3730(e), and, or in the alternative, Relators Reddell and Hendrix are original sources as therein defined. To the extent that any allegations or transactions herein have been publicly disclosed, Relator Reddell and Hendrix have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator Reddell's Original Complaint details Relator Reddell's discovery and investigation of Defendants' fraudulent schemes. As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relator voluntarily provided information, oral and/or written, and sent disclosure statements describing all material evidence, and information, related to the Original Complaint, both before and contemporaneously with filing the Original Complaint, to the Attorney General of the United States and the United States Attorney for the Eastern District of Texas, Beaumont Division. He has since supplemented his disclosures as appropriate in the same manner.

146.    Relators' Fourth Amended Complaint provides details regarding amended allegations related to Defendants' fraudulent schemes.  As required pursuant to 31 U.S.C. §§ 3730(b) and (e), Relators have voluntarily provided information, oral and written, and sent disclosure statements describing all material evidence, and information, related to the amended allegations in their Fourth Amended Complaint, both before and contemporaneously with filing the pleading, to the Attorney General of the United States and the United States Attorney for the Eastern District of Texas, Beaumont Division.

**B.**    **Defendants' Violation of the FCA**

      **1.**    **Defendants' Fraudulent Representations and Certifications Violate the FCA 31 U.S.C. § 3729(a)(1)(A).**

147.    From 2011 to the present, the Defendants have knowingly presented and/or caused to be presented false and/or fraudulent claims for reimbursement (i.e. for payment or approval) to the United States by falsely and/or fraudulently representing and certifying, expressly and/or impliedly, to the United States that the invoices submitted correctly reflected the costs and prices of the freight forward services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.  The invoices submitted for reimbursement for such services under the subcontract were false and fraudulent as the included costs and prices were approximately double those originally accepted and approved and included unallowable costs under the MSA.

148.    All invoices submitted by DynCorp as passed through from Damco from 2011 to the present under LOGCAP IV's Task Order No. 4 are tainted by these fraudulent prices and therefore, the damages are the full amount of those reimbursed invoices during this time period.

149.    Given the structure of the Government contracting system, the false statements, false representations, false records, and/ or material omissions made by the Defendants had the

potential to influence the payment decisions of the federal Government.  Because of the fraudulent representations, Defendants earned millions of dollars to which they are not legitimately entitled.  The ultimate submission to the federal Government of claims for payment was a foreseeable factor in the Government's loss and a consequence of the scheme.  As a result, the United States has suffered substantial damages.

### 2.    Defendants' Fraudulent Representations and Certifications Violate the FCA 31 U.S.C. § 3729(a)(1)(B).

150.    Defendants knowingly made, used, or caused to made or used, false records or statements with the specific intent to cause false and/or fraudulent claims to be paid or approved by the United States.   These false statements or records consist of false certifications or representations, expressed or implied, of compliance with all laws, made or caused to be made by Defendants in requesting payments from the federal Government for performing the contract at issue in this case.  The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that their statements were true, accurate, and correct.  The Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the prices proposed in the subcontract bid were the true and correct costs to be billed to the Government for the freight forwarding services into Kandahar, Afghanistan.  The Defendants knew that these prices were false and/or fraudulent because the costs did not include the accessorial costs.   Once performance began under the subcontract, the Defendants included these accessorial costs, approximately doubling the cost to the Government for these contracted services.  Defendants knowingly passed these inflated costs to the Government for reimbursement.

151.    Given the structure of the Government contracting system at issue, given the Defendants' false statements and representations, and given the false records and/or statements

that the Defendants made, used, or caused to be made or used, Defendants' conduct had the potential to influence the payment decisions of the federal Government.

152.     The ultimate submission to the federal Government of claims for payment, directly or indirectly, was a foreseeable factor in the Government's losses and a consequence of the Defendants' actions.  As a result, the United States Government has suffered substantial damages.

**3.     Defendants' Conspiracy Violates the FCA 31 U.S.C. § 3729(a)(1)(C).**

153.     By virtue of planning, and then implementing their schemes, Defendants' actions violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

154.     Defendants have knowingly conspired to falsely and/or fraudulently certify, implicitly or explicitly, their statements were true accurate and correct.  The Defendants knew that the cost per kilo submitted by Damco in its bid for the subcontract did not include the accessorial costs.  The parties knew that in exchange for the low prices that would be approved by the Government, Damco would allow DynCorp to use Damco's consolidation center building located at the airport in Dubai free of charge.  The rent-free use of this building allowed DynCorp to realize substantial savings in completing the Task Order No. 4 under LOGCAP IV.  The Defendants knew that Damco would then charge for the accessorial costs omitted from its bid, essentially doubling the cost to the United States Government for these services.

