# EXHIBIT 5



# MASTER AGREEMENT
# TERMS AND CONDITIONS

FOR THE SUPPLY OF

GLOBAL FREIGHT FORWARDING SERVICES

BY

DAMCO USA, INC



## Agreement Number: MA–2011-06-0031-DAMCO

**Period of Performance (one year)**
Start Date: Date signed on signature page
End Date: 365 days after date signed on signature page

1 of 32

Rev: September 21, 2011

BARR-000003

# TABLE OF CONTENTS

PART I – MASTER AGREEMENT ........................................................................................... 3
   PREAMBLE ..................................................................................................................... 3
   1. DEFINITIONS ............................................................................................................. 3
   2. TERM OF THE AGREEMENT .................................................................................... 5
   3. AGREEMENT CONSTRUCTION AND ORDER OF PRECEDENCE ........................... 5
   4. PRICE ........................................................................................................................ 6
   5. ORDERS AND ORDERING PROCEDURE ................................................................ 6
   6. WARRANTIES OF PERFORMANCE .......................................................................... 6
   7. DELIVERY, INSPECTION AND ACCEPTANCE ......................................................... 7
   8. PAYMENT AND INVOICING ...................................................................................... 8
   9. CHANGES/MODIFICATIONS ..................................................................................... 9
   10. NOTICES ................................................................................................................. 9
   11. DISPUTES ............................................................................................................... 9
   12. TERMINATION ....................................................................................................... 10
   13. COMPANY FURNISHED PROPERTY ..................................................................... 12
   14. STOP-WORK ORDER ............................................................................................. 12
   15. ASSIGNMENT ........................................................................................................ 12
   16. SUBCONTRACTING ............................................................................................... 12
   17. RIGHTS, REMEDIES & WAIVER ........................................................................... 12
   18. SEVERABILITY ...................................................................................................... 12
   19. APPLICABLE LAW .................................................................................................. 13
   20. COMPLIANCE WITH LAW ...................................................................................... 13
   21. ADDITIONAL GOVERNMENTAL AND FAR REQUIREMENTS ................................ 14
   22. INSURANCE ........................................................................................................... 16
   23. INDEMNIFICATION ................................................................................................ 18
   24. LIMITATION OF LIABILITY ..................................................................................... 18
   25. PROPRIETARY AND COMPANY CONFIDENTIAL INFORMATION ......................... 19
   26. RIGHTS IN WORK PRODUCT ................................................................................ 20
   27. PUBLIC RELEASE OF INFORMATION ................................................................... 21
   28. ORGANIZATIONAL CONFLICT OF INTEREST ...................................................... 21
   29. PATENTS AND ROYALTIES ................................................................................... 21
   30. TAXES, LIENS, ENCUMBRANCES, RIGHT TO SET OFF AND BACKCHARGES .... 22
   31. QUALITY ASSURANCE .......................................................................................... 23
   32. NOTICE OF THIRD PARTY CLAIMS AGAINST THE SUPPLIER .............................. 25
   33. ENTIRE AGREEMENT ............................................................................................ 25
   34. SURVIVAL .............................................................................................................. 25
   35. EXECUTION ........................................................................................................... 25
   SIGNATURE PAGE ...................................................................................................... 26
PART II – SUPPORTING DOCUMENTATION TO MASTER AGREEMENT ........................... 27
   Exhibit 1 – Statement of Work, Part 1, Concept of Operations
   Exhibit 2 – Statement of Work, Part 2, Written Statement of Work
   Exhibit 3 – Statement of Work, Trade Compliance Requirements
   Exhibit 4 – Orginal RFP Document
   Exhibit 5 – Sample Purchase Order
   Exhibit 6 – Schedule of Prices

Rev: September 21, 2011

BARR-000004

## PART I – MASTER SOURCING AGREEMENT

### PREAMBLE

This Agreement ("MA" or "Agreement") MA-2011-06-0031-DAMCO is made and entered into as of the date of the last signature hereto ("Effective Date"), by and between DynCorp International LLC, a Limited Liability Company organized and existing under the laws of the State of Delaware, and having its principal offices at 3190 Fairview Park Drive, Suite 700, Falls Church, VA 22042 (hereinafter "COMPANY"), and DAMCO, USA, INC, a Supply Chain Solutions – Logistics Business Entity organized under the laws of the State of Delaware and having its principal offices at 2 Giralda Farms, Madison Avenue, Madison, New Jersey 07940, USA (hereinafter "SUPPLIER" collectively the "Parties").

**WHEREAS,** COMPANY desires to have SUPPLIER perform the Services required by COMPANY as described in the Statement(s) of Work, Purchase Orders and/or the original RFP document in accordance with the terms of this Agreement; and

**WHEREAS,** SUPPLIER will provide all Services, manpower, facilities and know-how to COMPANY in order to accomplish the agreed upon tasks for the COMPANY; and

**NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, SUPPLIER and COMPANY hereby agree as follows:

This is an Indefinite Delivery, Indefinite Quantity (IDIQ) Agreement with fixed unit pricing, and may be entered into in support of a Prime Contract with COMPANY's customer ("Customer"). There is no funding attached to this IDIQ Agreement. Funding will be provided by the issuance of Purchase Orders under this Agreement. No revenue is guaranteed under this Agreement, and COMPANY is not obligated to place any Purchase Orders.

☐ This is a DOS1_rated order certified for national defense use. SUPPLIER is required to follow all provisions of the Defense Priorities and Allocations System Regulation (15 CFR 700). (This provision is applicable only if the box is checked)

### 1. DEFINITIONS

Definitions of terms not specifically defined in this Agreement shall be as set forth in the applicable terms and conditions incorporated in Orders issued pursuant to this Master Agreement.

Additional definitions applicable to this Agreement are as follows:

| | |
|---|---|
| Agreement | "Agreement", "Master Agreement", or "MA" means this written Agreement executed between COMPANY and SUPPLIER. |
| Lift and/or haul drawings | SUPPLIER shall be solely responsible for the production of and technical completeness and sufficiency of all required lift and/or haul drawings and the approval of such drawings by COMPANY before making any outsized, heavy or otherwise difficult lifts or hauls. The definition of outsized, heavy or otherwise difficult will be COMPANY responsibility. |
| Hub | "Hub" in this MA means a point where material shipments arrive and are sorted, accounted for, stored and/or warehoused until further distribution is required. |
| FOB | "FOB" in this MA means Forward Operating Base. An FOB normally receives materials only form a Hub or another FOB and is usually the final destination for materials. |
| Lane and/ or Route | "Lane and/or Route" in this MA means a point-to-point distance between a Hub or FOB that starts at a designated point of origin (Hub or FOB) and ends at a designated termination point (Hub or FOB). |

Rev: September 21, 2011

BARR-000005

| RFP | "RFP" means Request for Proposal and refers to the original RFP document. The RFP is considered to be an integral part of this MA as are the requirements contained in it. |
|---|---|
| Trip | "Trip" in this MA means a one time, one way travel from a Hub to an FOB or an FOB to another FOB. It is measured by a one way travel period, not by day or hour or distance. Example: Travel from Hub Leatherneck to FOB Airborne is a "trip" regardless of time spent during the travel. |
| SOW, Part 1 | "SOW, Part 1" means the Concept of Operations document and refers to the original Concept provided as part of the original RFP. SOW, Part 1, is considered to be an integral part of this MA as are the requirements contained in it. |
| SOW, Part 2 | "SOW, Part 2", is the written outline document describing the concept SOW and refers to the original Concept provided as part of the original RFP. SOW, Part 1, is considered to be an integral part of this MA as are the requirements contained in it. |
| SOW, Trade Compliance | The SOW for Trade Compliance requirements is a written requirements document that the supplier must follow to insure all that trade compliance issues are adhered to. This SOW is considered to be an integral part of this MA as are the requirements contained in it |
| Affiliate | "Affiliate" means, with respect to any entity, any other entity that controls, is controlled by, or is under common control with such entity. |
| Authorized Purchasing Representative | "Authorized Purchasing Representative" means COMPANY's Supply Chain Management employees or others as designated in writing by COMPANY. |
| Authorized End User | "Authorized End User" means COMPANY's Program and/or Project Management employees or others as designated in writing by COMPANY. |
| COMPANY | "COMPANY" means DynCorp International LLC (DynCorp) including its Affiliates or divisions. |
| Days | "Days" referred to in this Agreement are defined as calendar days, unless otherwise specified. |
| Intellectual Property | "Intellectual Property" has the meaning as defined in Section 25, Proprietary and Company Confidential Information. |
| Order | "Order" means the instrument of contracting including the Purchase Order, as modified by written changes issued by COMPANY's Authorized Purchasing Representative, and all referenced documents. |
| Party or Parties | "Party" or "Parties" means COMPANY or SUPPLIER or COMPANY and SUPPLIER collectively, respectively |
| Prime Contract | "Prime Contract" means a contracting instrument, if any, issued to COMPANY. |
| Program Addendum | "Program Addendum" means certain terms and conditions applicable to this Agreement which are required by or in connection with a specific customer program designated by this Agreement or on the face of an Order. |
| Proprietary Information | As defined in Intellectual Proprietary and Company Confidential Information Section 25, Proprietary and Company Confidential |

Rev: September 21, 2011

BARR-000006

| | Information. |
|---|---|
| Purchase Order | "Purchase Order" or "Order" refers to specific orders for Products or Services associated with this Agreement. |
| Purchase Order Administrator | "Purchase Order Administrator" refers to COMPANY's Sourcing Department Representative assigned to administer this Agreement. |
| SUPPLIER | "SUPPLIER" means the entity identified as such in the Preamble of this Agreement, and includes all lower tier Suppliers and SUPPLIERs. |
| Services | "Services" means those services described in this Agreement, including any goods, supplies, materials, articles, items, parts, components or assemblies incidental to the performance of such services. |
| Site | "Site", "Worksite" and/or "Jobsite" refer to the location(s) and premises of work performance under this Agreement. |
| Concept of Operation | "The Concept of Operation" for this MA is an integral part of the SOW as described above and carries the same force as the SOW. |
| Terms and Conditions | "Terms and Conditions" means these Agreement Terms and Conditions |

In the event of any inconsistency in the definition of a term defined in this Section of this Agreement and a term defined in the terms and conditions incorporated in a Purchase Order, the definition set forth in this Section shall take precedence.

## 2.    TERM OF THE AGREEMENT

2.1    This Agreement shall become effective as of the date shown on the signature page of this MA and shall continue in effect for one year (365 days) unless terminated in accordance with this Agreement.

## 3.    AGREEMENT CONSTRUCTION AND ORDER OF PRECEDENCE

This Agreement consists of the Articles in this Part I, the Signature page and Supporting Documentation in Part II:

| ITEM | DESCRIPTION | DOC ID / VERSION |
|---|---|---|
| Part I | MASTER AGREEMENT | MA – 2011-06-0031-DAMCO |
| Part II | SUPPORTING DOCUMENTATION | MA – 2011-06-0031-DAMCO |
| Exhibit 1 | SOW. Part 1 | |
| Exhibit 2 | SOW, Part 2 | |
| Exhibit 3 | SOW, Trade Compliance Requirements | |
| Exhibit 4 | Original RFP | |
| Exhibit 5 | Sample Purchase order | |
| Exhibit 6 | Schedule of Prices | |

It is the obligation of the SUPPLIER to exercise due diligence to discover and to bring to the attention of the COMPANY, at the earliest possible time, any ambiguities, discrepancies, inconsistencies, or conflicts in or between any of the technical or contractual provisions hereof. Any ambiguity, discrepancy, inconsistency or conflict in or between any of the technical or contractual provisions hereof shall be resolved by giving precedence in the following order:

A.  Articles (Part I)

5 of 32

Rev: September 21, 2011

B. Supporting Documentation (Part II)
C. Purchase Order Terms and Conditions (to be issued under performance of this agreement)**
D. FAR/Prime Contract Flow Down Requirements (included on the PO)
E. SDRL Delivery Dates and other Deliverables (included on the PO)

** Any additional terms and conditions contained in the Purchase Order issued under performance of this Agreement with the intent of having precedence over the above listed items, and which is mutually agreed upon in writing by the COMPANY and SUPPLIER, shall prevail and take precedence over the aforementioned items.

