# EXHIBIT 15

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  EASTERN DISTRICT OF TEXAS
 3                     BEAUMONT DIVISION
 4
 5
 6   UNITED STATES OF AMERICA ex    )
     rel. ROBERT REDDELL and        )
 7   ROBERT HENDRIX,                )
                                    )
 8         Plaintiff,               )  Case Number
                                    )
 9         vs.                      )  1:14-cv-00086-MAC
                                    )
10   DYNCORP INTERNATIONAL, LLC;    )
     DAMCO U.S.A. INC.,             )
11                                  )
           Defendant.               )
12
13              REMOTE VIDEOCONFERENCE
14      VIDEO-RECORDED DEPOSITION OF STEVE TRAUTWEIN
15         Thursday, March 11, 2021, 8:02 a.m. MST
16
17                    Goodyear, Arizona
18
19
20
21
22
23   Reported By: Marjorie Peters, FAPR, RMR, CRR, RSA
24   Job Number: 4466632
25
```

Page 1

```
 1        REMOTE VIDEOCONFERENCE
 2    VIDEO-RECORDED DEPOSITION OF STEVE TRAUTWEIN,
 3  a witness herein, called by the Relators for
 4  examination, taken pursuant to the Notice, by and
 5  before Marjorie Peters, a Registered Merit Reporter,
 6  Certified Realtime Reporter and Notary Public in and
 7  for the Commonwealth of Virginia, Witness at
 8  Goodyear, Arizona, on Thursday, March 11, 2021, at
 9  8:02 a.m.
```
Page 2

```
 1           A P P E A R A N C E S
 2  For the Defendant DynCorp:
 3    Luke Meier, Esquire
      Sara N. Gerber, Esquire
 4    BLANK ROME LLP
      1825 Eye Street NW
 5    Washington, D.C. 20006
      lmeier@blankrome.com
 6    +1.202.420.2249
 7
 8  ALSO PRESENT:
 9    Jason Lemley, Legal Videographer
10    Bill Walter, Dixon Hughes Goodman, LLP
11    Rachelle Barstow, Maersk
12    Dani Elks, Damco
```
Page 4

```
 1           A P P E A R A N C E S
 2  For the Relators:
 3    Greg M. Dykeman, Esquire
      Patrick Conar Crosby, Esquire
 4    STRONG PIPKIN BISSELL & LEDYARD, LLP
      595 Orleans, Suite 1400
 5    Beaumont, Texas 77701
      gdykeman@strongpipkin.com
 6    409-981-1120
 7  For the Relators:
 8    Janis Gorton, Esquire
      BERG & ANDROPHY
 9    3704 Travis Street
      Houston, TX 77002
10    jgorton@bafirm.com
      (713) 529-5622
11
12  For the Relators:
13    Sarah Frazier, Esquire
      LAW OFFICE OF SARAH FRAZIER, PLLC
14    919 Decatur Street
      Houston, TX 77007
15    sarah@sarahfrazierlaw.com
      713-510-3336
16
17  For the Defendant Damco:
18    Richard G. Shephard, Esquire
      Clara Kollm, Esquire
19    MORGAN LEWIS & BOCKIUS
      1111 Pennsylvania Ave. NW
20    Washington, DC 20004
      Clara.kollm@morganlewis.com
21    Richard.shephard@morganlewis.com
      +1.202.373.6579
```
Page 3

```
              UNCERTIFIED DRAFT
                      5
 1              I N D E X
 2  EXAMINATION                          PAGE
 3  STEVE TRAUTWEIN
 4    By Ms. Frazier                       8
 5    Acknowledgement of Witness          158
 6    Certificate of Reporter             159
 7    Errata Sheet                        160
 8         I N D E X   O F   E X H I B I T S
 9  EXHIBIT                              PAGE
10  Exhibit 2   DynCorp's Global Freight   55
11              Forward Process Selection
12              Summary, DI-REDDELL
13              00001501-07
14  Exhibit 3   Pricing Analysis, Global   65
15              Freight Forwarding,
16              BARR-018735-44
17  Exhibit 4   (skipped)                  --
18  Exhibit 5   Bid Sheet,                 78
19              DamcoRR_00222394
20  Exhibit 6   Advance Notification and  107
21              ACO Request Consent Form,
22              BARR-18674-716
23  Exhibit 8   FAR 15.403-1              128
```
Page 5

2 (Pages 2 - 5)

```
 1            Business systems administration.  I
 2   would characterize myself as an expert in that
 3   arena.
 4            As well as FAR Part 31-type issues
 5   on cost allowability.
 6       Q.   Okay.  The list that I have is cost
 7   accounting systems and their administration,
 8   contract administration within Department of
 9   Defense, et cetera, CACO functions, business system
10   administration, and FAR 31.
11       A.   Yeah.  I would correct you on the cost
12   accounting systems, you said.  It was Cost
13   Accounting Standards.
14       Q.   Okay.  Any other areas of expertise
15   besides those?
16       A.   Cut out there, last word.
17       Q.   Any areas of expertise besides those?
18       A.   Well, I would say I've developed a level
19   of expertise with respect to broader acquisition
20   issues.
21            Oh, I left one out, too.  A very
22   important one.  I am an expert in terms of
23   commercial item determinations and commercial item
24   pricing.
25       Q.   Okay.  Once again, I ask, are there any
                                                    Page 42
```