155.     Defendants have conspired in knowingly presenting false and/or fraudulent claims for payment or approval to the United States Government and have knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims. The United States has suffered substantial damages as a result of the perpetration of Defendants' conspiracies.

**4.    Defendants Failed to Disclose Their Obligation to Repay the Government in Violation of the Reverse False Claims Provision.**

156.    A person is liable for a reverse false claim under the FCA if he knowingly and improperly avoids an obligation to pay the United States.

157.    Defendants falsely and/or fraudulently submitted claims for reimbursement (i.e. for payment or approval) to the United States and falsely and/or fraudulently represented that the invoices submitted correctly reflected the costs and prices of the freight forward services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.  The invoices submitted for reimbursement for such services under the subcontract were false and fraudulent as the included costs and prices were not authorized by the subcontract and approximately doubled those originally accepted and approved.  As a result, the Government has been falsely and/or fraudulently overcharged for freight forward services.

158.    As part of their scheme, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay money to the Government.  These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendants to the Government in requesting payment from the Government for freight forward services. In addition, by Spring of 2013, Damco induced DFS to add fictitious accessorial fees to invoices, then later granted credits for those fees, in order to obscure the fact that Damco was not incurring accessorial costs.

159.    Under the False Claims Act, the term "obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

61

160.    Here, the obligation to pay money to the Government arises directly from the language of the Prime Contract, which expressly incorporates FAR obligations for a contractor to repay the overpayments to the Government once the contractor becomes aware of the overpayments. Both Defendants were aware of the overpayments made by the Government, as alleged above, but conspired to conceal and avoid the obligation to repay the money. Whether or not DynCorp passed on to the United States any of the March 2013 settlement, it certainly declined to declare that the money was return of an overpayment, as both the 2003 and 2008 versions of 52.232-25(d) required, because doing so would have alerted the United States to larger issues with Damco's invoicing practices.

161.    By virtue of the Defendants' failure to disclose their obligation to repay the Government, the United States has suffered substantial monetary damages.

## IX.    DAMAGES

162.    The Defendants defrauded the federal Government in an amount to be determined. The United States Government had reimbursed the Defendants at least $64 million, out of which over $34 million is comprised of improper accessorial costs alone. Because the Defendants fraudulently induced the Government into entering the contract for these services, the Government is entitled to the full reimbursement of the $64 million.

## X.    CAUSES OF ACTION

### A.    Count I: False Claims - 31 U.S.C. § 3729(a)(1)(A)

163.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of the Fourth Amended Complaint.

164.    From 2011 through the duration of the Damco MSA, the Defendants have knowingly presented and/or caused to be presented false and/or fraudulent claims for reimbursement (i.e. for payment or approval) to the United States.

165.    First, DynCorp's invoices to the United States are false or fraudulent on their face to the extent that they include charges for services and goods that Damco did not deliver. These include oversize charges for goods that were not oversized and therefore required no special handling, shipments that required no customs or import documentation, shipments that were already palletized or required no palletization, etc. Damco caused such claims to be presented by knowingly falsely invoicing for them, and DynCorp knowingly submitted these false invoices.

166.    Second, the Defendants presented/caused to be presented false claims by falsely and/or fraudulently representing and certifying, expressly and/or impliedly, to the United States that the invoices submitted correctly reflected the costs and prices of the freight forwarding services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.

167.    The invoices submitted for reimbursement for such services under the subcontract were approximately double those originally accepted and approved. The claims were false because they varied from the terms of LOGCAP IV, which required costs invoiced to be both allowable and reasonable under FAR 52.216-7, when in fact they violated the terms of the Damco subcontract, and/or were unreasonable. This was despite knowing express certification of compliance with LOGCAP IV that DynCorp knowingly included with every invoice it submitted and that Damco caused to be made, as described in Section VII.E above. Defendants also impliedly certified that DynCorp's invoices were in compliance with LOGCAP IV by submitting / causing to be submitted these invoices. The invoices were accompanied by specific

63

representations that the amounts were associated with particular Damco invoices related to its delivery of freight forwarding services. Further, the Defendants conveyed to the United States deceptive half-truths or outright lies with, *e.g.,* every justification of award statement that referred to price schedules that the parties had abandoned or partial information about comparable prices that were not, in fact, comparable.