## 4.   PRICE

The price(s) to be paid to SUPPLIER by COMPANY for the Products or Services ordered by COMPANY pursuant to this Agreement are set forth in Part II Exhibit 6 "Schedule of Prices". These prices shall be firm- fixed for the term of this Agreement including exercised options.

## 5.   ORDERS AND ORDERING PROCEDURE

5.1   All Services to be performed under this Agreement shall be ordered by issuance of written Purchase Orders/Task Orders by COMPANY's Authorized Purchasing Representatives. Such Purchase Order/Task Order shall accompany a Statement of Work (SOW) and reference the applicable pricing in Part II Exhibit 6 "Schedule of Prices", or other such pricing as negotiated and agreed upon in any such Purchase Order/Task Order.

5.2   If the SUPPLIER accepts orders or directions from other than the Authorized Purchasing Representatives or accepts orders or directions for service not contained in the pricing schedule, it does so at its own risk and cost. Payment will be made only for Services performed pursuant to the specific direction of the Authorized Purchasing Representatives.

5.3   All Purchase Orders/Task Orders issued under this Agreement shall be subject to the terms and conditions of this Agreement and its exhibits and attachments.

5.4   COMPANY will issue a Purchase Order/Task Order for tasks to be performed. Purchase Orders/Task Orders shall be funded individually with Fixed Prices or Not to Exceed (NTE) values. Issuance of the Purchase Order/Task Orders shall constitute authorization for the SUPPLIER to proceed with the work defined therein.

5.5   If mailed, sent electronically, or faxed, a Purchase Order/Task Order is considered "issued" when COMPANY deposits a hardcopy Purchase Order/Task Order in the mail, the electronic copy has left the COMPANY's server, or a fax confirmation is generated when faxed.

5.6   Purchase Orders/Task Orders are issued by COMPANY's Authorized Purchasing Representatives.

5.7   Any Purchase Order/Task Order issued during the term of this Agreement and not completed within the Agreement term shall be completed by the SUPPLIER within the time specified in the Purchase Order/Task Order. This Agreement shall govern the SUPPLIER's and COMPANY's rights and obligations with respect to that Purchase Order/Task Order to the same extent as if the Purchase Order/Task Order were completed during the term of the Agreement.

## 6.   WARRANTIES OF PERFORMANCE

6.1   SUPPLIER hereby represents and warrants that it will faithfully perform its Services in a fully professional manner and shall not engage in any activity or course of conduct that would be reasonably likely to bring the name of COMPANY into disrepute, or cause COMPANY or its affiliates to be in violation of or subject to loss or reduction of benefits under any applicable law or regulation.

6.2   SUPPLIER shall procure and pay for all insurances, permits and inspections required by this Agreement and any governmental authority for any part of the Services and shall furnish any

Rev: September 21, 2011

BARR-000008

bonds, security, or deposits required for performance of the Services and bill back COMPANY for all procured insurances, permits and inspections acquired.

6.3 These Services shall be performed in accordance with all local, state, federal and international laws that may be applicable to such Services. SUPPLIER agrees to indemnify COMPANY against any loss, costs, damage, or liability incurred by reason of SUPPLIER's violation of this Section.

6.4 SUPPLIER warrants that the prices for the Services sold to COMPANY under this Agreement are no less favorable than those currently extended to any other customer in comparable status, buying the same or like Services/Products in equal or smaller quantities and under similar circumstances. If during the term hereof SUPPLIER reduces the price for any such Services/Products as to one or more categories of customers in a status comparable to COMPANY, the corresponding price herein shall be likewise reduced.

6.5 For Services, SUPPLIER, where allowable in each country involved, shall perform a pre-employment screening to assure all of SUPPLIER's employees are qualified and capable of performing the Services described in the attached Statement of Work. In addition, all of SUPPLIER's employees shall be screened for drugs that are illegal in the United States or any other applicable law. All of SUPPLIER's employees must pass such test prior to being approved for work under this Agreement.


## 7. DELIVERY, INSPECTION AND ACCEPTANCE

7.1 DELIVERY. Deliveries and performance shall be strictly in accordance with the schedule as described in Part II Exhibit 6 "Schedule of Prices" or as stated in the Purchase Order/Task Order. In the event of a conflict between the Schedule of Prices and the Purchase Order/Task Order, the pricing in the Purchase Order/Task Order shall prevail. SUPPLIER agrees to advise COMPANY, as soon as possible, of any delays in meeting the schedule and the reasons therefore. If a delay is due to causes beyond SUPPLIER's control and without fault or negligence of SUPPLIER, COMPANY may, in its sole discretion, either adjust the delivery schedule or terminate the Agreement for convenience. If the delay is due to SUPPLIER's failure, and the failure is not cured within ten (10) days after SUPPLIER's receipt of COMPANY's written notice thereof, COMPANY may, in its sole discretion, either accept a revised delivery schedule and an equitable reduction in the price in accordance with the damages stated in Article **Error! Reference source not found.** herein, and/or terminate for default. Acceptance of late deliveries shall not constitute a waiver thereof by COMPANY. INSPECTION: COMPANY and its customer may inspect and/or test materials, work in progress, and completed Services at all reasonable times and places during performance of the work and prior to shipment. Mutually rejected services shall be re-performed in an acceptable manner and at no additional cost to COMPANY. If inspection and tests are made on SUPPLIER's premises, SUPPLIER shall, without additional charge, provide reasonable facilities and assistance for the safety and convenience of the inspectors performing these duties. Inspections and tests shall be performed in such a manner as not to unduly delay work in progress. Unless otherwise agreed in writing, all Services furnished under this Agreement are subject to COMPANY's inspection and acceptance or rejection at destination, notwithstanding any previous COMPANY or its customer's source inspection or test. Inspection/test at source or at destination shall not relieve SUPPLIER of its responsibility to furnish the Services in strict conformance with the Statement(s) of Work requirements. SUPPLIER shall maintain an inspection and quality control system acceptable to COMPANY and its customer. Upon COMPANY's request SUPPLIER shall furnish COMPANY the records of inspection/test for Products and Services furnished hereunder at any time during the warranty period or as may be required by Federal Acquisition Regulations (FAR).

7.2 ACCEPTANCE. Services will be accepted when satisfactorily performed in accordance with instructions contained in the Statement(s) of Work.

Rev: September 21, 2011

BARR-000009

## 8.   PAYMENT AND INVOICING

8.1   The SUPPLIER shall be paid Net 45 days from (a) COMPANY's receipt of SUPPLIER's properly completed invoice, including appropriate backup documentation (supporting receipts, packing lists, etc.) as required, and (b) delivery and acceptance of the Services in accordance with the Statement of Work and Milestone Payment Schedule, if applicable.

8.2   Invoices shall be submitted electronically with backup documents in accordance with the Part II Exhibit 6 "Schedule of Prices". Each invoice shall reference the Invoice Number, Date of Invoice, this Agreement Number, Purchase Order/Task Order Number, Total current invoice amount, and cumulative billings to date and any other additional information as specifically required in the Statement of Work.

8.3   Invoices shall be submitted via email to the following:

| Department: | Accounts Payable |
|---|---|
| Company: | DynCorp International LLC |
| eMail: | accountspayable@dyn-intl.com |

8.4   Discrepancies in invoices will result in a delay of payment pending resolution of discrepancy(s).

8.5   .

8.6   All costs, expenses and other amounts so invoiced will be substantiated and supported by documents satisfactory to and verified by COMPANY.  SUPPLIER will maintain, for a minimum period of thirty nine (30) months after final payment has been made to SUPPLIER under this Agreement, all records and accounts pertaining to work performed hereunder.  SUPPLIER agrees that COMPANY will have the right to audit, copy and inspect, or cause to have audited, copied and inspected, SUPPLIER's records and accounts pertaining to performance under this Agreement at all reasonable times during the course of performance hereunder and for a minimum period of thirty nine (39) months after final payment has been made to SUPPLIER.

8.7   This paragraph applies to flexibly priced agreements (any which are not entirely Firm Fixed Price) for which the SUPPLIER does NOT have a U.S. Government approved or recognized Cost Accounting System.  In such cases, the Parties agree on the following process(es) for near real-time verification and/or validation of the quantity of the Agreement Line Item (SLIN<s>) Unit(s) of Measure delivered by the SUPPLIER: _____ .  Payments for invoice amounts over $5,000.00 (Five Thousand U.S. dollars) will be effected by wire transfer.

8.8   SUPPLIERs Bank information:

| Bank Name: | Bank of America |
|---|---|
| Address: | 901 Main Street, Dallas, Texas  75202 |
| Phone#: | 973-377-7332 |
| Contact Person: | Rocio Ruano |
| Account #: | 3756673063 |
| ABA or SWIFCODE: | 111000012 |

8.9   Upon payment of the final invoice,it is recognized that all work under the DI Procurement Awards has been completed.  Subcontractor agrees to raise any disputes or concerns within 30 days of the final invoice.  If no concerns are raised during this 30 day notice period after issuance of the final invoice, the procurement action will be considered closed and paid in full at the end of the 30 day notice period.

Rev: September 21, 2011

BARR-000010

## 9. CHANGES/MODIFICATIONS

9.1   No oral statement of any person shall modify or otherwise affect the terms, conditions, or specifications stated in this Agreement. Sole authority to issue change orders and modifications to this Agreement is vested in the Authorized Purchasing Representatives.

9.2   COMPANY may at any time, by written order to SUPPLIER, make changes in or additions to the specifications or drawings, require additional work or Services, or delete Services covered by this Agreement (collectively "Change").

9.3   If any such Change causes any increase in the cost of, quantity of or the time required for performance of this Agreement, the SUPPLIER may apply to the COMPANY for an equitable adjustment in the Part II Exhibit 1 "Schedule of Prices", the quantity, or performance schedule, or any or all of the foregoing, and, if approved, this Agreement will be modified in writing accordingly. If such Change causes any decrease in the cost of, quantity of or in the time required for performance of this Agreement, the SUPPLIER shall notify the COMPANY of an equitable adjustment and such decrease will be applied to the Part II Exhibit 1 "Schedule of Prices", the quantity or performance schedule or any or all of the foregoing.

9.4   Any claim for or notification of equitable adjustment by SUPPLIER under this Section must be asserted within fifteen (15) days from the date of receipt by SUPPLIER of a written change order from COMPANY; provided, however, that COMPANY may, in its sole discretion, receive and act upon any such claim at any time before final payment under this Agreement. The claim or notification shall be submitted to COMPANY's Authorized Purchasing Representative.

9.5   No Change shall be binding on either SUPPLIER or COMPANY unless issued in writing and signed by COMPANY's Authorized Purchasing Representative.

## 10. NOTICES

All Notices should be directed to the appropriate Category Manager, and copied to the Vice President of Sourcing listed below. Either party must notify the other of change in official address by written notice to the other party.

| Role | Category Manager | Director Sourcing | VP Sourcing | SUPPLIER |
|---|---|---|---|---|
| Company | DynCorp International LLC | DynCorp International LLC | DynCorp International LLC | DAMCO USA, Inc |
| Address | Brian Perrenot | Janet Edwards | Krista Robinson | Brian Andrusin |
| Address | 13601 N Freeway, Suite 2075, Fort Worth, TX 767177 | 13601 N Freeway, Suite 2075, Fort Worth, TX 767177 | 13601 N Freeway, Suite 2075, Fort Worth, TX 767177 | 1530 Wilson Blvd. Suite 650. Arlington, VA  22209-2419 |
| Phone | 817-224-1354 | 817-224-1354 | 817-224-1354 | 703-351-0123 |
| Fax | 817-224-8362 | 817-224-8362 | 817-224-8362 | 253-736-7293 |
| eMail: | Brian.perrenot@dyn-intl.com | Janet.edwards@dyn-intl.com | Krista.robinson@dyn-intl.com | Brian.Andrusin@Damco.com |
| Attn: | | | | |

## 11. DISPUTES

11.1   Any dispute arising under this Agreement which is not settled by agreement of the Parties or pursuant to paragraph 12.2 below may be settled by appropriate legal proceedings brought in Fairfax County, Virginia. Pending any decision, appeal or judgment referred to in this provision or the settlement of any dispute arising under this Agreement, SUPPLIER shall proceed diligently with the performance of this Agreement.