```
 1   guess I would have to understand who the lawyer was
 2   with respect to their knowledge and ability, et
 3   cetera.
 4       Q.   So, Mr. Trautwein, you cut out
 5   sound-wise there, and I have just noticed that I
 6   don't know if you're using your -- are you using
 7   your earbuds right now?
 8       A.   I don't use the earbuds, but I have the
 9   speaker here.  Can you -- the earbuds were causing
10   me not to be able to hear.  I can hear better
11   through the computer.
12       Q.   I can understand that myself, I would
13   rather not wear earbuds myself, but you are cutting
14   out again.  I don't know if there's anything else
15   you can do about that.
16       A.   No, the computer speaker is open as well
17   as the earbud speaker.  So I'm not sure what else I
18   can do.
19       Q.   Okay.  We'll try to continue, but if
20   we're still having these issues, they may ask us to
21   try to correct it a little bit better.
22            Okay.  Do you have an understanding
23   about whether interpretation of a regulation is a
24   matter of law in a lawsuit?
25       A.   I couldn't answer that.
                                                    Page 44
```

```
 1   other areas of expertise you are claiming today?
 2       A.   No.
 3       Q.   You're not claiming expertise in freight
 4   forwarding; correct?
 5       A.   I am not, no.
 6       Q.   Now, are you claiming expertise with
 7   regard to the interpretation of FAR 31?
 8       A.   Yes.  As a contracting officer in
 9   Department of Defense, that was a critical part of
10   my role, was oftentimes interpreting what FAR Part
11   31 or what the Cost Accounting Standards meant and
12   how they should be applied.
13       Q.   You're aware that FAR 31 is a
14   regulation; correct?
15       A.   Yes.
16       Q.   And in claiming expertise in
17   interpreting a regulation, do you claim expertise in
18   the law?
19       A.   I do not, no.
20       Q.   What difference, if any, is there in how
21   you interpret -- let me restate.
22            Do you believe that you have equal
23   expertise compared with a lawyer with regard to
24   interpreting FAR 31?
25       A.   I would not necessarily claim that.  I
                                                    Page 43
```