168.    These claims were also material to the Government's decision to pay because they doubled the cost of the subcontract. Further, as Reddell pointed out in 2012, the Army announced in a July 25, 2012 advisory that excessive accessorial rates had come to their attention and that such rates should be monitored. And that warning arose out of a case in which the Department of Justice prosecuted this very fraud in 2012, as described above. *See* http://www.justice.gov/opa/pr/2012/January/12-civ-002.html.

169.    To the extent that the United States may have continued to reimburse DynCorp for Damco's fraudulent invoices, it did so only without knowledge of the fraud. Indeed, DynCorp's invoices did not contain sufficient information to detect the fraud, and no audit or other reporting had been undertaken as to the subcontract. To the extent that investigation of this case may have overlapped with the time period of the contract, which is not alleged, it was briefly, and the United States has in no way released its claims, which remain subject to adjudication by this Court. In fact, the investigation of this case remains open today.

170.    As a result of Defendants' scheme to submit inflated and otherwise improper invoices to the Government for reimbursement for freight forwarding services, all of the claims that Defendants presented are false and/or fraudulent. Defendants knowingly presented or caused to be presented such false and/or fraudulent claims for payment or approval in violation of current 31 U.S.C. § 3729(a)(1)(A).

171.    The United States paid the false and/or fraudulent claims.

172.    By virtue of the false and/or fraudulent claims that Defendants knowingly presented or caused to be presented, the United States has suffered substantial monetary damages.

**B.    Count II: False Records or Statements - 31 U.S.C. § 3729(a)(1)(B)**

173.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Fourth Amended Complaint.

174.    As a result of Defendants' scheme to submit inflated and otherwise improper invoices to the Government for reimbursement for freight forwarding services, Defendants knowingly made or used or caused to be made or used false records or statements and omitted material facts that were material to false and/or fraudulent claims, in violation of current 31 U.S.C. §3729(a)(1)(B).  These false statements or records consist of knowingly false and/or fraudulent invoices by both DynCorp and Damco and other statements provided to the Government as well as false certifications or representations made or caused to be made by Defendants to the Government, including those described in Section VII.E., above.  Each invoice and/or claim for reimbursement submitted in connection with the contracts at issue in this case was material to multiple false and/or fraudulent claims for payment.

175.    By virtue of the false records or statements that Defendants made or used, the United States has suffered substantial monetary damages.

**C.    Count III: Conspiracy to Defraud the Government - 31 U.S.C. § 3729(a)(1)(C)**

176.    Relators reallege and hereby incorporate by reference each and every allegation contained in all the paragraphs of this Fourth Amended Complaint.

177.    Defendants have knowingly conspired to falsely and/or fraudulently certify, implicitly or explicitly, in Damco's bid, DynCorp's subcontract with Damco, the Justification(s)

of Award and related documentation, and invoices for freight forwarding services that their statements were true accurate and correct and that the Defendants were in full compliance with the federal laws governing such contracts in violation of current 31 U.S.C. § 3729(a)(1)(C).

178.   The Defendants knowingly conspired to falsely and/or fraudulently certify, explicitly or implicitly, that their statements were true, accurate, and correct.

179.   By agreement, the Defendants falsely and/or fraudulently certified, explicitly or implicitly, that the prices proposed in the subcontract bid were the true and correct costs to be billed to the Government for the freight forwarding services into Kandahar, Afghanistan. The Defendants knew that these prices were false and/or fraudulent because the costs did not include the accessorial costs.  Once performance began under the subcontract, the Defendants included these accessorial costs, approximately doubling the cost to the Government for these contracted services.  To the extent that this unlawful agreement did not begin before performance began, it began whenever DynCorp learned of Damco's extra-contractual charges and certainly by the time DynCorp negotiated a modification of the MSA without ACO consent.

180.   Further, the Defendants agreed unlawfully in March 2013 to settle only a small portion of Damco's overcharges, allowing Damco to unlawfully retain the rest, in March 2013, while concealing the rest of the overcharges and conspiring to have new pricing approved on false pretenses.  They further agreed to a fuel surcharge for the sole purpose of allowing Damco to continue pursuing ill-gotten gains on the same scale as its outrageous palletization charges.

181.   Defendants knowingly passed these inflated charges to the Government for reimbursement.

182.   Defendants have conspired in knowingly presenting false and/or fraudulent claims for payment or approval to the United States government and have knowingly made, used, or

caused to be made or used false records or statements material to false and/or fraudulent claims in violation of current 31 U.S.C. § 3729(a)(1)(C).