11.2   Notwithstanding any provisions herein to the contrary:

Rev: September 21, 2011

BARR-000011

11.3  If a decision on any question of fact arising under an applicable Prime Contract is made by the Customer and such a question of fact is also related to this Agreement, said decision, if binding upon COMPANY under the Prime Contract, shall also be binding upon COMPANY and SUPPLIER with respect to this Agreement with respect to such question insofar as it relates to this Agreement; provided, however, that if SUPPLIER is adversely affected by any such decision made by the Customer, and if COMPANY elects not to appeal such decision pursuant to the "Disputes" clause of the Prime Contract, COMPANY shall promptly notify SUPPLIER. If SUPPLIER thereafter requests, within sixty (60) days, for COMPANY to appeal such decision, COMPANY shall do so. If COMPANY appeals such decision, whether at its election or at SUPPLIER's request, any decision upon such an appeal, if binding upon COMPANY under the Prime Contract shall in turn be binding upon COMPANY and SUPPLIER under this Agreement with respect to such question of fact insofar as it relates to this Agreement.

11.4  If any such appeal is denied or otherwise decided adversely to SUPPLIER's interest, or if SUPPLIER is otherwise adversely affected by any decision made by any representative of the Customer on any question of fact and/or law arising under the Prime Contract which is also related to this Agreement, from which an appeal under the "Disputes" clause in the Prime Contract is not available, said decision, if binding upon COMPANY under the Prime Contract, shall in turn be binding upon COMPANY and SUPPLIER with respect to such question insofar as it relates to this Agreement; provided, however, that if SUPPLIER is adversely affected by any such decision, and if COMPANY elects not to bring suit against the Customer with respect to such decision, COMPANY shall notify SUPPLIER with reasonable promptness. If SUPPLIER timely requests COMPANY to bring suit against the Customer, COMPANY shall do so. If COMPANY brings suit against the Customer with respect to any such decision, whether at its election or at SUPPLIER's request, a final judgment in any such suit, if binding upon COMPANY under the Prime Contract shall in turn be binding upon SUPPLIER and COMPANY under this Agreement with respect to the question decided insofar as it relates to this Agreement.

11.5  If any such appeal or suit is taken or brought by COMPANY whether at its election or at SUPPLIER's request, SUPPLIER shall assist COMPANY in its prosecution thereof in every reasonable manner and SUPPLIER shall be afforded reasonable opportunity to participate in the prosecution thereof to the extent SUPPLIER's interest may be affected. To the extent required by COMPANY, SUPPLIER shall prosecute for COMPANY any appeal or suit taken or brought at SUPPLIER's request and, in such event, COMPANY shall assist SUPPLIER in every reasonable manner. All costs and expenses incurred by the parties in prosecuting any appeal or suit taken or brought at COMPANY's election shall be borne by COMPANY unless it is shown that SUPPLIER's interest in the appeal is limited to a matter of which there is not an identity of interest between the parties, in which case SUPPLIER shall bear all costs and expenses associated with such segregable issue or matter. All costs and expenses incurred by SUPPLIER and COMPANY in prosecuting any appeal or suit taken or brought at SUPPLIER's request shall be paid by SUPPLIER. Where practicable, COMPANY shall, in good faith, consult with SUPPLIER concerning the presentation to the Contracting Authority or other cognizant representatives of the Customer of the questions referred to in paragraph (1) and (2) above to the extent they may affect SUPPLIER's interest.

11.6  The rights and obligations described herein shall survive completion of and final payment under this Agreement.

## 12.  TERMINATION

12.1  TERMINATION FOR CONVENIENCE. COMPANY and SUPPLIER reserve the right, at any time, in its own best interest, and without liability, to terminate this Agreement in whole or in part, by written notice of termination for convenience to SUPPLIER and COMPANY. COMPANY shall pay SUPPLIER only for Products/Services satisfactorily delivered and accepted up to the date of termination, at the price indicated in this Agreement.

12.2  TERMINATION FOR DEFAULT  COMPANY may, without liability, and in addition to any other rights or remedies provided herein or by law, terminate this Agreement in whole or in part by written notice of default if SUPPLIER:  (a) fails to deliver the Products or perform the Services

Rev: September 21, 2011

BARR-000012

within the time specified; (b) fails to make sufficient progress with the work, thereby endangering completion of performance within the time specified; (c) fails to comply with any of the other instructions, terms, or conditions of the Agreement; (d) SUPPLIER becomes insolvent or subject to proceedings under any law relating to bankruptcy or the relief of debtors or admits in writing its inability to pay its debts as they come due. COMPANY's right to terminate for default may be exercised if SUPPLIER does not cure the failure within ten (10) business days (or such longer period as COMPANY may authorize in writing) after receiving COMPANY's notice of such failure. If COMPANY terminates this Agreement in whole or in part, SUPPLIER shall use its best effort to mitigate the costs associated with such termination and shall promptly submit a final termination settlement proposal to COMPANY, but no later than three (3) months from the effective date of termination. Such settlement proposal shall contain sufficient detail with supporting documentation for allowing COMPANY to reasonably ascertain the validity of such proposal. In COMPANY's sole discretion, should such proposal not contain sufficient detail to reasonably determine the validity of such costs, or if SUPPLIER fails to submit the required proposal within the time allowed, then COMPANY may determine unilaterally the amount, if any, due the SUPPLIER as a result of the termination. COMPANY may withhold from any amount due SUPPLIER sums reasonably necessary to protect COMPANY against any liability or expenses arising from the termination for default.

12.3 SUPPLIER shall transfer title and deliver to COMPANY, in the manner and to the extent requested in writing by COMPANY, at or after termination such complete articles and partially-completed articles and any materials, parts, tools, dies, patterns, jigs, fixtures, plans, drawings, information, and contract rights as SUPPLIER has produced or acquired for performance of the terminated portion of the Agreement.

12.4 COMPANY will pay SUPPLIER the contract price for complete Products delivered to and accepted by COMPANY and the fair market value of any partially completed Products and other property requested by COMPANY and delivered by SUPPLIER.

12.5 COMPANY may purchase similar supplies or services from others and SUPPLIER shall be liable for any additional costs above the original price for the terminated Products/Services. SUPPLIER shall continue performance of this Agreement to the extent not terminated.

12.6 COMPANY shall have no obligations to SUPPLIER with respect to the terminated portion of this Agreement except as herein provided. In the event of SUPPLIER's default, COMPANY's rights, as set forth herein, shall be in addition to COMPANY's other rights in law and in equity whether or not set forth in this Agreement.

12.7 EFFECT OF TERMINATION. Upon expiration or early termination of this Agreement pursuant to Section 12.1, Termination for Convenience, COMPANY may, without liability, cancel any portion of any Purchase Order or Statement of Work with respect to any Product that has not been provided or Service that has not been performed, and accepted by COMPANY. If COMPANY does not exercise such right, then the obligations of each of COMPANY and SUPPLIER under this Agreement with respect to any Purchase Order or SOW that has been accepted by SUPPLIER shall survive the termination of this Agreement until those obligations have been fully performed and those obligations shall remain subject to the terms of the Agreement.

12.8 SUPPLIER shall, upon COMPANY's request, continue the performance of the Services during a reasonable period of time designated by COMPANY, not to exceed ninety (90) days following the date of expiration or termination of this Agreement ("Termination Assistance Period") and the performance of those Services shall remain subject to the terms of the Agreement, including without limitation the applicable fees. The quality and level of performance during the Termination Assistance Period shall not be degraded from that provided during the term of the Agreement. At COMPANY's request, SUPPLIER shall assist COMPANY in transitioning the Services to another provider or to COMPANY to perform internally. Unless otherwise agreed, for a period of ninety (90) days after the expiration of the Termination Assistance Period, SUPPLIER shall (i) provide support to the extent of answering questions from COMPANY regarding the Services on an "as needed" basis; and (ii) will deliver to COMPANY any remaining COMPANY furnished property and documentation still in SUPPLIER's possession.

Rev: September 21, 2011

BARR-000013

### 13. COMPANY FURNISHED PROPERTY

Any COMPANY furnished property, including but not limited to, equipment, drawings, specifications, data and the like, provided to SUPPLIER for performance of the work under this Agreement, shall remain the property of COMPANY, shall be considered Proprietary Information of COMPANY and shall not be used by SUPPLIER for its own purposes or given to a third party without the express written consent of the COMPANY. Any designs, drawings, dies, molds, tooling, technical data/information, materials, equipment, etc., that SUPPLIER makes or buys from others for producing the Products/Services and charges to COMPANY's account, shall become COMPANY's property, with transfer of full legal and equitable title, immediately upon manufacture or procurement. All such COMPANY property shall be marked as belonging to COMPANY, shall be physically segregated from the property of the SUPPLIER or third party property located on SUPPLIER's premises, and shall be used exclusively to perform the work requirements of this Agreement. Upon Agreement completion, all COMPANY furnished property shall be returned to the COMPANY in the same condition as received, allowing for reasonable wear and tear, except to the extent that the property has been incorporated into Products delivered or consumed in the performance of the work. SUPPLIER shall be responsible for all loss or damage to COMPANY furnished property.

### 14. STOP-WORK ORDER

COMPANY may, at any time, by written notice to SUPPLIER, stop all or any part of the work hereunder for up to ninety (90) calendar days. Upon receiving a stop-work order, SUPPLIER shall immediately comply with its terms and take all reasonable steps to avoid incurring any additional costs allocable to such work. If additional costs are incurred as a direct result of the stop-work, SUPPLIER may submit a claim for equitable adjustment requesting an increase in price and/or an extension in schedule to the COMPANY within 45calendar days after the resumption of work or, absent such resumption, the ninetieth calendar day after receipt of the stop work notice.

### 15. ASSIGNMENT

SUPPLIER shall not assign this Agreement, or any rights, interest, or payments, or the performance of any of its duties under this Agreement without the prior written consent of COMPANY. SUPPLIER, however, notwithstanding the above, may assign right to payment as a function of ordinary banking and financing operations in its company. COMPANY may assign any of its rights, or delegate any of its obligations, to any parent company, Affiliate, subsidiary, or to any successor in interest following a merger, acquisition or transfer of substantially all of its assets without the consent of SUPPLIER.

### 16. SUBCONTRACTING

Except for standard commercial items, raw materials, or other supplies identified in SUPPLIER's proposal as procured from others, SUPPLIER shall make commercially reasonable efforts not to subcontract any portion of the work without the prior written consent of COMPANY, which shall include a review of the proposed subcontract agreement to ensure compliance with the requirements of this Agreement. COMPANY's consent to subcontract shall not relieve SUPPLIER from any of its responsibilities or obligations under this Agreement. SUPPLIER shall be solely responsible for all Products, Services and obligations provided or performed by its subcontractors/suppliers. The terms of any subcontract agreement shall be consistent with the terms and conditions of this Agreement.

### 17. RIGHTS, REMEDIES & WAIVER

The rights and remedies provided in this Agreement to COMPANY shall be cumulative with and in addition to the rights and remedies otherwise available at law or elsewhere provided for herein. No failure to exercise or delay in exercising on the part of COMPANY of any right provided by this Agreement or at law shall operate as a waiver thereof unless such waiver is in writing.

### 18. SEVERABILITY

In the event that any term or provision of this Agreement shall for any reason be held to be invalid or unenforceable in any respect by any court or administrative body of competent jurisdiction, unless such term or provision goes to the root of the Agreement and subject to agreement otherwise, this Agreement shall continue in full force and effect (except that the invalid form or provision shall be

12 of 32

Rev: September 21, 2011

BARR-000014

excised from the Agreement) and shall be interpreted and construed as if such term or provision, to the extent the same shall have been held to be invalid, illegal, or unenforceable, had never been contained herein. In the event that such term or provision goes to the root of the Agreement, the Parties shall negotiate an amendment to this Agreement, modifying it as necessary to accommodate the court or administrative interpretation.