```
 1       Q.   Why cannot you answer that?
 2       A.   I'm not sure if it's a matter of law or
 3   not.
 4       Q.   If a judge issues a ruling with regard
 5   to interpreting the FAR regulations in a lawsuit in
 6   which you are involved, do you understand whether
 7   that judge is creating the law that governs that
 8   case or not?
 9       A.   That would be my laymen's understanding.
10       Q.   Since Mr. Walter testified, have you had
11   an opportunity to speak with him with regard to this
12   case?
13       A.   After his testimony?
14       Q.   Yes.
15       A.   Yes.  We spoke briefly last night and
16   for about a minute this morning.
17       Q.   When you say "briefly," how long last
18   night?
19       A.   Oh, estimated, five, six minutes.
20       Q.   Do you have any opinions about this
21   case, at the current time, other than those which
22   are contained in your expert report?
23       A.   I -- do I have opinions about the case
24   other than what's in my expert report; is that what
25   you said?
                                                    Page 45
```

12 (Pages 42 - 45)

**Page 46**

1   Q. Yes.
2   A. I haven't formed any definitive opinions
3   other than what I focused on in my expert report.
4   Q. Okay. Have you reviewed any additional
5   materials since issuing your expert report?
6   A. I believe I have, yes. I believe I
7   reviewed Mr. Walter's rebuttal, and I reviewed
8   another -- another opinion from Mr. Walker, I
9   believe, after we issued our report.
10  Q. Anything else?
11  A. I don't recall other than review -- or I
12  guess I'll call it refresh my memory with respect to
13  some of the documents that were relied on in
14  looking -- in drafting our expert report.
15  Q. I'm sorry. Did you say you may have
16  looked again at documents that you relied upon
17  previously?
18  A. Yes. For example, I re-looked at the
19  commercial item pricing guide, for example, just to
20  refresh my memory.
21  Q. With regard to Opinion 1, how was the
22  decision made to offer an opinion with regard to the
23  bidding process?
24  A. With regard to the admitting process,
25  you said?

**Page 47**

1   Q. Bidding process. That's what --
2   A. Bidding. Bidding. I'm sorry. I have
3   a --
4   Q. I did not go over any ground rules for
5   depositions before we started, and I probably should
6   have because it's been a long time for you.
7        So just like a few quick reminders.
8   I'm really trying not to talk over you because I
9   want to have a clear record, and if you could watch
10  out for that, too, that would be helpful.
11  A. Okay.
12  Q. That's really the major one that I want
13  to bring up.
14       Whenever you want a break, just let
15  me know, and other than answering the question that
16  is on the table, if any, at that time, that's not
17  going to be a problem at all.
18       If there is anything that you cannot
19  hear well, I ask that you let me know, and if you
20  haven't, I'm going to assume that the audio is
21  functioning accurately; is that fair?
22  A. Yes.
23  Q. If there's any question that you don't
24  understand, I'm going to ask you to let me know that
25  as well, and otherwise, I'll assume that you're

**Page 48**

1   understanding my question; is that fair?
2   A. Yes.
3   Q. Okay. I think that will be it for
4   ground rules.
5        So Opinion 1 of your report relates
6   to the bidding process; correct?
7   A. That's correct.
8   Q. How did you come to decide to issue an
9   opinion about the bidding process?
10  A. The charter that we received from Blank
11  Rome, at least -- it got called charter. It sounds
12  more formal than it is, but the issues we were asked
13  to address had to do with DynCorp's actions with
14  respect to their subcontracting with Damco.
15       So, obviously, a part of that would
16  be the bidding process and the way the contract was
17  entered into.
18  Q. Okay. So in the materials that you
19  looked at in order to assess that bidding process
20  for Opinion 1 were what?
21       Can you recall what materials you
22  looked at in order to assess that bidding process?
23  A. I -- I don't recall specifically, but I
24  looked at an array of documentation with respect to
25  some of the market research that DynCorp did with --

**Page 49**

1   in terms of freight forwarding functions, as well as
2   documentation on the pricing, ultimately.
3   Q. Sorry. You cut out at the end of that
4   last sentence.
5   A. Looked at documentation with respect to
6   the pricing.
7   Q. Okay. What materials did you look at
8   that reflected market research that was performed?
9   A. I don't recall specifically.
10  Q. Okay. So Opinion 1 says, "DynCorp
11  conducted a thorough and appropriate process to
12  select Damco as a Transportation Services Provider,
13  using market research, proposal evaluation, and
14  cost/price analysis techniques recognized as
15  sufficient under the proposal solicitation and
16  evaluation provisions in FAR Part 15"; right?
17  A. Correct.
18  Q. So you have offered the opinion that
19  DynCorp used appropriate market research in this
20  bidding process; right?
21  A. That's correct.
22  Q. And that the process was adequate as a
23  whole; right?
24  A. That the process of market research was
25  adequate as a whole?

13 (Pages 46 - 49)

## Page 66

```
 1   A.   What number is it?
 2   Q.   Let me see my notes.
 3        This is actually -- it has a former
 4  exhibit designation as well, and so we'll call it
 5  Exhibit 0003.
 6   A.   Okay.  I have it up.
 7   Q.   Okay.  I'm going to direct you to a page
 8  on this one.  If you could look at -- let's see,
 9  this is going to be electronic -- kind of hard to
10  see the electronic pages, so let me count them.
11       4.
12   A.   Okay.  I'm on page 4.
13   Q.   At the top of page 4 -- and you may have
14  to zoom in on it a little, I know the print --
15   A.   Yes, I have zoomed in.
16   Q.   All right.  So on this version of this
17  chart, can you see a column for Damco?
18   A.   I do not.  Not on the top chart.
19   Q.   Okay.  Let me give you a little help.
20  Go --
21   A.   Oh, I'm sorry.  I -- when I go down to
22  the left side, I do see Damco.
23   Q.   So we're looking at the chart on the top
24  of electronic page 4, that says, "Online Global
25  Freight Forwarding."
```

## Page 67

```
 1   A.   I do -- yeah, I do see it now.  It says,
 2  "Brian" -- I was looking at "Brian Andrusin" on top,
 3  and now it says -- underneath, it says, "Damco USA."
 4  I do see it.
 5   Q.   That's right.
 6        So it says, "Brian Andrusin," and
 7  then, "Damco USA," at the top column; right?
 8   A.   Correct.
 9   Q.   What's the final score listed here?
10   A.   72.
11   Q.   Okay.  So have you ever seen this
12  document before?
13   A.   I don't recall seeing this document.
14   Q.   Go to the first page.
15        I just want to make sure, this
16  document is listed -- is -- has the heading "Pricing
17  Analysis, Global Freight Forwarding and
18  Intra-Theater Transport RFP"; right?
19   A.   Correct.
20   Q.   Number 1 says that the suppliers are The
21  Bright Group, UPS, Kuehne & Nagel, and Damco
22  Logistics.
23        Do you see that?
24   A.   I do see that.
25   Q.   Are you aware of the fact that Kuehne &
```

## Page 68