183.    By virtue of the false and/or fraudulent claims submitted, paid, or approved as a result of the conspiracies to defraud the Government, the United States has suffered substantial monetary damages.

**D.    Count IV: Reverse False Claims – 31 U.S.C. § 3729(a)(1)(G)**

184.    Relators reallege and hereby incorporate by reference each and every allegation contained in all the paragraphs of this Fourth Amended Complaint.

185.    Defendants schemed to falsely and/or fraudulently submit claims for reimbursement (i.e. for payment or approval) to the United States and falsely and/or fraudulently represent that the invoices submitted correctly reflected the costs and prices of the freight forwarding services as bid and accepted under the subcontract between DynCorp and Damco for LOGCAP IV's Task Order No. 4.  As reflected in Reddell's cost analysis, the invoices submitted for reimbursement were false and/or fraudulent as the included costs and prices were not authorized by the subcontract and approximately doubled those originally accepted and approved. As a result, the Government has been falsely and/or fraudulently overcharged for freight forward services.  Throughout this scheme, Defendants have knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease and obligation to pay money to the Government.  These false statements or records include but are not limited to false certifications or representations made or caused to be made by Defendants to the Government in requesting payment from the Government for freight forwarding services. The contractual obligation to repay the money to the Government arose once the Defendants became aware of the overcharged payments.

186.    After learning that the Government was investigating Damco's fraudulent scheme, and after the false claims were submitted, Damco gave misleading information to the Army. In a June 1, 2015 letter, Damco claimed it had conducted an audit of all invoices under the MSA and found that the charges on Damco's invoices were accurate and that Damco had in fact undercharged DynCorp half a million dollars. Damco asserted that the undercharges and overcharges were a result of a misunderstanding regarding oversized cargo charges that was later clarified. Even if this were true, Damco's letter completely ignored the fact that all accessorials were extra-contractual and not incurred. This internal audit was conducted by Maersk.  DynCorp representatives similarly told investigating agents around the same time that the overcharges were a mere misunderstanding concerning oversize standards, and that the United States was made whole with the March 2013 settlement.  Defendants had express obligations to notify the Government and seek instructions for repayment mandated by the Prime Contract and FAR clause 52.232-25(d) incorporated therein, and to repay the Government, and DynCorp used those knowingly false statements to conceal the known obligation to repay the overcharges.

187.    By virtue of the Defendants' failure to disclose their obligation to repay the Government in violation of current 31 U.S.C. § 3729(a)(1)(G), the United States has suffered substantial monetary damages.

## XI.    RELIEF

188.    On behalf of the United States Government, the *qui tam* Relators seek to receive monetary damages equal to three times that suffered by the United States Government.  In addition, the *qui tam* Relators seek to receive all civil penalties on behalf of the United States Government in accordance with the False Claims Act.

189.    The *qui tam* Relators seek to be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act.

190.    The *qui tam* Relators seek to be awarded all costs and expenses for this action, including attorneys' fees and court costs.

191.    The *qui tam* Relators seek pre-judgment interest at the highest rate allowed by law.

## XII.   PRAYER

192.    WHEREFORE, Relators pray that this Court enter judgment on behalf of the Relators and against Defendants for the following:

a.  Damages in the amount of three (3) times the actual damages suffered by the United States Government as a result of Defendants' conduct;

b.  Civil penalties against Defendants equal to $11,000 for each violation of 31 U.S.C. § 3729;

c.  The maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.  All costs and expenses of this litigation, including attorney's fees and costs of court;

e.  Pre-judgment interest at the highest rate allowed by law; and

f.  All other relief on behalf of Relators or the United States Government to which they may be entitled and that the Court deems just and proper.

## XIII.   JURY DEMAND

193.    Pursuant to Federal Rule of Civil Procedure 38, Relators demand a trial by jury.

Respectfully submitted,

/s/ Sarah M. Frazier
David H. Berg
State Bar No. 02187000
Joel M. Androphy
State Bar No. 01254700
Sarah M. Frazier
State Bar No. 24027320
Victoria R. Mery

State Bar No. 24094845
Berg & Androphy
3740 Travis Street
Houston, Texas 77002
Telephone (713) 529-5622
Facsimile (713) 529-3785
Email: dberg@bafirm.com
Email: jandrophy@bafirm.com
Email: sfrazier@bafirm.com
Email: vmery@bafirm.com
Greg M. Dykeman
State Bar No. 06325100
Stacie Augustine
State Bar No. 24050239
Strong Pipkin Bissell & Ledyard, L.L.P.
14th Floor, San Jacinto Building
595 Orleans
Beaumont, Texas 77701
Telephone: (409) 981-1120
Facsimile: (409) 981-1010
gdykeman@strongpipkin.com
saugustine@strongpipkin.com

**ATTORNEYS FOR RELATORS ROBERT REDDELL AND ROBERT HENDRIX**

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the above and foregoing document was filed electronically in compliance with Local Rule CV-5. As of this date, all counsel of record, including the United States Attorney's Office for the Eastern District of Texas, have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A).