## 19. APPLICABLE LAW

Irrespective of the place of performance, this Agreement will be construed and interpreted according to the federal common law of government contracts as enunciated and applied by federal judicial bodies, Boards of Contract Appeals, and quasi-judicial agencies of the federal government. To the extent that the federal common law of government contracts is not dispositive, the laws of the Commonwealth of Virginia shall apply, irrespective of its choice of law rules.

## 20. COMPLIANCE WITH LAW

20.1  SUPPLIER hereby represents that it has neither received nor given any gifts or gratuities, nor participated in any other unethical conduct as defined in the Procurement Integrity Provisions of the Office of Federal Procurement Policy (OFPP) Act, in connection with this Agreement. If, at any time, COMPANY determines that SUPPLIER is in violation of the foregoing representation, COMPANY may cancel this Agreement upon written notice to SUPPLIER and COMPANY shall have no further obligation to SUPPLIER beyond payment for Services and Products delivered through the date of termination. The parties hereto further agree that any breach of this representation by SUPPLIER shall be a material breach of each and every Agreement between COMPANY and SUPPLIER and COMPANY shall have, in addition to all contractual remedies, all remedies available at law or in equity.

20.2  SUPPLIER acknowledges an understanding of the United States Government's zero tolerance policy regarding Trafficking in Persons. Contractors and SUPPLIERs at any tier shall not engage in forms of trafficking in persons during the period of performance of the contract; nor procure commercial sex acts during the period of performance of the contract; nor use forced labor in the performance of the contract. Actions will be taken against the SUPPLIER and individual employees for violations of this policy, including, but not limited to, immediate termination of the Agreement or removal of individuals found to be in violation of the policy, suspension of Agreement payments; termination of the Agreement for default or cause, or suspension, and debarment of the SUPPLIER. The SUPPLIER shall include the substance of this Section 20.2, including this sentence, in all lower tier subcontracts.

20.3  SUPPLIER, its employees, and representatives, shall at all times comply with all applicable federal, state, and local laws, rules, regulations and orders in effect during the term of this agreement, including, but not limited to the following, as amended:

20.3.1    the Fair Labor Standards Act of 1938;

20.3.2    the Federal Occupational Safety and Health Act of 1970 (OSHA);

20.3.3    the Toxic Substances Control Act of 1976;

20.3.4    the Walsh-Healy Public Contracts Act;

20.3.5    any regulations concerning nondiscrimination in employment (including the Equal Opportunity Clause of Section 202, Executive Order 11246, dated September 24, 1965) 38 USC 2012, as amended by Section 402 of the Vietnam Veterans Readjustment Assistance Act of 1974 and Section 503 of the Rehabilitation Act of 1973, which are incorporated herein by reference; and

20.3.6    any other federal law concerning labor relations, nondiscrimination in employment, minimum wages, overtime compensation, hours of employment, and working conditions.

Rev: September 21, 2011

BARR-000015

## 21. ADDITIONAL GOVERNMENTAL AND FAR REQUIREMENTS

21.1 Foreign Corrupt Practices Act: SUPPLIER (including SUPPLIER's subcontractors, suppliers, employees, agents, or representatives) represents and certifies that it will perform under this Agreement in accordance with the U.S. Foreign Corrupt Practices Act, similar foreign laws, and COMPANY's FCPA Policy and shall not offer, promise, authorize, or approve to pay or actually pay money or anything of value (including gifts), directly or indirectly, to a foreign official in connection with the performance of this Agreement that are contrary to the laws of the United States, SUPPLIER's country, or the laws of any foreign country in which COMPANY performs under this Agreement. COMPANY may take any action or combination of actions listed below against the SUPPLIER and its individual employees for violations of this provision, including, but not limited to: immediate termination of this Agreement; removal of individuals found to be in violation of this provision; suspension of payments under this Agreement; and/or termination of this Agreement for convenience or default. The SUPPLIER shall include this provision, including this sentence, in all lower-tier agreements. The SUPPLIER represents and warrants that it shall, at all times, comply with any and all applicable laws, ordinances, statutes, rules, and regulations of the United States and any foreign country in which COMPANY performs under this Agreement.

21.2 International Trade Compliance: IT IS THE POLICY OF DYNCORP INTERNATIONAL ("COMPANY") TO FOLLOW ALL INTERNATIONAL TRADE REGULATIONS, AND COMPANY WILL NOT CONDUCT BUSINESS WITH THE SANCTIONED AND EMBARGOED COUNTRIES LISTED BELOW. REGULATIONS CAN CHANGE AT ANY TIME. THE SUPPLIER IS RESPONSIBLE FOR AND EXPECTED TO KEEP UP WITH THE MOST CURRENT VERSION OF INTERNATIONAL TRADE REGULATIONS AND BE IN FULL COMPLIANCE AT ALL TIMES. IF THE SUB-CONTRACTOR HAS KNOWLEDGE OF, OR SUSPECTS THAT A VIOLATION MAY OCCUR OR MAY TAKE PLACE THEY ARE REQUIRED TO NOTIFY DYNCORP INTERNATIONAL IMMEDIATELY.

21.3 The Services, Products, technology and/or technical data provided or disclosed in performance of this Agreement may be subject to required and continuing U.S. Government approvals, clearances, regulations, and export/import and re-export requirements, including the U.S. Department of State International Traffic in Arms Regulations (ITAR – Title 22, CFR Parts 120– 130), the U.S. Department of Commerce Export Administration Regulations (Title 15, CFR 730– 774), Office of Foreign Asset Control (OFAC) (Title 31, Chapter V and appropriate amendments), The U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives Regulations (Title 27, CFR, Chapter II, Parts 447 to end) and any other U.S. Government regulation applicable to the export/import, re-export, or disclosure of such controlled technical data (or the products thereof) to parties who are not considered U.S. Persons under U.S. export controls whether within, or outside, the U.S., including those employed by, or otherwise associated with, the SUPPLIER.

21.4 The SUPPLIER shall take those measures necessary to ensure compliance with the following regulations:

21.4.1 The Department of State, Directorate of Defense Trade Controls (DDTC), International Traffic in Arms Regulations (ITAR) governing the temporary and permanent export of defense articles and technical data, the temporary import of defense articles and technical data, and the provision of defense Services to foreign persons, whether in the U.S. or abroad..

21.4.2 The Department of Commerce (DoC) Bureau of Industry and Security (BIS) Export Administration Regulations (EAR) governing the export of U.S. produced material and technical data.

21.4.3 The Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives Regulations governing the permanent import of defense articles into the United States.

21.4.4 The Department of Commerce, U.S. Census Bureau (Census) Foreign Trade Regulations governing the use of the Automated Export System for filing Electronic Export Information.

Rev: September 21, 2011

BARR-000016

21.4.5 The Department of Homeland Security, U.S. Customs and Border Protection and associated regulations associated with importing into the United States.

21.4.6 The Department of the Treasury's Office of Foreign Assets Control (OFAC) and associated regulations.

21.5 All export and import permitting and licensing transactions performed under this Agreement shall fully comply with the applicable federal regulations. Furthermore, the SUPPLIER represents that "Neither the applicant, its chief executive officer, president, vice presidents, other senior officers or officials (e.g. comptroller, treasurer, general counsel) nor any member of its board of directors is: a. The subject of an indictment for or has been convicted of violating any of the U.S. criminal statutes enumerated in ITAR 120.27 since the effective date of the Arms Export Control Act, Public Law 94-329, 90 Stat. 729 (June 30, 1976); or b. Ineligible to contract with, or to receive a license or other approval to import defense articles or defense Services from, or to receive an export license or other approval from any agency of the U.S. Government."

21.6 OFAC administers a number of U.S. economic sanctions and embargoes that target geographic regions and governments. Sanctioned countries include: The Balkans, Belarus, Burma, Cote d'Ivoire (Ivory Coast), Cuba, Democratic Republic of Congo, Iran, Liberia (Former Liberian Regime of Charles Taylor Sanctions), Lebanon, Libya, North Korea, Somalia, Sudan, Syria, and Zimbabwe. OFAC also administers sanction programs for WMD non-proliferation, Diamond Trading (Conflict Diamonds), Counter Terrorism and Counter Narcotics. U.S. persons, including foreign branches of U.S. depository institutions and trading companies, are prohibited from engaging in any transactions, including purchase, sale, transportation, swap, financing, or brokering transactions related to goods or services of sanctioned and embargoed country origins, or services owned or controlled by sanctioned and embargoed country Governments.

21.7 Department of Labor regulation, 29 CFR 471: Excepting SUPPLIERs domiciled outside of the United States and the tasks being entirely performed under this Agreement outside the United States, for Subcontracts greater than $100,000 in total value or which increases to or above such amount, during the term of this contract, the SUPPLIER agrees to post a notice, of such size and in such form, and containing such content as the Secretary of Labor shall prescribe, in conspicuous places in and about its plants and offices where employees covered by the National Labor Relations Act engage in activities relating to the performance of the Agreement, including all places where notices to employees are customarily posted both physically and electronically. The "Secretary's notice" shall consist of the following: See 29 CFR Part 471, Appendix A to Subpart A. at http://www.hq.nasa.gov/office/procurement/regs/pic10-06.html

21.8 Truth in Negotiations Act, Public Law 87-653: Applies to all subcontracts and Agreement modifications over $650,000 except when: 1) adequate price competition exists; 2) the price is set by law or government; 3) the acquisition is for a commercial item and 4) the head of the contracting activity for the government agency grants a waiver

21.9 Certifications and Representations: The following clauses set forth in the Federal Acquisition Regulation (FAR) and are incorporated herein by reference with the same force and effect as if given in full text. In the event of a conflict between any Article in this Agreement and the FAR clauses listed below, the FAR clauses shall prevail. SUPPLIER acknowledges that COMPANY will rely upon SUPPLIER's certifications and representations contained in this clause and in any written offer, proposal or quote, or company profile submission, which has resulted in this Agreement to SUPPLIER. By entering into such Agreement, SUPPLIER republishes the certifications and representations submitted with its written offer, including company profile information, and oral offers/quotations made at the request of COMPANY, and SUPPLIER makes those certifications and representations set forth below. SUPPLIER shall immediately notify COMPANY of any change of status regarding any certification or representation

| 52-203-11 | Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions |
| 52-203-13 | Contractor Code of Business Ethics and Conduct (Dec 2008) |
| 52-204-10 | Reporting Executive Compensation and First-Tier Agreement Awards |
| 52-209-5 | Certification Regarding Responsibility Matters. |

Rev: September 21, 2011

BARR-000017

| 52-209-6 | Protecting the Government's Interest When Subcontracting with Contractors Debarred Suspended or Proposed for Debarment |
|---|---|
| 52.212-5(e)(1) | Contract Terms and Conditions Required to Implement Statutes or Executive Orders—Commercial Items. (Dec 2009) |
| 52-215-2 | Audit and Records – Negotiation |
| 52-215-12 | SUPPLIER Cost or Pricing Data |
| 52-215-13 | SUPPLIER Cost or Pricing Data – Modifications Agreement values over $650K and negotiated the following CAS clauses are applicable:<br>• 52.230-1 Cost Accounting Standards Notices and Certification<br>• 52.230-2 Cost Accounting Standards<br>• 52.230-3 Disclosure and Consistency of Cost Accounting Practices<br>• 52.230-6 Administration of Cost Accounting Standards |
| 52.219-8 | Utilization of Small Business Concerns (May 2004) |
| 52.222-21 | Prohibition of Segregated Facilities (FEB 1999) |
| 52.222-26 | Equal Opportunity  (Mar 2007) |
| 52.222-35 | Affirmative Action for Special Disabled and Vietnam Era Veterans (Sept 2007) |
| 52222-36 | Affirmative Action for Handicapped Workers (June 1998) |
| 52.222-41 | Service Contract Act of 1965 (Nov 2007) |
| 52.244-6 | Subcontracts for Commercial Items and Commercial Components (OCT 1995) |
| 52.222-53 | Exemption from Application of the Service Contract Act to Contracts for Certain Services-Requirements (Feb 2009) |
| 52.222-54 | Employment Eligibility Verification (Jan 2009) |
| 52.226-6 | Promoting Excess Food Donation to Nonprofit Organizations (Mar 2009) (Pub. L. 110-247). Flow down required in accordance with paragraph (e) of FAR clause 52.226-6. |
| 52.247-64 | Preference for Privately Owned U.S.-Flag Commercial Vessels (Feb 2006). |
| **The following DFAR Clauses are only applicable if this Agreement is issued under a DoD Prime Contract:** | |
| 252.204-7008.1 | Export Controlled Items |
| 252.222-7005 | Additional Requirements and Responsibilities Restricting the Use of Mandatory Arbitration Agreements |