```
 1  Nagel was initially the supplier who was awarded
 2  what ended up being awarded to Damco in the end?
 3   A.   I recall seeing somewhere in the
 4  documentation I reviewed that, in fact, Kuehne &
 5  Nagel was the initial awardee.
 6   Q.   Okay.  So I believe that we have said
 7  that you had -- when you evaluated DynCorp's
 8  evaluation of proposals, you had not had the
 9  opportunity to review either of these documents that
10  indicate technical scoring for the bidders; correct?
11   A.   I don't recall if I reviewed these
12  specific documents.  I do recall that there was some
13  document I reviewed that had a discussion of
14  technical evaluations.  I just don't recall
15  specifically what that was.
16   Q.   Okay.  Can you point out for me on
17  Appendix A what document contained that technical
18  review information?
19   A.   I don't recall.
20   Q.   Are you positive that it's there?
21   A.   Well, when you say "positive it's
22  there," again, it could have been an attachment to
23  one of the documents listed or embedded therein in
24  terms of a discussion.  I -- so I can't, with any
25  degree of positivity, give you an answer on that.
```

## Page 69

```
 1   Q.   But then it would be contained within
 2  the Bates label range that's indicated on your
 3  Appendix A; right?
 4        MR. MEIER:  Objection.  Asked and
 5  answered.
 6   A.   Correct.
 7   Q.   I'm sorry.  Did you say "right"?  It was
 8  hard to hear.
 9   A.   I said "correct."
10   Q.   Okay.  So, in any case, I take it that
11  you can't provide an explanation today for why the
12  technical scores listed for Damco during this
13  process go from 72 to 82?
14        MR. MEIER:  Objection.  Form.
15   A.   I can't provide an explanation for it.
16  I know that changes in assessments are quite common
17  in terms of evaluations of contractors, and they're
18  also somewhat subjective on the part of individuals
19  doing them.
20   Q.   So at the time that you evaluated
21  DynCorp's proposal evaluation, you did so without
22  access to the technical scoring, and the apparent
23  change in technical scoring along the way; is that
24  right?
25        MR. MEIER:  Objection.  Form.
```

18 (Pages 66 - 69)

**Page 70**

1  A.  I don't recall having a knowledge or
2  understanding of a change in technical scoring.
3  Q.  Okay.  So the last part of your
4  statement of Opinion 1 says that you assessed and
5  found sufficient the cost/price analysis techniques
6  employed by DynCorp as part of the bidding process;
7  is that right?
8  A.  That's correct.  That's what the opinion
9  states.
10  Q.  What was your understanding of what
11  those cost/price analysis techniques were?
12  A.  Well, first and foremost, was the fact
13  that this was a competitively awarded subcontract.
14  Q.  Okay.  Other than being competitively
15  awarded, did you take into account any other aspect
16  of what you deemed a cost/price analysis technique?
17  A.  Well, in addition to competition, there
18  was certainly the kind of price analysis one would
19  expect in an acquisition -- or in a subcontracting
20  action like this, where comparisons are made between
21  the offered prices.
22  Q.  So that would be based on pricing
23  analysis information that you had found in an ACO
24  consent document?
25  A.  Again, I don't recall specifically where

**Page 71**

1  I saw that or where I found it.
2  Q.  Well, did you consider the November 2011
3  ACO consent document?
4  A.  Did I consider that document in arriving
5  at my Opinion Number 1?
6  Q.  Yes.
7  A.  Yes, that was part of the consideration.
8  Q.  I'm getting an exhibit.  Bear with me
9  for a moment.
10      Let's go back to Exhibit 123, the
11  JOA from July 2012.
12  A.  Okay.  I have that up.
13  Q.  Go to page 2 of 4, and it has the
14  heading "Price Analysis" at the top.
15  A.  Okay.
16  Q.  Does this appear to resemble the price
17  analysis that you found sufficient in rendering that
18  part of your Opinion 1?
19  A.  Yes.  This represents a reasonable
20  summary of it.
21  Q.  Okay.  In finding this pricing analysis
22  sufficient, did you look at any underlying
23  materials; any other pricing information, anything
24  else besides this chart information?
25  A.  I may have --

**Page 72**

1  (Clarification requested by the Court Reporter.)
2  Q.  This chart information.
3      That was my fault.  I turned away.
4  A.  I may have.  I don't recall specifically
5  what documents those would be, though.
6  Q.  Okay.  So does that mean that you're
7  unable to point me to where Exhibit A is to be
8  indicated?
9  A.  Yes.
10  Q.  All right.  In rendering Opinion 1, are
11  there any other materials that we haven't talked
12  about that you relied upon?
13  A.  I don't recall if there's any other
14  materials specifically.  Certainly, I relied upon my
15  experience and exposure to these kinds of issues
16  throughout my career.
17      MS. FRAZIER:  It might be a good
18  time for a five-minute break, if that's good for
19  you.
20      THE WITNESS:  Thank you.  That works
21  for me.
22      THE VIDEOGRAPHER:  Going off the
23  record.  Time is 10:13.
24  (RECESS, 10:13 a.m. - 10:24 a.m.)
25      THE VIDEOGRAPHER:  Back on the

**Page 73**

1  record.  This marks the beginning of media unit
2  number 2.  Time is 10:24.
3  BY MS. FRAZIER:
4  Q.  So as part of Opinion 1, Mr. Trautwein,
5  in item number 6 on page 3 of your expert report,
6  you make the assertion that in evaluating proposals,
7  DynCorp considered only the offerers' base rates and
8  did not try to make an apples-to-apples comparison
9  of accessorial charges; correct?
10  A.  That is correct.
11  Q.  What was the basis for that assertion?
12  A.  For my assertion?
13  Q.  Yes.
14  A.  That was the understanding that I got
15  from the documentation that I reviewed, which again
16  I can't point you to specifically where it is, but I
17  recall seeing the documentation that addressed what
18  rates -- what details to compare in terms of the
19  rates.
20  ==Q.  Okay.  You can probably guess my next==
21  ==question.==
22      ==If you look at Appendix A, can you==
23  ==pinpoint for me a document that supports that==
24  ==DynCorp considered only offerers' base rates and not==
25  ==accessorial charges?==