/s/ Sarah M. Frazier        

Sarah M. Frazier

71

**EXHIBITS TO RELATORS ROBERT REDDELL AND ROBERT HENDRIX'S ORIGINAL, FIRST, SECOND & THIRD AMENDED COMPLAINTS, incorporated by reference in this FOURTH AMENDED COMPLAINT**

| EXHIBIT | DESCRIPTION | BATES NO. |
|---------|-------------|-----------|
| 1 | Damco Bidsheet 8 | BARR-000035.1-000035.13 |
| 2 | DynCorp Master Agreement with Damco | BARR-000003-000034 |
| 3 | Damco Freight Invoice Audit PowerPoint Presentation I | BARR-000036.1-000036.9 |
| 4 | Damco Freight Invoice Audit PowerPoint Presentation II | BARR-000037.1-000037.6 |
| 5 | Damco Invoice/MSA Audit Memorandum | BARR-00038-000039 |
| 6 | MAWB 327-00184026 Analysis Excel Spreadsheet | BARR-000040 |
| 7 | MAWB 686-00142026 Analysis Excel Spreadsheet | BARR-000063.1-000063.8 |
| 8 | MAWB 686-00142026 Analysis PowerPoint Presentation | BARR-000064.1-000064.5 |
| 9 | Damco Bidsheet 9 | BARR-018570.1-018570.7 |
| 10 | Email Correspondence: "RE TO 0004 Freight Factor  REAs SITREP" | BARR-018571-018572 |
| 11 | Email Correspondence: "RE 3.1 M HBL level detail" and Attachment: "Damco Oversize final list 4-10-13" | BARR-018573-018580.178 |
| 12 | Damco Oversize Analysis | BARR-018581.1-018581.108 |
| 13 | Email Correspondence: "RE DAMCO Palletization Charges" | BARR-018582-018583 |
| 14 | Advance Notification & ACO Consent Request Form and Attachments:<br>(1) Material Requisition & Signature Authority Documentation<br>(2) Statement of Work<br>(3) Pricing Summary<br>(4) Process Summary<br>(5) Attachment A Technical Evaluation<br>(6) Attachment B Comparative Pricing<br>(7) CACO Letter<br>(8) EPLS & Visual Compliance<br>(9)     Draft PO LG40032512 | BARR-018674-018716 |
| 15 | Justification of Award Dated July 10, 2012 | BARR-018717-018720 |
| 16 | Bidsheet sent to Jetta Aiello by Damco | BARR-018721 – BARR-018726 |

| 17 | December 6, 2012 JOA | BARR-018727 – BARR-018734 |
| 18 | Draft Pricing Analysis | BARR-018735 – BARR-018744 |
| 19 | August 8, 2013 email containing string of past auditor questions with attachments | BARR-018745 – BARR-018806 |
| 20 | July 16, 2013 email from Brian Freas to Robert Reddell | BARR-018807 – BARR-018811 |
| 21 | July 5, 2013 JOA | BARR-018812 – BARR-018817 |
| 22 | DAMCO USA Inc. Invoice to DynCorp International LLC # 55-35-001908-01 | BARR – 018820 |
| 23 | DAMCO USA Inc. Invoice to DynCorp International LLC # 55-35-012449-01 | DAMCOARMY_00017282 |
| 24 | DAMCO USA Inc. Invoice to DynCorp International LLC #55-10-000848-01 | BARR – 018819 |
| 25 | DFS Middle East F.Z.E. Invoice # 2012-42535 | BARR – 018818 |
| 26 | DFS Middle East F.Z.E. Credit Memo # 2013-52706 | BARR – 174224 |
| 27 | DFS Middle East F.Z.E. Invoice #2013-51157 | BARR – 174225 |
| 28 | DFS Middle East F.Z.E. Invoice # 2012-45088 | BARR – 174226 |