## 22.  INSURANCE

SUPPLIER/ Subcontractor/ Vendor, from the time of start of the Services hereunder until completion of the Services, shall provide at its own expense and maintain in effect the following types and amounts of insurance with terms and with insurance companies satisfactory to COMPANY:

22.1  Aviation Liability Insurance:  When subcontract performance involves use of aircraft or aviation related Services are present, the Subcontractors, and any Subcontractors, as applicable, shall procure and maintain at all times Aviation Liability Insurance (Including War Risk Coverage and/or Hangar keepers Liability Coverage if applicable) against death, bodily injury, and property damage claims.  Such insurance shall be designated to protect the personnel including all COMPANY employees, and shall indemnify and defend COMPANY from all claims arising out of acts or omissions of the SUPPLIER and/or participants under this Agreement and all Task Order/Purchase Orders issued under this  Agreement. This insurance shall be procured and maintained with limits of not less than $3,000,000 per person/passenger; $3,000,000 with respect to any one person/passenger injured or killed; $3,000,000 per occurrence for property damage; and, subject to that limit per person/passenger, an aggregate limit of $50,000,000 with respect to any number of persons injured or killed as a result of any one accident.

22.2  Automobile/Motor Liability Insurance:  The SUPPLIER, and their SUPPLIERs, as applicable, shall procure and maintain at all times Business Automobile/Motor Liability Insurance.  The policy shall provide for bodily injury and property damage liability covering the operation of all motor vehicles used in connection with performing the contract.  Policies covering motor vehicles operated in the United States shall provide coverage of at least $1,000,000 combined single limit per occurrence for bodily injury and property damage.  The amount of liability coverage on other policies shall be commensurate with any legal requirements of the locality and sufficient to meet normal and customary claims.

22.3  Workers' Compensation, Defense Base Act, and Employers' Liability:  The SUPPLIER is required to comply with all applicable Federal and State workers' compensation and occupational disease statutes.  If occupational diseases are not compensable under those statutes, such occupational diseases shall be covered under the employer's liability section of the insurance policy, except

BARR-000018

when contract operations are so commingled with a SUPPLIER's commercial operations that it would not be practical to require this coverage. Employer's liability limits shall be not less than $500,000 for bodily injury by accident per accident and $500,000 bodily injury by disease policy limit. Workers Compensation insurance applies to Workers' Compensation Law of the states, territories and countries working under, except in states with exclusive or monopolistic funds that do not permit worker's compensation benefits to be written by private insurance companies. Monopolistic states certificate of insurance coverage is required if applicable. An alternate employer endorsement shall also be maintained and a copy of the endorsement sent to DynCorp International Corporate Risk Management. If Workers Compensation under the Defense Base Act (DBA) is applicable to the contract or location of Services performed, DBA insurance shall be secured and made evident in the form of a certificate of insurance with an authorized insurance carrier approved by the US Dept of Labor.

22.4 Commercial General Liability: The SUPPLIER, and their SUPPLIERs, as applicable, shall provide commercial general liability for bodily injury and property damage liability insurance including contractual liability coverage written on the comprehensive form of policy of at least $1,000,000 per occurrence and $2,000,000 policy aggregate. Coverage will not be limited to the territory or regions provided in the SOW.

22.5 Vessel Liability: When subcontract performance involves lease or charter of vessels, the SUPPLIER, and their SUPPLIERs, as applicable, shall provide vessel liability and protection and indemnity insurance as determined by COMPANY Corporate Risk Management.

22.6 Excess Liability: The SUPPLIER, and their SUPPLIERs, as applicable, shall provide umbrella and or excess liability to include bodily injury and property damage covering general liability, automobile liability, and employer's liability. The insurance provided under this Section must be in the amount of not less than $4,000,000 per occurrence and be excess over all underlying insurance coverage listed.

22.7 Cargo Insurance: For contracts that involve marine Cargo shipments, including the use of a Freight Forwarding company, SUPPLIER must notify COMPANY Risk Management in advance of any shipment to ensure proper COMPANY cargo insurance requirements are met.

22.8 Professional Liability Insurance: For projects involving Professional Services (Architects, Engineers, Consultants, etc.), the SUPPLIER shall maintain professional liability coverage during the term of this agreement. The limits of this coverage shall be a minimum of $3,000,000.00 combined single limit. This requirement shall extend to all professional subcontractors employed by the prime consultant, engineer or surveyor. SUPPLIER shall provide certification of such insurance and a copy of the policy upon request.

22.9 Insurance Policies: All insurance policies shall bear an appropriate endorsement whereby the insurance carrier waives any right of subrogation acquired against COMPANY and the United States of America by reason of any payment under such policy, and such policy shall further provide that COMPANY receives 30 days prior notice before cancellation of such policy or reduction of coverage there under can be effective. For all insurance policies, the SUPPLIER shall, prior to the performance of this contract and the performance of an option period or 30 days prior to the expiration of insurance coverage, submit to COMPANY either (a) a certified copy of the insurance policy actually procured and maintained, or (b) an insurance certificate issued by the insurance company verifying coverage in conformity with this contract.

22.10 Insurance Deductible: The SUPPLIER shall be responsible for all deductibles associated with any accident, incident or damage against personnel or property. COMPANY will not assume any liability including, but not limited to the insurance deductible.

22.11 Additional Insured: The SUPPLIER shall identify DynCorp International LLC as additional insured on all Policies associated with this Agreement except for Workers Compensation.

22.12 Lower Tier Insurance: SUPPLIER shall require its lower tier SUPPLIERs to provide the same insurance coverages and requirements as described herein, unless otherwise agreed in writing between the parties.

Rev: September 21, 2011

BARR-000019

22.13 Certificate(s) of Insurance: The SUPPLIER shall furnish the COMPANY with a current certificate of insurance as evidence of the insurance required, within five (5) calendar days after execution of this Agreement. 23.1 In addition, the SUPPLIER shall furnish evidence of a commitment, by the insurance carrier, to notify the COMPANY in writing of any material change, expiration or cancellation of any of the insurance policies required not less than thirty (30) calendar days before such change, expiration or cancellation is effective. When coverage is provided by self-insurance, the SUPPLIER shall not change or decrease the coverage without the COMPANY's approval.

## 23.  INDEMNIFICATION

23.1  The SUPPLIER shall indemnify, defend,  and hold harmless COMPANY, COMPANY's customers, and each of COMPANY's owner(s), affiliates, directors, officers, employees and agents  from all damages, claims, liabilities, losses, demands, causes of action, law suits and expenses (including reasonable attorney's fees) arising out of or relating to any claims, causes of action, lawsuits or other proceedings, regardless of legal theory, that result, in whole or in part, from SUPPLIER's (or any of SUPPLIER's subcontractors, suppliers, employees, agents or representatives): (i) negligence, fraud or willful misconduct in entering into or performing under this Agreement; (ii) Products or Services including, without limitation, any claims that such Products or Services infringe any patent, copyright, trademark, trade secret, or any other proprietary right of any third party or; (iii) any breach of any representation, warranty, or covenant made herein.

23.2  If SUPPLIER's liability arises by reason of the negligence of COMPANY, its agents, employees, officer, and/or directors, then the SUPPLIER shall not be liable hereunder except to the extent of the SUPPLIER's contributory negligence.

23.3  COMPANY shall promptly notify SUPPLIER of any claim against COMPANY covered by this indemnification provision and shall authorize representatives of SUPPLIER to settle or defend any such claim or suit and to represent COMPANY in, or take charge of, any litigation in connection therewith.

## 24.  LIMITATION OF LIABILITY

SUPPLIER AGREES THAT COMPANY AND ITS AFFILIATES AND THEIR RESPECTIVE OWNERS, OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS AND AGENTS SHALL NOT BE LIABLE FOR ANY DAMAGES, INCLUDING WITHOUT LIMITATION INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, AND EXEMPLARY DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, AND LOSS OF OR CORRUPTION OF DATA) ARISING OUT OF OR RELATING TO SUPPLIER'S PERFORMANCE OF THIS AGREEMENT OR SUPPLIER'S BREACH OF ANY TERM OR CONDITION OF THIS AGREEMENT, REGARDLESS OF THE LEGAL THEORY UNDER WHICH SUCH DAMAGES ARE SOUGHT.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, COMPANY AND ITS OWNERS, AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS AND AGENTS SHALL NOT BE LIABLE FOR ANY DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, OR DATA, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, REGARDLESS OF CAUSE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR RELATING TO (I) THE USE OF, INABILITY TO USE OR DELAY CAUSED BY ANY DATA PROVIDED BY COMPANY, INCLUDING WITHOUT LIMITATION ANY ERRORS AND OMISSIONS AND ANY UNTIMELINESS; (II) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES; (III) ANY GOODS OR SERVICES PURCHASED OR OBTAINED THROUGH OR FROM COMPANY; (IV) MESSAGES OR CONTENT RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM COMPANY, INCLUDING WITHOUT LIMITATION COMPUTER VIRUSES; (V) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA, REGARDLESS OF WHETHER SUCH INTERRUPTION, SUSPENSION OR TERMINATION WAS JUSTIFIED, NEGLIGENT OR INTENTIONAL, INADVERTENT OR ADVERTENT.

Rev: September 21, 2011

BARR-000020

## 25. PROPRIETARY AND COMPANY CONFIDENTIAL INFORMATION

25.1  To protect certain proprietary or company confidential information (either or both of which are herein described as "Proprietary Information"), which may be disclosed between the parties, the parties agree that:

25.1.1  Proprietary information includes, without limitation, data which a disclosing party now or in the future possesses relating to certain technical, business, financial, and other data generally considered by that party to be company confidential. The parties may specify the type of Proprietary Information to be disclosed under this Agreement and the express purpose for such disclosures. Lack of specification will not affect the obligations regarding treatment of Proprietary Information. If so desired, the Proprietary Information is described as: _____ for the express purpose of _____

25.1.2  This Article controls only Proprietary Information which is disclosed by a party, ("Discloser") on or after the Effective Date of the Agreement. The party receiving the Proprietary Information ("Recipient") will continue to protect Proprietary Information for a period of three years beyond the termination of this Agreement.

25.1.3  Recipient shall not disclose Proprietary Information to any third party without the prior written consent of the Discloser and shall limit its disclosure to its employees, agents, and consultants having a need to know and who are under non-disclosure obligations no less restrictive than this Agreement. Recipient shall cooperate with Discloser in fully enforcing any such obligations. Recipient shall protect the disclosed Proprietary Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized disclosure of the Proprietary Information as Recipient uses to protect its own proprietary or company confidential information of a like nature. Recipient may make copies of the Proprietary Information as reasonably necessary to effectuate the intent of this Agreement, provided that each copy is considered Proprietary Information and all proprietary legends or markings on the original are retained on the copies.

25.1.4  Recipient shall have a duty to protect only that Proprietary Information which is (a) disclosed to Discloser in writing (to include electronic transmissions and data files) and is marked as "Proprietary" or "Company Confidential," or with a similar legend, at the time of disclosure, or which is; (b) disclosed by Discloser in any other manner and is identified as proprietary or company confidential in a written memorandum delivered to Recipient within 15 (fifteen) days of the disclosure.

25.1.5  The obligations herein will not apply to any information which is (a) available to the public other than by breach of this Agreement by Recipient; (b) rightfully received by Recipient from a third party without proprietary or company confidential limitations; (c) independently developed by Recipient's employees; or (d) known to Recipient prior to first receipt of same from Discloser.