```
 1    A.   I can't recall specifically, no.
 2    Q.   So I'll show you an exhibit.  I believe
 3  it's in your marked exhibits.
 4  (Previously marked Exhibit 124, e-mail, 8.11.2011,
 5  DamcoRR_00222391, was presented.)
 6    Q.   Please look at Exhibit 124, previously
 7  marked.
 8    A.   I have that exhibit up.
 9    Q.   Okay.  So have you ever seen this
10  document before?
11    A.   I don't recall if I've seen this or not.
12    Q.   This is an August 11, 2011, e-mail from
13  Brian Andrusin of Damco to Brian Perrenot of
14  DynCorp, cc'ing another DynCorp representative; is
15  that correct?
16    A.   I don't know the gentlemen or the
17  references.  I presume that's correct.
18    Q.   Do you see that it notes, we have taken
19  the fuel and security out of the accessorial tab and
20  added into the base rate structure?
21    A.   Yes.
22    Q.   This was during the time frame of the
23  bidding process; correct?
24    A.   It appears so, yes.
25    Q.   Do you know whether -- I believe that
                                                Page 74
```

```
 1  your expert report points to discussions between
 2  DynCorp and the different bidders.
 3         Do you know whether DynCorp and
 4  different bidders discussed accessorials
 5  specifically?
 6    A.   I don't recall specifically the
 7  discussions that I saw documented in the documents I
 8  looked at.
 9    Q.   Did you attend Chelsea Cullum's
10  deposition?
11    A.   I did, yes.
12    Q.   Do you recall that I asked her about
13  discussions that occurred between DynCorp and Damco
14  during the bidding process?
15    A.   I don't recall the specific discussion,
16  but I'm sure that was touched on.
17  (Previously marked Exhibit 125, Rates inclusive,
18  DI-REDDELL 00707893-928, was presented.)
19    Q.   Please look at Exhibit 125 in your
20  marked exhibits folder.
21    A.   Okay.  I have it up.
22    Q.   Okay.  Have you ever seen this document
23  before?
24    A.   I don't know if I saw it during the
25  preparation of my expert opinion, but I do recall
                                                Page 75
```

```
 1  seeing it, I believe, during Ms. Cullum's
 2  deposition.
 3    Q.   It was indeed offered during
 4  Ms. Cullum's deposition, I'll represent to you.
 5         Do you see that this is entitled
 6  "Record of Negotiations" at the top?
 7    A.   Yes.
 8    Q.   And then there is a sort of chart that
 9  has a column entitled "Summary of Negotiation
10  Communications"?
11    A.   Yes.
12    Q.   And there are minutes that then ensue
13  between Damco and DynCorp with regard to Damco's
14  bid?
15    A.   Yes.  I see that they've got the minutes
16  or discussion of what occurred.
17    Q.   Let's go to -- let's see if I can get an
18  electronic page -- electronic page 5.
19    A.   Okay.  I'm at the top of page 5.
20    Q.   There's a reference to bid sheet 8 at
21  the top of page 5; do you see that?
22    A.   No.  We must be on a different page.
23  Mine says electronic page 5.
24         Okay.  Mine's -- okay.  Here.  I'm
25  at it now.  Sorry.
                                                Page 76
```