25.1.6  Each Discloser warrants that it has the right to make the disclosures under this Agreement. NEITHER PARTY MAKES ANY EXPRESS WARRANTIES AND DISCLAIMS ALL IMPLIED WARRANTIES WITH RESPECT TO INFORMATION DELIVERED HEREUNDER, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR FREEDOM FROM PATENT OR COPYRIGHT INFRINGEMENT, WHETHER ARISING BY LAW, CUSTOM, OR CONDUCT. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES.

25.1.7  Neither party has an obligation under this Agreement to offer for sale products using or incorporating the Proprietary Information. Either party may, at its sole discretion, using its own information, offer such products for sale and may modify them or discontinue sale at any time.

Rev: September 21, 2011

BARR-000021

25.1.8   Neither party acquires any licenses or any other intellectual property rights of the other party under this Agreement.

25.1.9   Recipient may reproduce and disclose Proprietary Information as part of a proposal to a potential customer provided (a) if the customer is the U.S. Government that the Proprietary Information shall be disclosed pursuant to and bearing the appropriate legends set forth in the applicable regulations; (b) if the customer is other than the U.S. Government that the customer is under non-disclosure obligations no less restrictive than in this Agreement; and (c) Recipient informs Disclosure of the intent to reproduce and disclose Proprietary Information as part of a proposal reasonably in advance of doing so.

25.1.10   If Recipient or any of its affiliates is required to disclose Proprietary Information by any law, rule, regulation, order or any court or other competent tribunal, judicial process or request any competent governmental agency, Recipient will be entitled to disclose such Company Confidential Information but will promptly notify Discloser of such request or requirement and shall cooperate with Discloser in seeking appropriate protective arrangements.

25.1.11   Monetary damages would be inadequate to compensate Discloser for breach of Recipient's obligations under this Article.  Accordingly, the parties agree that any such breach would cause irreparable injury to Disclosure and that, in addition to any other remedies that would be available in law or in equity or otherwise, Discloser shall be entitled to obtain such injunctive relief as a court of competent jurisdiction may deem proper against the threatened breach or continued breach by Recipient, without the necessity of proving actual damages.

25.1.12   Recipient represents and warrants that no technical data delivered to it by Discloser shall be exported from the United States without first complying with all requirements of the International Traffic in Arms Regulations and the Export Administration Act, including the requirement for obtaining any export license, if applicable.  Recipient shall first obtain the written consent of Discloser prior to submitting any request for authority to export any such technical data.

25.2   All Background Investigations (BI) and associated documents are the sole property and Proprietary Information of COMPANY.  The SUPPLIER shall exercise the utmost discretion in regard to all matters relating to Background Investigations.  The SUPPLIER shall not communicate to any person any information known by reason of performance of Services under this Agreement, that has not been made public, except as is required in the necessary performance of duties.  All documents and records (including photographs) generated during the performance of work under this Agreement shall be for the sole use and shall become the exclusive property of COMPANY.  Furthermore, no article, book, pamphlet, recording, broadcast, speech, television appearance, film, or photograph concerning any aspect of work performed under this Agreement shall be published or disseminated through any media without the prior written consent of COMPANY.  These obligations do not cease upon the expiration or termination of this Agreement.

25.3   Upon completion, expiration or termination, all documents, reports, technical documents, maps, plans, recommendations, estimates, pamphlets, recordings, broadcast, speeches, television appearances, film, photographs concerning any aspect of work performed under this Agreement, whether written, electronic, analog or digital will be provided to COMPANY on proper media for storage purposes.  All other copies will be destroyed, deleted, or expunged from SUPPLIER's files or storage facilities.

## 26.   RIGHTS IN WORK PRODUCT

26.1   COMPANY shall have all right, title and interest in and to all Products, materials, source code, software, documentation, information and data of whatever kind of work product created in the performance of Services hereunder. If during the term of this Agreement, any of SUPPLIER's personnel should (either alone or with others) make, conceive, discover, reduce to practice, or further develop any invention, modification, discovery, design, development, improvement,

20 of 32

Rev: September 21, 2011

process, formula, software, data, techniques, know-how, secret, or intellectual property right whatsoever or any interest therein (whether or not patentable or registerable under copyright or similar statutes or subject to analogous protection (herein called "Inventions") that relates to the business of COMPANY or any client of COMPANY or any of the Products or Services being developed, manufactured, or sold by COMPANY or which may conveniently be used in relation therewith, or results from Services performed by SUPPLIER or its personnel or results from the use of premises owned, leased, or contracted for by COMPANY, such Inventions and the benefits thereof shall immediately become the sole and absolute property of COMPANY and its assigns, and SUPPLIER shall promptly disclose to COMPANY (or any persons designated by it) each such Invention and benefits and/or rights resulting there from to COMPANY and assign it to COMPANY without compensation and shall communicate, without cost or delay, and without publishing the same, all available information relating thereto to COMPANY.

26.2   Upon disclosure of each Invention to COMPANY created during the performance of this Agreement, SUPPLIER will (and shall cause SUPPLIER's employees to) at the request and cost of COMPANY, sign, execute, make and do all such deeds, documents, acts and things as COMPANY and its duly authorized agents may reasonably require:

26.3   To apply for, obtain and vest in the name of COMPANY as assignee (unless COMPANY otherwise directs) letters patents, trademarks, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

26.4   To defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patents, trademarks, copyright or other analogous protection.

## 27.   PUBLIC RELEASE OF INFORMATION

No public release of information, news release, announcement, advertisement, denial or confirmation of this Agreement or the subject matter hereof, shall be made without COMPANY's prior written approval; provided, however, that COMPANY's approval shall not be required for release of information necessary to the performance of SUPPLIER's duties hereunder, to support SUPPLIER's application for financing, or to SUPPLIER's attorneys or accountants.

## 28.   ORGANIZATIONAL CONFLICT OF INTEREST

28.1   SUPPLIER warrants that, to the best of its knowledge and belief, there are no relevant facts or circumstances which would give rise to an organizational conflict of interest, as defined in Federal Acquisition Regulation (FAR) Part 9, Subpart 9.5, or that the SUPPLIER has disclosed all such relevant information.

28.2   SUPPLIER agrees that if an actual or potential organizational conflict of interest is discovered after award, the SUPPLIER will make a full disclosure in writing to the COMPANY.  This disclosure shall include a description of actions, which the SUPPLIER has taken or proposes to take to avoid or mitigate the actual or potential conflict.

28.3   If the SUPPLIER was aware of a potential organizational conflict of interest prior to award or discovered an actual or potential conflict after award and did not disclose or misrepresented relevant information to the COMPANY, the COMPANY may terminate the Agreement for default. The SUPPLIER shall insert the substance of this Section 28, Organizational Conflict of Interest, in all lower tier subcontracts.

## 29.   PATENTS AND ROYALTIES

SUPPLIER shall defend all suits and claims against Customer or COMPANY, and shall hold each of them free and harmless, and hereby indemnifies Customer and COMPANY from all liability, damages, costs, and royalties, including without limitation reasonable attorney fees, from: (a) any infringement or alleged infringement of any patent, or for the misuse of any patented article, by SUPPLIER in the performance of the Services, or (b) the infringement or alleged infringement of any patent by Customer or COMPANY's use or operation of the Services following the completion thereof by SUPPLIER, or (c) the use or misuse, by SUPPLIER during the performance of the Services, of any company confidential

Rev: September 21, 2011

BARR-000023

information or secret processes, or (d) any use or misuse of company confidential information or secret processes by Customer or COMPANY in the use or operation of the Services following acceptance.

## 30.   TAXES, LIENS, ENCUMBRANCES, RIGHT TO SET OFF AND BACKCHARGES

SUPPLIER shall ensure that a clause substantially similar to this Article is included in all lower tier subcontracts issued hereunder.

Except as otherwise set forth below, the Schedule of Prices stated in Article 4, and all other prices and rates set forth herein, includes all taxes, duties and fees and other assessments of whatever nature imposed by governmental authorities (hereinafter "taxes") and applicable to the performance of the Statement of Work and this Agreement. The SUPPLIER shall not be reimbursed for personal property taxes on construction equipment and other property owned by the SUPPLIER, taxes on net income of the SUPPLIER, personal income taxes or any other type of applicable taxes assessed by any governmental authority.

In the case of Afghan subcontractors (SUPPLIER or SUPPLIER's business domiciled in Afghanistan) performing work in Afghanistan, all applicable taxes required to be paid directly to the controlling government by COMPANY will be withheld from invoice payment, including but not limited to, Afghan Employee Income Tax Withholding, Landlord Tax, Business Receipt Taxes (BRT) and SUPPLIER/vendor withholdings.

In the case of non-Afghan subcontractors performing work in Afghanistan, the Agreement Price, and all other prices and rates set forth herein and as stated in Article 4, shall not include any costs for Afghan taxes, including but not limited to Afghan Employee Income Tax Withholding, Landlord Tax, Business Receipt Taxes (BRT) and SUPPLIER/vendor withholdings, duties and fees and other assessments of whatever nature imposed by Afghan governmental authorities (hereinafter "taxes") and applicable to the performance of the Work and this Agreement.

The SUPPLIER shall pay promptly when due, all such taxes set forth in this Article 30.

The SUPPLIER shall be responsible for maintaining and furnishing the necessary records and documentation required by government authorities and the COMPANY, and shall apply for and obtain tax refunds or exemptions.

In the case of U.S. Contractors, the COMPANY is required to obtain correct taxpayer identification numbers from all non-corporate payees who receive payment for Services, rents, royalties or interest that would be subject to IRS Form 1099 reporting.  Thirty-one percent (31%) back-up tax withholding will be imposed on all Form 1099 reportable payments made to the SUPPLIER, if the SUPPLIER fails to provide a correct taxpayer identification number.

If the SUPPLIER  imports and exports materials, equipment, supplies, tools, or any item for performance of the Services, any custom duties, value added, import or export taxes, document fees, handling charges, or other fees related to the importation or exportation of such materials, equipment, supplies, tools or other items shall be paid by the SUPPLIER. Should the Islamic Republic of Afghanistan impose any taxes, the SUPPLIER shall notify the COMPANY immediately for resolution. At the COMPANY's option, the SUPPLIER shall pay such taxes, only with advance approval of the COMPANY, subject to reimbursement by the COMPANY. The sole purpose of this Article is to avoid a delay and disruption of the work in the event the Government of the Islamic Republic of Afghanistan attempts to impose taxes or duties previously unknown.

Furthermore, SUPPLIER agrees to keep the project, premises and other property of COMPANY and COMPANY's Customer, and any other person, free and clear from any and all claims, liens, restrictions, reservations, security interests and encumbrances arising from this Agreement, SUPPLIER's performance or nonperformance, or related to the Services. To the maximum extent allowed by law, SUPPLIER agrees to release, defend, indemnify, and hold harmless the COMPANY Indemnities from and against any and all laborers', material men's, mechanic's, subcontractors, or any other liens, claims, restrictions, reservations, security interests and encumbrances arising from, alleged to arise from, or in any way arising from this Agreement, SUPPLIER's performance or nonperformance, or related to the

Rev: September 21, 2011

BARR-000024

Services. SUPPLIER agrees that any payment made by COMPANY constitutes trust funds intended for the benefit of any contractors, suppliers and laborers. At any time, if SUPPLIER fails to make any payment to any of its contractors, suppliers and laborers, COMPANY may elect to pay such beneficiaries directly or by issuance of joint checks, or take any other action required to prevent imposition of a lien. Regardless of the payment terms in this Agreement, COMPANY's obligation to pay the purchase price is conditioned upon (a) receipt of completed, non-defective conforming Services; (b) receipt and acceptance by COMPANY of SUPPLIER's accurate and properly completed invoice accompanied by satisfactory supporting documentation; and (c) compliance by SUPPLIER with all terms and conditions of this Agreement. SUPPLIER agrees to pay promptly when due all bills for labor, material, equipment or services in connection with the Services. If such bills are not promptly paid by SUPPLIER when due, COMPANY may pay them and SUPPLIER will immediately reimburse COMPANY therefore. COMPANY may at its discretion set off any funds owed by SUPPLIER against any other amounts due to SUPPLIER under any other contract with COMPANY or any affiliate of COMPANY. SUPPLIER waives all rights of lien against the premises, facilities, equipment and other property of COMPANY or any affiliate. Any sums due SUPPLIER hereunder may be applied by COMPANY as a set off against any sums owed by SUPPLIER to COMPANY or any of its affiliates or against any claims of third parties against COMPANY arising from SUPPLIER's performance, breach or default, hereunder, whether under this Agreement or any other purchase order or other contract. Upon prior notice to SUPPLIER and SUPPLIER's failure to cure within the period of time contained therein, COMPANY reserves the right to back charge SUPPLIER for any losses, damages, claims, costs and expenses incurred resulting from SUPPLIER's breach of any provision of this Agreement. COMPANY may withhold or set-off any payment due under this or any other contract with SUPPLIER or any of its affiliates in order to recover such back charged amounts.