```
 1    Q.   Okay.
 2    A.   I do see that.
 3    Q.   Do you recall that bid sheet 8 in the
 4  request for proposals was the bid sheet for
 5  accessorial charges for OCONUS?
 6         MR. SHEPHARD:  Objection to form.
 7    A.   Also you were a little fuzzy.  If you
 8  could repeat the question.
 9    Q.   Do you recall that bid sheet 8, they
10  would have been looking at was for accessorial
11  charges, if any, on OCONUS?
12         MR. MEIER:  Objection to form.
13         MR. SHEPHARD:  Objection to form.
14    A.   I don't recall that bid sheet 8 was
15  specifically focused on accessorials.  Again, I just
16  don't recollect if that's true or not.
17    Q.   Okay.  Putting up an exhibit.  I
18  apologize for the slowness of this process, but
19  apparently we should look at the rate sheet.
20         While I'm doing that, do you -- if
21  you could look at Appendix A again.  Do you see that
22  there's a rate sheet listed on there?
23    A.   I see rate sheet 8 is listed on
24  Appendix A, yes.
25    Q.   Okay.  Do you remember what it is?
                                                Page 77
```

**Page 106**

1  say, "In its comparative assessment of offerors,
2  DynCorp considered only the offerers' base rates and
3  did not try to make an apples-to-apples comparison
4  of accessorial charges that might differ by
5  offerer," et cetera; correct?
6      A.   Which number are you -- which paragraph
7  are you reading from?
8      Q.   It's page 3 of your expert report at
9  Paragraph 6.
10     A.   Paragraph -- which one?
11     Q.   Paragraph 6.
12     A.   Oh, okay.
13          I don't see any reference in
14 Paragraph 7 to accessorials.
15     Q.   Paragraph 6.
16     A.   Oh.
17          Yeah, what I said there, "In its
18 comparative assessment of offerers, DI only
19 considered the offerers' base rates, and did not try
20 to make an apples-to-apples comparison of
21 accessorial charges..."
22          That was the end result that they
23 ended up with in terms of their approach because, as
24 I understand it, they could not provide that common
25 comparison of accessorials amongst the various

**Page 107**

1  bidders.
2      Q.   I cannot tell if you are modifying the
3  statement from your expert report or not.
4           Are you comfortable with the
5  statement from your expert report?
6      A.   I am, yes.
7      Q.   So it's your -- it's your assertion that
8  DynCorp considered only base rates in comparing
9  offerers; right?
10     A.   In making the award and determining best
11 value, yes, that was the end result.
12     Q.   So I have marked as a new exhibit what
13 is -- what's been designated, at least for now, as
14 Exhibit 0006.
15          Do you see that?
16     A.   May take me a bit to get there.  Let me
17 get out of full screen view here.
18 (Exhibit 0006, Advance Notification and ACO Request
19 Consent Form, BARR-18674-716, was marked for
20 identification.)
21     A.   I do see Exhibit 0006, yes.
22     Q.   Okay.  Is this a document you reviewed
23 in forming your opinions?
24     A.   Yes.  I have seen this document.
25     Q.   I'm going to look at another page, which

**Page 108**

1  I am -- page -- electronic 32 is Bates page 18706 in
2  Exhibit 0006.
3      A.   Is that attachment B, comparative
4  pricing?
5      Q.   It's the comparative pricing page with
6  the chart at the top.
7           Do you see that?
8      A.   I do see the chart, yes.
9      Q.   Now, this is an ACO consent from
10 November 2011.  Is that -- do you understand that?
11     A.   I haven't looked through the entire
12 document, but it's labeled "ACO Consent."  So I just
13 haven't had a chance to refresh my memory with
14 respect to the entire document.
15     Q.   Okay.  Do you see the date for the ACO
16 consent?
17     A.   Okay.  I now see -- I've scrolled down.
18 I see the CACO letter dated 26 October 2011.
19     Q.   All right.  So we'll call it fall of
20 2011.
21          So back to page electronic 32, Barr
22 018706, this is the comparative pricing that was
23 submitted to the government for purposes of the ACO
24 consent; correct?
25     A.   Could you repeat that?  You -- it was

**Page 109**

1  vague, what you say.  It was hard to hear.
2      Q.   This is the comparative pricing that was
3  submitted to the government for ACO consent;
4  correct?
5      A.   Yes.
6      Q.   Does this pricing -- you said that
7  DynCorp didn't look at the accessorials in awarding
8  the contract; correct?
9      A.   I believe I said that they only
10 considered the base rates as evidenced by some of
11 the documents you put up.  I believe there were
12 discussions on accessorials.
13     Q.   So this chart does not -- this chart
14 reflects base rates; right?
15     A.   I would -- I don't know that for a fact.
16     Q.   Okay.  Are you aware of any process that
17 DynCorp undertook to render accessorials that may
18 have been bid by different bidders into and
19 equivalent to add to the base rate so that this
20 chart could be made?
21     A.   No, I am not.
22     Q.   So can you think of any alternative to
23 this chart being based on base rates?
24          MR. SHEPHARD:  Objection to form.
25     A.   Again, I wasn't there at the creation of