Unless otherwise provided for in this Agreement, SUPPLIER is responsible for payment of, and the compensation set forth herein includes, all sales, use, excise, value-added, goods and services, business (franchise or privilege), trade license and other such taxes, any taxes imposed on SUPPLIER which are based on revenue, income, net income, net assets, net worth, or capital and any taxes imposed in lieu thereof, and all duties, fees, levies, charges or other assessments of whatever nature imposed by governing authorities or any jurisdiction applicable in connection with performance under this Agreement. SUPPLIER accepts sole responsibility and liability for the payment of any and all contributions or taxes for unemployment insurance, social security payments, or other assessments for those persons performing work for SUPPLIER hereunder. If it is ever determined that any tax included in the price paid by COMPANY was not required to be paid, SUPPLIER agrees to refund promptly such amount to COMPANY. SUPPLIER will release, defend, indemnify, and hold the COMPANY Indemnitees harmless from and against any fines, penalties, interest, costs (including attorney's fees and court costs), charges, fees, losses, damages or liabilities, arising from, alleged to arise from, or in any way associated with SUPPLIER's failure to comply with the terms of this Paragraph.

COMPANY will withhold from payments to be made to SUPPLIER any amounts legally required to be withheld from such payments and remitted to the governmental, regulatory or taxing authority of any jurisdiction relevant to the transaction as described in this Article 30.

## 31.  QUALITY ASSURANCE

SUPPLIER shall maintain a quality assurance program and process that meets the requirements stipulated in the Statement of Work, Purchase Orders and this Agreement.  SUPPLIER shall provide a copy of its quality assurance program if COMPANY so requests or, at COMPANY's discretion, COMPANY shall have the right to audit such quality assurance program to determine compliance. The COMPANY shall provide SUPPLIER, if requested in writing, with guidance in defining a program that meets these requirements. SUPPLIER shall provision the Services and Products in conformity with the rules of its quality assurance program. In the event that third parties for SUPPLIER manufacture Products, or subsystems of Products, SUPPLIER warrants that such third parties are in compliance with the Quality Assurance provisions contained in this Article 31.

Whenever Services and Products are found to be defective, the total number and the location of defective or possibly defective Services and Products shall be immediately determined by SUPPLIER.

Rev: September 21, 2011

BARR-000025

SUPPLIER shall ensure that whenever the Services and Products are found to be defective, the total number and the location of defective or possibly defective Services and Products can immediately be determined. SUPPLIER shall keep the COMPANY informed of SUPPLIER's marking system in such a way as to allow the COMPANY itself to find defective Services and Products at any time.

SUPPLIER shall keep records (documentation) of the quality assurance procedures it has taken, in particular for measured values and test results, and shall maintain the records and any Product samples in an orderly manner, so that they are accessible to the COMPANY.

SUPPLIER shall guarantee the COMPANY, upon request; free access to inspect the records described above and shall allow the COMPANY to obtain Product samples for evaluation and testing. SUPPLIER shall also assist the COMPANY in evaluating the records and samples.

SUPPLIER shall grant to the COMPANY's representative free access to SUPPLIER's facilities and premises, to the extent this may be required for confirming the existence and functioning of SUPPLIER's quality assurance program and its operation (quality audit). The COMPANY shall give SUPPLIER adequate advance notice of the visit of its representative.

If SUPPLIER receives from third parties (e.g., its own subcontractors/suppliers) advance supplies (e.g., component materials, software, services, manufacturing or testing equipment) for the manufacture or the quality assurance of the Products, SUPPLIER shall assure the quality of such advance supplies either by its own means or requiring the third party, through contractual obligation, to comply with SUPPLIER's own quality assurance program. SUPPLIER agrees that all materials it procures or acquires in connection with the Products shall be purchased from SUPPLIER's approved subcontractors and tested/verified in accordance with SUPPLIER's specifications. SUPPLIER shall ensure the quality of such purchased parts, tools, etc., and maintain accurate records on the disposition of any non-conforming material that it receives.

SUPPLIER shall inform the COMPANY of all modifications to the agreed upon quality assurance program and to the quality assurance procedures, as well as of all changes in materials, production methods, subcontracted parts, data sheets and other documents used in connection with the manufacture and distribution of the Products. This information shall be complete and concise, and shall be provided no less than ninety (90) days in advance of implementation so as to permit the COMPANY to review it regarding its consequences and to object to it before any modification is made to the Products. The COMPANY's failure to object shall not discharge SUPPLIER of its sole responsibility for the properties and reliability of the Products.

SUPPLIER shall maintain an environmental, health and safety program in accordance with local, state and federal requirements.

If SUPPLIER determines, in the course of testing Products, that the reliability or characteristics of the Products deviate from those specified in the Instructions, SUPPLIER shall immediately inform the COMPANY thereof and take corrective action, such as improving production methods, materials, parts, test procedures, test facilities, etc. Until the corrective action is effective, the COMPANY may require SUPPLIER to implement special measures (e.g., greater test frequency) for a reasonable period of time. SUPPLIER shall bear mutually agreed upon extra costs arising as a result of the special measures, but only to the extent that the decrease in quality cannot be shown to have been caused by the COMPANY.

Considering that the necessary tests are to be performed prior to delivery to the COMPANY, the COMPANY shall be required to inspect the Products on delivery solely with regard to their type and for any clearly discernible damage to the outer packing that occurred during transportation.

To supervise the implementation of this Article 31 and to achieve the coordination necessary for its performance, each party shall immediately designate a representative and inform the other party in writing of his/her name. The representatives shall be authorized to accept all statements in connection with the implementation of this Article 31. Each party shall immediately inform the other party in writing of the replacement of a representative.

The COMPANY shall promptly inform Supplier if it determines that any of the Services and Products do not meet the requirements specified in this Agreement or otherwise are not in conformance with the

Rev: September 21, 2011

BARR-000026

requirements of this Agreement. SUPPLIER agrees to respond in a timely manner to COMPANY's quality related corrective action requests not to exceed seventy-two (72) hours for those requests made by the cognizant Quality Engineer or Technical Representative) as a result of quality non-conformances.

SUPPLIER agrees to use commercially reasonable efforts to deliver Services and Products that conform to the requirements of this agreement and shall not be defective in materials or workmanship.

The parties agree to establish regular quality review meetings. Topics for such meetings may include the following, but will not be limited to:

- Review of quality acceptance criteria as part of a cost improvement program;
- Quality performance (receiving inspection/installation results);
- Corrective action results/change control;
- Field problem reviews; and
- Regulatory impacts.

## 32.  NOTICE OF THIRD PARTY CLAIMS AGAINST THE SUPPLIER

SUPPLIER shall give COMPANY immediate notice of any suit or action filed, or any claims made, against SUPPLIER arising out of the performance of this Agreement or any lower-tier subcontracts. SUPPLIER shall furnish immediately to COMPANY copies of all documents received by SUPPLIER pertinent to such actions, suits, or claims.

## 33.  ENTIRE AGREEMENT

This Agreement, together with all documents, specifications, and drawings incorporated herein by reference, constitutes the entire agreement between COMPANY and SUPPLIER, and there are no terms, conditions, or provisions, either oral or written, between the parties other than those herein contained, and this Agreement supersedes any and all oral or written representations, inducements, or understandings of any kind or nature between the parties relating to the Services.

## 34.  SURVIVAL

In the event of termination or expiration of this agreement for any reason the following sections will survive such termination or expiration: Article 6 Warranties of Performance; Article 19, Applicable Law; Article 23, Indemnification; Article 24, Limitation of Liability; Article 25, Proprietary and Company Confidential Information; Article 26, Rights in Work Product; Article, 29, Patents and Royalties and this Article 34, Survival.

## 35.  EXECUTION

This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.  The exchange of telefaxed or scanned and electronically transmitted signatures shall be sufficient for operation of this Agreement.

Rev: September 21, 2011

BARR-000027

**SIGNATURE PAGE**

IN WITNESS HEREOF, the parties hereto have executed this Agreement as of the latest date set forth below:

| Company | DynCorp International LLC | DAMCO USA, Inc |
|---|---|---|
| Signature | | |
| Name | Krista Robinson | Brian Andrusin |
| Phone | 817-224-7541 | 703-351-0123 |
| Title | VP, Sourcing | Director, Government Services |
| Date | 10-25-2011 | 10/3/11 |

26 of 32

**PART II – SUPPORTING DOCUMENTATION**

**Exhibit 1 – SOW, Part 1, Concept of Operations**

Click on the icon to see the Presentation



2_Global RFP Freight
Forwarding Concept o

**Exhibit 2 – SOW, Part 2, Written Statement of Work**

Click on the icon to read



3_Global RFP
Statement of Work (S

**Exhibit 3 – Trade Compliance SOW**

Click on the icon to read



Trade Compliance
Requirements SOW.d

**Exhibit 4 – Original RFP Document**



1_Global RFP Freight
Forwarding and Intra

**Exhibit 5 – Sample Purchase order**

Rev: September 21, 2011

BARR-000029

Case 1:14-cv-00086-MAC   Document 193-3   Filed 05/28/21   Page 29 of 33 PageID #:
5443
Case 1:14-cv-00086-RC   Document 2-8   Filed 02/05/14   Page 28 of 32 PageID #: 100

**DynCorp INTERNATIONAL**

13500 Heritage Parkway
Fort Worth, TX 76177
United States

Equal Opportunity Employer

**Purchase Order**

P.O. # LC40921712

Site: PMO

DPAS Rating DO-S1

This is actual order certified for national defense use, and the Contractor shall follow all the requirements of the Defense Priorities and Allocations System regulation (15 CFR 700).

| Date 05/25/2011 | Terms NET 30 | | Subtotal $1,000.00 |
|---|---|---|---|
| Status OPEN | Contract No: WS2P1J-07-D-0007 | | Tax |
| FOB KUWAIT | | | Freight |
| Confirmed Order 5/25/2011 | Approved Order 5/25/2011 | | Total $1,000.00 |

**Vendor Address**

**Billing Address**

A copy of the Purchase Order must accompany all shipments for prompt payment.

PMO-HDQ SITE
13500 Heritage Parkway
Fort Worth, TX 76177
US

Contact
Purchased By Samntha Menon
E-mail: samntha.menon@dyn-intl.com

**Ship To Site:** MEHUB

MIDDLE EAST RECEIVING HUB
Expedited World Cargo
Contact via email
logcap_po@ewcnow.com
AE

Contact: Gary Coetzee
WORK 703-316-0100
Ship Via: EWC-LCIV

SAMPLE

Page 1  Printed 05/26/2011  9:03:18 am

28 of 32

Rev: September 21, 2011

BARR-000030

**SAMPLE**

# DynCorp INTERNATIONAL

13500 Heritage Parkway
Fort Worth, TX 76177
United States

ACCEPTANCE: Acknowledgment of this order or, in any event, delivery to whole or part constitutes acceptance of this order. It is the entire contract and is not subject to variation irrespective of the wording of the acceptance. No changes are binding on buyer unless in writing and signed by its authorized person of buyer's Procurement Department.