```
 1   let's use a different example.  Let's say there are
 2   a number of oversize materials that are being flown
 3   by a carrier, and Damco gets -- hires this carrier
 4   to fly planes for it, but the carrier doesn't charge
 5   anything for oversize.  Would it be appropriate for
 6   Damco to add on oversize?"
 7           You know what.  I'm sorry.  Let's
 8   start this passage -- because it cuts off the
 9   answer.
10           Let me go back up.
11           So is it clear from this deposition
12   that Adam Nicholas believes, as he's testifying,
13   that in order to charge a hazmat charge under the
14   MSA between Damco and DynCorp, there has to be
15   actual hazardous material being shipped?
16      A.   That would seem to be a logical reading
17   of Mr. Nicholas's understanding as reflected in his
18   deposition, yes.
19      Q.   So before you said, you would want to
20   talk to DynCorp folks and understand if whether
21   there was maybe some agreement you were not aware of
22   under which they expected to be charged hazmat, even
23   where a hazardous material was not on board.
24           Do you remember that?
25      A.   I do remember --
                                                Page 146
```

```
 1           MR. MEIER:  Objection to form.
 2      A.   I do remember -- I do remember that,
 3   yes.  I think I said I would like to talk to someone
 4   from them, and if I didn't say it before, I would
 5   also like to review the -- in more detail, the
 6   subcontractual relationships -- the documents.
 7      Q.   So as far as Adam Nicholas's testimony,
 8   it doesn't support any notion that there was any
 9   agreement between DynCorp and Damco to charge hazmat
10   charges if hazardous materials were not on board a
11   shipment; is that fair?
12      A.   I believe that's an accurate reflection
13   of his testimony, yes.
14      Q.   And have you read any materials in this
15   case and listed them on Appendix A that actually
16   indicate any such agreement between Damco and
17   DynCorp?
18      A.   I haven't seen any material that
19   specifically references hazmat and charges incurred,
20   et cetera.
21      Q.   Nowhere in the MSA does it actually
22   state that it's okay to charge all of the listed
23   accessorials on all shipments; correct?
24      A.   To my recollection, it -- the MSA does
25   not specifically address that issue, but it does
                                                Page 147
```

```
 1   have language about other pricing, et cetera, which
 2   provides fairly significant latitude in my opinion.
 3      Q.   You mean the language about
 4   modifications that can be made to the MSA?
 5      A.   I think that's part of it, yes.
 6      Q.   I would like to address Opinion 7 in
 7   your report which states, "DynCorp's invoice review
 8   practices and the type of supporting data DynCorp
 9   obtained from Damco to support payment of its
10   invoices were adequate given the fixed price
11   commercial services nature of the MSA."
12           Do you see that?
13      A.   I do see that, yes.
14      Q.   So earlier you stated that the only
15   deposition that you read in this case prior to
16   submitting your expert report was Jetta Aiello's
17   deposition; do you recall that?
18      A.   Yes.  I think I may have also said I
19   read some of the -- I think I had presumed some of
20   the expert opinions were depositions, and that may
21   not be an accurate presentation, but Aiello's is the
22   only deposition of a non-expert that I recall
23   looking at, yes.
24      Q.   Well, sir, more to the point, all of the
25   initial expert reports were due on the same day,
                                                Page 148
```

```
 1   were they not.
 2           MR. SHEPHARD:  Objection to form.
 3      Q.   I mean, let's just -- let's just put
 4   this to bed as a housekeeping matter.  I'm not
 5   asking you about expert reports because you weren't
 6   reading other defense expert reports as you were
 7   giving your own expert report.  They were all due at
 8   the same time.
 9           Do you remember that?
10      A.   Again, as far as depositions, I believe
11   Aiello's is the only one I did look at.
12      Q.   So you did not read Krista Robinson's
13   deposition, then?
14      A.   I don't recall reading that, no.
15      Q.   So I take it you were unaware of her own
16   conclusions with regard to the adequacy of DynCorp's
17   invoice review practices?
18      A.   That's correct.
19      Q.   Give me a moment for some exhibit work
20   here.
21           All right.  I have now introduced
22   and waiting for it to come up, Exhibit 0010.
23           (Exhibit 0010, Robinson 7.23.2019 deposition
24   excerpts, was marked for identification.)
25      Q.   Excerpts of Krista Robinson's
                                                Page 149
```

```
 1  deposition.
 2    A.  I have it in my window.
 3    Q.  So you are familiar with the fact that
 4  Jetta Aiello was describing her invoice oversight
 5  work as employing a three-way match method; correct?
 6    A.  I don't recall the specific terminology,
 7  but I do remember that -- that term mentioned, and
 8  that she had developed her own process for reviewing
 9  the invoices.
10    Q.  Okay.  Do you know whether DynCorp
11  changed its invoice oversight practices over the
12  course of the performance of the MSA?
13    A.  I don't know for certain, but it seems
14  like in all of the documentation that I read that
15  there were some adjustments to their invoice review
16  process based on their initial experience.
17    Q.  So I'm going to ask you to look at
18  page 120 -- depo excerpt page 120.
19    A.  Okay.
20    Q.  So in discussion about -- let me back up
21  and ask you, are you aware of the fact that in
22  December 2012 DynCorp submitted a justification of
23  award to attempt to retroactively get approval for
24  prices under the MSA?
25    A.  I do recall that.  I don't recall all of
```
Page 150