**Equal Opportunity Employer**

This is label print certified for national defense use, and the Contractor shall follow all the requirements of the Defense Priorities and Allocations System regulation (15 CFR 700).

## Purchase Order

P.O. # LC40021712

Site: P140

**DPAS Rating DO51**

EQUAL EMPLOYMENT OPPORTUNITY CLAUSES
This Equal Opportunity Clause as required by Executive Order 11246, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212 (formerly 2012), Section 503 of the Rehabilitation Act of 1973, as amended and their implementing regulations at 41 CFR Chapter 60 (41 CFR 60-1.4, 41 CFR 60-250.4, and 41 CFR 741.4) as part of this purchase order and hereby apon the Seller (Subcontractor, Vendor, or Supplier) unless exempted by rules, regulations or orders of the Secretary of Labor.

### Order For

PURCHASE TERMS AND CONDITION:
VENDOR AGREES THAT THE DYNCORP INTERNATIONAL PURCHASE ORDER TERMS AND CONDITIONS THAT THE SUPPLIER SIGNED WITH ITS CURRENT "SUPPLIER INFORMATION PACKET" IS INCORPORATED INTO AND GOVERNS THIS PURCHASE ORDER.

ORDER ACKNOWLEDGEMENT
PLEASE ACKNOWLEDGE YOUR RECEIPT AND ACCEPTANCE OF THIS PURCHASE ORDER BY SIGNING AND DATING BELOW.
RETURN SIGNED COPY VIA EMAIL TO THE BUYER AS NOTED IN PO HEADER ABOVE.

Packing & Labeling Instructions:
1.Each DI Purchase Order line item MUST be packed separately because they WILL be going to different DI sites. (i.e. Line 1 should be packaged separately from line 2 and so on).
DO NOT IN ANY CIRCUMSTANCES MIX LINE ITEMS, EVEN IF THEY ARE OF THE SAME MATERIAL. OUR FREIGHT FORWARDER HAS BEEN ORDERED TO REFUSE ANY DELIVERIES PACKED IN THIS MANNER.

2 Each package/carton/shipping container must have the following on the label:
oDynCorp Purchase Order number and line number
oDynCorp part number ordered
oPart Description as indicated on PO
oJob Control Number
oDue Out Doc Number
oQuantity inside the package

3.All packaging must be ready for international transport. Boxed and secured to pallet. Poor packaging or insufficient labeling will require the freight be returned to you and will be picked up when the freight meets the standard.

4.If cargo is picking up at a separate location provide the pick-up location Company name, address, contact name, phone number, and email. Be advised, third party pick up locations must also meet the Packaging & Labeling expectation and MUST see the DynCorp PO Number.

5 If you are shipping hazardous cargo, attach MSDS sheets to the freight and include with the shipping documents. Ensure that the Hazardous material is properly packaged and labeled with Hazardous Markings. (Show UN#, Class, and Proper labels)

6 Packing slip to clearly state the PO, PO line number, Description, Job Control Number and Due Out Doc Number, Quantity Shipped by line to match the PO.

7.Scan copy of packing slip and DynCorp PO including pieces, weight and dimensions of shipment and a copy of the MSDS, if the shipment is HAZARDOUS, to the email listed on the PO.

Following the above instructions will expedite the receiving process and will then help with expediting final payment to vendor.
PICK-UP - COLLECTION
1.OVERSHIPMENT WILL NOT BE ACCEPTED.

2.For PICK-UP KINDLY CONTACT EWC at LOGCAPIV@ewcnow.com AND ewclogcap.dubai@moveonslog.com OR ewclogcap.kuwait@moveonslog.com.

3.Pick up as allowed at the vendors country of location, only when the goods are available at the premises (Warehouse, Factory, Works etc). Pickup from countries other than the country of location is not allowed. Subject to exceptions by DI written notice.

PROOF OF DELIVERY
PLEASE SUBMIT TO BUYER UPON DISPATCH OF GOODS / UPON RECEIPT OF SIGNED DELIVERY NOTES FROM FORWARDER.

Page 2 Printed 05/25/2011 6:00:18 am

Rev: September 21, 2011

BARR-000031

Case 1:14-cv-00086-MAC   Document 2-8 Filed 02/05/14   Page 31 of 33   PageID #: 5445
Case 1:14-cv-00086-RC   Document 12-8   Filed 02/05/14   Page 30 of 32   PageID #: 102
5445



**DynCorp INTERNATIONAL**

ACCEPTANCE: Acknowledgment of this order at any event, delivery in whole or part constitutes acceptance of this order. It is the entire contract and is not subject to revisions incorporated at later meeting of this acceptance. No changes are binding on buyer unless in writing and signed by an authorized person of Buyer's Procurement Department.

13000 Heritage Parkway
Fort Worth, TX 76177
United States

Equal Opportunity Employer

**Purchase Order**

P.O. # LG-00021712

Site: FMO

DPAS Rating DO51

This is dated order defined by defined delivery etc, and the Contractor shall follow all the requirements of the Defense Priorities and Allocations System regulation (15 CFR 700)

EQUAL EMPLOYMENT OPPORTUNITY CLAUSES

The Equal Opportunity Clause required by Executive Order 11246, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212 (formerly 2012), Section 503 of the Rehabilitation Act of 1973, as amended and their implementing regulations at 41 CFR Chapter 60 (41 CFR 60-1.4, 41 CFR 60-250.4, and 41 CFR 60-4) are part of this purchase order and binding upon the Seller (Subcontractor, Vendor, or Supplier) (when accepted by rules, regulations or orders of the Secretary of Labor)

**INVOICING**
PLEASE SUBMIT YOUR INVOICES ALONG WITH THE SIGNED PO COPY AND SIGNED DELIVERY NOTE TO
LOGCAPAfghanAP2@dyn-intl.com and LOGCAPAfghanAP@dyn-intl.com for prompt payment.

**Additional Notes**
*** PLEASE NOTE THIS IS A SAMPLE PO ***

**Trade Compliance**
IT IS THE POLICY OF DYNCORP INTERNATIONAL (DI) TO FOLLOW ALL INTERNATIONAL TRADE REGULATIONS, AND DI WILL NOT CONDUCT BUSINESS WITH THE SANCTIONED AND EMBARGOED COUNTRIES LISTED BELOW. REGULATIONS CAN CHANGE AT ANY TIME. THE SUBCONTRACTOR IS RESPONSIBLE FOR AND EXPECTED TO KEEP UP WITH THE MOST CURRENT VERSION OF INTERNATIONAL TRADE REGULATIONS AND BE IN FULL COMPLIANCE AT ALL TIMES. IF THE SUB-CONTRACTOR HAS KNOWLEDGE OF, OR SUSPECTS THAT A VIOLATION MAY OCCUR OR MAY TAKE PLACE THEY ARE REQUIRED TO NOTIFY DYNCORP INTERNATIONAL IMMEDIATELY.

The services, products, technology and/or technical data provided or disclosed in performance of the Agreement may be subject to required and continuing U.S. Government approvals, clearances, regulations, and export/import and re-export requirements, including the U.S. Department of State International Traffic in Arms Regulations (ITAR) (Title 22, CFR Parts 120-130), the U.S. Department of Commerce Export Administration Regulations (Title 15, CFR 730-774), Office of Foreign Asset Control (OFAC) (Title 31, Chapter V and appropriate amendments) and any other U.S. Government regulations applicable to the export/import, re-export, or disclosure of such controlled technical data (or the products thereof) to parties who are not considered U.S. Persons under U.S. export controls whether within, or outside, the U.S., including those employed by, or otherwise associated with, the Subcontractor.

OFAC administers a number of U.S. economic sanctions and embargoes that target geographic regions and governments. Sanctioned countries include: The Balkans, Belarus, Burma, Côte d'Ivoire, Cuba, Democratic Republic of Congo, Iran, Liberia, Lebanon, North Korea, Sudan, Syria, and Zimbabwe. U.S. persons, including foreign branches of U.S. depository institutions and trading companies, are prohibited from engaging in any transactions, including purchase, sale, transportation, swap, financing, or brokering transactions related to goods or services of sanctioned and embargoed country origins, or services owned or controlled by sanctioned and embargoed country Governments.

The United Nations maintains Arms Embargoes which include, but are not limited to the following countries: Côte d'Ivoire, Democratic Republic of Congo, Iraq, Iran, Lebanon, Liberia, North Korea, Sierra Leone, Somalia, and Sudan.

The parties acknowledge and agree to comply with all such U.S. regulations regarding the purchase, sale, transportation, swap, financing, brokering transactions related to goods or services of sanctioned and embargoed country origins, services owned or controlled by sanctioned and embargoed country Governments, export/import, re-export, or disclosure and will obtain any and all such registrations, licenses, permits, agreements, approvals and/or certifications, as may be required by regulation for the products, services, and/or technical data that may be provided to parties under this Agreement before initiating performance.

| Item # | MFG Part Number (Description) | Status | Qty | Price | Total |
|---|---|---|---|---|---|
| 1 | 12333 (CUTTER, DIAMETER, 33MM) | OPEN | 100.00 EA | 5.00 | $500.00 |
| | Job Control No: 123 | PA ZA4L56 | PAA 41-20-0001-MH00 | | NEW |
| | Requested by: | | Mark For: OM | Priority: 12 | Owner ID: CAP |
| 2 | BP32B (HAMMER, HAND) | OPEN | 50.00 EA | 7.00 | $350.00 |
| | Job Control No: 123 | PA ZA4M12 | PAA 41-20-0001-MH00 | | NEW |
| | Requested by: | | Mark For: OM | Priority: 12 | Owner ID: CAP |

Page 3  Printed 05/25/2011  8:00:18 am

Rev: September 21, 2011

BARR-000032

**DynCorp INTERNATIONAL**

13900 Heritage Parkway
Fort Worth, TX 76177
United States

ACCEPTANCE: Acknowledgment of this order at any event, delivery in whole or part constitutes acceptance of this order. It is the entire contract and is not subject to variation thereunder of the wording of this management. No changes are binding on buyer unless in writing and signed by an authorized person of Buyer's Procurement Department.

Equal Opportunity Employer

This is a rated order certified for national defense use, and the Contractor must follow all the requirements of the Defense Priorities and Allocations System regulation (15 CFR 700).

**Purchase Order**

P.O. # LG-00021712
Site: FMO

DPAS Rating DOS1

EQUAL EMPLOYMENT OPPORTUNITY CLAUSES
The Equal Opportunity Clauses required by Executive Order 11246, as amended, the Vietnam Era Veteran's Readjustment Assistance Act of 1974, as amended, 38 U.S.C. 4212 (formerly 2012), Section 503 of the Rehabilitation Act of 1973, as amended and their implementing regulations at 41 CFR Chapter 60 (41 CFR 60-1.4, 41 CFR 60-250.4, and 41 CFR 60-741.4) are part of this purchase order and binding upon the Seller (Subcontractor, Vendor, as Supplier) unless exempted by rules, regulations or orders of the Secretary of Labor.

| 3 | 2RZV1 (SCISSORS,ELECTRICIANS, Splicers Kit, 3 Pc) | OPEN | 10.00 EA | 15.00 | $150.00 |
|---|---|---|---|---|---|

| Job Control No: 123 | | PA ZA4M12 | PAA 41-20-0001-MH00 | | NEW |
|---|---|---|---|---|---|

| Requested by: | | Mark For: CM | Priority: 12 | Owner ID: CAP |
|---|---|---|---|---|

**Note To Vendor:**

Over shipments will not be accepted.  Please acknowledge your receipt and acceptance of this Purchase Order by signing and dating below.  Return signed copy via email to the Buyer as noted in P/O header above, Page 1.

**Vendor Acknowledgement**

Vendor Signature: _____      Authorized Signature: _____

Vendor Name: _____      Date: _____

SAMPLE

Page: 4  Printed: 09/29/2011  8:00:18 am

Rev: September 21, 2011

BARR-000033

**Exhibit 6 -- Pricing Schedule**

Click icon to see pricing schedules

DAMCO (zipped)
Folder.zip

Rev: September 21, 2011

BARR-000034