```
 1  the details of it.
 2    Q.  Are you aware that months before that,
 3  some at DynCorp were surprised to learn what rates
 4  were being charged by Damco?
 5    A.  I remember reading some e-mail traffic
 6  in the documents that I reviewed that indicated some
 7  level of surprise on DynCorp's part.
 8    Q.  Okay.  Well, I will represent to you
 9  that that is a subject of general discussion as this
10  passage begins.
11    A.  You cut out there.  You cut out there.
12  I'm sorry.  I don't -- if you can repeat your
13  representation.
14    Q.  Yep.
15        I will represent to you that that
16  was the general subject of discussion at the time
17  that this passage that we'll look at occurs.
18    A.  Okay.  Thank you.
19    Q.  On page 120, line 9, I was the
20  questioner, I asked, "What was the problem here as
21  you understood it at the time?  What was the problem
22  here that this was able to happen?"
23        Do you see that?
24    A.  I do see that.
25    Q.  And Krista Robinson answered that, "The
```
Page 151

```
 1  invoices came across, and that Jetta was able to
 2  approve them prior.  That's what I was going to say.
 3  This is what, I think, one of the problems that we
 4  had with this is that then it went back over to the
 5  program office for the program to review the
 6  invoices prior to payment."
 7        And I asked, "And was that a
 8  reaction to realizing the system had failed?"
 9        And the answer was given, "Do you
10  mean that the system being the CPSR or the process
11  in general?"
12        And I said, "The invoice approval
13  process."
14        Krista Robinson answers at the
15  bottom of page 120, "Yes, yes, yes.  It was -- it
16  was -- it was unreasonable to expect that a
17  logistics clerk like Jetta could be knowledgeable
18  enough about these dynamics to be able to -- that
19  was unrealistic."
20        And I asked, "To be able to what?"
21        She answers, "To approve the
22  invoices against a document, and if there is a
23  question on how to read it or question it or
24  highlight it."
25        Then I asked, "Okay.  And why was it
```
Page 152

```
 1  unreasonable to ask Ms. Aiello to have those
 2  particular duties on her own?"
 3        Ms. Robinson answered, "Just a
 4  mammoth -- the massive amount of freight that was
 5  moving at the time.  She wasn't just doing it only
 6  on behalf of LOGCAP.  She was doing it on behalf of
 7  multiple programs.  So I think that back-end part of
 8  the process broke down when -- when it moved over to
 9  the COE."
10        I'll represent to you that that is
11  likely a reference to the Centers of Excellence.
12        Did I read that correctly?
13    A.  Yes, you did.
14    Q.  Then down at the bottom of page 121,
15  Krista Robinson says, "I felt better once I moved
16  over to the program office if the program themselves
17  did it.  That was one of the great learnings I had
18  from moving from the COE over to the program office
19  itself."
20        Did I read that correctly?
21    A.  Yes, you did.
22    Q.  You understand that Krista Robinson
23  moved the invoice oversight process that she's
24  talking about here to the LOGCAP folks at some point
25  before she was deposed about this?
```
Page 153

```
 1         CERTIFICATE OF COURT REPORTER
 2
 3      I, Marjorie Peters, Fellow of the Academy of
 4   Reporting, Registered Merit Reporter, Certified
 5   Realtime Reporter, Notary Public the Commonwealth of
 6   Virginia, before whom the foregoing deposition was
 7   taken, do hereby certify that the foregoing
 8   transcript is a true and correct record of the
 9   testimony given; that said testimony was taken by me
10   stenographically and thereafter reduced to
11   typewriting under my direction and that I am neither
12   counsel for, related to, nor employed by any of the
13   parties to this case and have no interest, financial
14   or otherwise, in its outcome.
15      I further certify that signature was not
16   waived by the witness.
17
18      IN WITNESS WHEREOF, I have hereunto set my
19   hand this 6th day of April, 2021.
20
21
22
23   [signature: Marjorie Peters]
24
     Marjorie Peters, FAPR, RMR, CRR
25   My Commission expires on August 31, 2024.
                                                 Page 158
```

```
 1   Mr. Luke Meier, Esq.
 2   lmeier@blankrome.com
 3           April 6, 2021
 4   RE:  United States Of America Ex Rel. v. Dyncorp International
 5       3/11/2021, Steve Trautwein (#4466632)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   errata-tx@veritext.com.
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19   If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25
                                                 Page 159
```

```
 1   United States Of America Ex Rel. v. Dyncorp International
 2   Steve Trautwein (#4466632)
 3          E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____   _____
24   Steve Trautwein             Date
25
                                                 Page 160
```

```
 1   United States Of America Ex Rel. v. Dyncorp International
 2   Steve Trautwein (#4466632)
 3          ACKNOWLEDGEMENT OF DEPONENT
 4      I, Steve Trautwein, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____   _____
12   Steve Trautwein             Date
13   *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15      _____ DAY OF _____, 20___.
16
17
18      _____
19      NOTARY PUBLIC
20
21
22
23
24
25
                                                 Page 161
```